Robert L. Brace, State Bar No. 122240
rlbrace@rusty.lawyer
115 E. Islay Street
Santa Barbara, CA 93101
Telephone:  (805) 845-8211

Michael P. Denver, State Bar No. 199279
mpdenver@hbsb.com
HOLLISTER & BRACE,
a Professional Corporation
1126 Santa Barbara Street
Santa Barbara, CA  93101
Telephone: (805) 963-6711
Facsimile:  (805) 965-0329

Attorneys for Plaintiffs
and all others similarly situated

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN WALTER MADISON, an individual; MICHAEL BERESFORD, an individual; HENRIETTE BERESFORD, an individual; WILLARD GARDNER BRONSON, AS TRUSTEE OF THE WILLARD BRONSON REVOCABLE TRUST; BROYCO PROPERTIES, LLC; an Arizona limited liability company; JO ANN ARLENE CASSO, an individual; PAMELA JEAN CASWELL, an individual; PAMELA J. GEREMIA, an individual; SYLVIA HAHN, an individual; SANDRA KAY KRONEMEYER AND ALAN ROY PARNESS, AS TRUSTEES OF THE PARNESS KRONEMEYER REVOCABLE TRUST; WILMA K. KRONEMEYER, AS TRUSTEE OF THE KRONEMEYER FAMILY REVOCABLE TRUST; THOMAS P. MADISON, an individual; RANDALL L. SHAW, an individual; SHARYN SIMMONS, | **CASE NO.: 5:16-cv-00502-SJO (FFMx)_** <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> 1. **RICO LIABILITY;** <br><br> 2. **FRAUD;** <br><br> 3. **AIDING AND ABETTING FRAUD;** <br><br> 4. **CONSPIRACY TO COMMIT FRAUD;** <br><br> 5. **AIDING AND ABETTING CONVERSION;** <br><br> 6. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;** <br><br> 7. **INTENTIONAL INTERFERENCE WITH CONTRACT;** <br><br> 8. **NEGLIGENCE; AND** <br><br> 9. **NEGLIGENT SUPERVISION** |

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

| | |
|---|---|
| 1 | AS TRUSTEE OF THE SHARYN LYNN SIMMONS LIVING TRUST; KASIA STEFANEK, AS TRUSTEE OF THE KASIA STEFANEK REVOCABLE TRUST; and all others similarly situated, |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 |                 Plaintiffs, <br> vs. |
| 7 | JOEL BARRY GILLIS, an individual; EDWARD WISHNER, an individual; CITY NATIONAL BANK, N.A., a national banking association; PATRICK BRIAN FITZWILLIAM, an individual; BETTY SALEH FITZWILLIAM, an individual; DOES 1 through 10, inclusive, |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 |                 Defendants. |

10.   **FINANCIAL ELDER ABUSE**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ................................................................. 1

II. JURISDICTION AND VENUE ............................................................ 5

III. PARTIES ........................................................................................... 6

    A. Plaintiffs ..................................................................................... 6

    B. Defendants ................................................................................. 14

    C. Non-Defendant RICO Enterprise Members ................................. 15

IV. DOE ALLEGATIONS ...................................................................... 17

V. AGENCY ALLEGATIONS ................................................................ 18

VI. INFORMATION ALLEGATIONS .................................................... 18

VII. SUMMARY OF THE PONZI SCHEME .......................................... 18

VIII. SUMMARY OF CNB'S INVOLVEMENT IN THE PONZI SCHEME ... 19

    A. Real Rent Versus Phantom Rent at NASI ..................................... 20

    B. Fitzwilliam Was Never an Innocent Investor in NASI ................. 23

    C. Fitzwilliam and Betty Saleh Buy 30 ATM Machines and Are Not Net Winners ................................................................................. 26

    D. No Later Than June of 2009 Fitzwilliam Discovers the Ponzi and Enters Into a Conspiracy to Assist the Ponzi ................................. 27

    E. Fitzwilliam and CNB, Through Fitzwilliam, Assist the Ponzi Scheme ...................................................................................... 30

    F. Fitzwilliam's Assistance in NASI's Ponzi Was, In Part, for the Benefit of CNB ........................................................................... 37

IX. PREDICATE ACTS OF WIRE FRAUD AND MAIL FRAUD ............... 38

X. CLASS ACTION ALLEGATIONS ..................................................... 40

XI. CAUSES OF ACTION ...................................................................... 43

XII. PRAYER FOR RELIEF .................................................................... 51

XIII. JURY DEMAND ............................................................................ 51

LIST OF EXHIBITS ............................................................................... 52

**EXHIBIT A**

Plaintiffs John Walter Madison; Michael Beresford; Henriette Beresford; Willard Gardner Bronson, as Trustee of The Willard Bronson Revocable Trust; Broyco Properties, LLC; Jo Ann Arlene Casso; Pamela Jean Caswell; Pamela J. Geremia; Sylvia Hahn; Sandra Kay Kronemeyer and Alan Roy Parness, as Trustees of the Parness Kronemeyer Revocable Trust; Wilma K. Kronemeyer, as Trustee of the Kronemeyer Family Revocable Trust; Thomas P. Madison; Randall L. Shaw; Sharyn Simmons, as Trustee of the Sharyn Lynn Simmons Living Trust; and Kasia Stefanek, as Trustee of the Kasia Stefanek Revocable Trust, as putative representatives of the class members as defined herein, allege with particularity pursuant to Fed. R. Civ. P. 9(b) as follows:

## I.

## SUMMARY OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of approximately 1,300 people located throughout the United States (more than 1/3 in states other than California) who lost money (approximately $125 million in total) as the result of a long-term (15-year) Ponzi scheme operated out of Woodland Hills, Canoga Park and Calabasas, California by Joel Barry Gillis ("Gillis") and Edward W. Wishner ("Wishner"). Gillis and Wishner will be collectively referred to as the "RICO Defendants."

2.     The RICO Defendants owned and operated Nationwide Automated Systems, Inc. ("NASI"), an entity that was seized by the SEC for the sale of unregistered securities, and which is now in receivership before this court. See *SEC v. Nationwide Automated Systems, Inc.*, Case No. cv-14-07249-SJO. The RICO Defendants, by means of the predicate acts of wire fraud and mail fraud, convinced the plaintiffs and the class members (hereinafter collectively referred to as the "Plaintiffs") to enter into purported "sale and leaseback" agreements involving Automated Teller Machines ("ATMs"). Samples of the form agreements used by NASI which were signed by each Plaintiff and each class

1

**EXHIBIT A**

member are attached as **Exhibit 1**. Under the agreements Plaintiffs purchased one or more ATMs from NASI at a price of either $12,000 or $19,800 per machine, and then leased the ATMs back to NASI in exchange for "rent" payments of fifty cents out of each transaction fee (generally $2.50 to $3.00) earned by each machine on each cash transaction.

3.     For each ATM, NASI agreed to collect the rent due and hold it for the benefit of each plaintiff. NASI was to account for the rent collected and then remit a monthly rent statement and rent payment to each plaintiff owner. NASI guaranteed that the fifty cent share of each transaction fee would generate, at a minimum, a 20% annualized return on the amount invested by each plaintiff, and if it did not, NASI would make up the difference.  Examples of fabricated rental income statements are attached as **Exhibit 2**.  Each plaintiff received a version of Exhibit 2 each month along with their "rent" check.

4.     However, the ATMs the RICO Defendants represented as being sold to Plaintiffs and leased back by NASI did not exist. NASI only owned and operated approximately 240 ATMs, not 31,417 ATMs that were the subject of the NASI buy-and-leaseback agreements as of June 2014. The RICO Defendants were engaged in inter-state wire and mail fraud, stealing over $125 million dollars from unsuspecting victims, the exact amount to be determined at trial.

5.     NASI was a long-term and financially significant customer of Defendant City National Bank ("CNB") at its branch in Woodland Hills, California. The relationship between NASI and CNB started in 1996 and was not a typical banking relationship. From 2007 through 2014, over $350 million of investors' money flowed into and out of NASI's accounts at CNB, generating substantial service fees, profits for the branch and compensation for its branch manager. CNB was the bank the RICO Defendants used to deposit Plaintiffs' money derived from their purported purchase of ATMs from NASI.  CNB was the bank the RICO Defendants used to make lulling payments back to Plaintiffs

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1    as purported rental income from the phantom transaction fees earned by their
2    non-existent ATMs. CNB was also the bank the RICO Defendants used to
3    launder the money stolen from the Plaintiffs to fund their lavish lifestyles and the
4    other businesses of the ongoing criminal enterprise.

5        6.     At some point in time, but no later than June 30, 2009, CNB
6    obtained knowledge through Defendant Patrick Brian Fitzwilliam, its Senior
7    Vice President and branch manager (hereinafter "Fitzwilliam" or "Branch
8    Manager"), that NASI was being operated as a Ponzi scheme and using the bank
9    to collect and disburse stolen funds. After the exact date of discovery, which is to
10   be determined, CNB, through its Senior Vice President and Branch Manager,
11   participated in the scheme, providing substantial assistance with actual
12   knowledge of all facts related to it.

13       7.     CNB's knowledge of the scheme perpetrated by the RICO
14   Defendants was derived primarily from its Branch Manager, but was also known
15   by other employees at the bank. As detailed below in the facts alleged,
16   Fitzwilliam, while in charge of the NASI accounts, was also a significant
17   investor in the NASI scheme. Fitzwilliam, with his wife and business partner,
18   made substantial income from the RICO enterprise after obtaining the requisite
19   knowledge that it was a fraud which required avoidance instead of assistance. A
20   summary of the payments from Fitzwilliam to NASI and from NASI to
21   Fitzwilliam is attached as **Exhibit 3**.   Fitzwilliam was a net winner. The
22   Plaintiffs are all net losers.

23       8.     Fitzwilliam's wife, Defendant Betty Saleh Fitzwilliam (hereinafter
24   "Betty Saleh"), was, at times material to this case, perpetrating her own
25   independent financial crimes against innocent members of the public through her
26   employment as a licensed financial advisor. Crimes which included the same
27   methods, artifices and devices employed by our named RICO Defendants. Until
28   she was fired on June 25, 2009, when she was fired from Wedbush, Defendant

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1    Betty Saleh defrauded her elderly investment clients by employing forgery, lies,
2    and fabricated client account statements.  Betty Saleh would never unknowingly
3    invest in a Ponzi scheme. Betty Saleh would knowingly invest in a Ponzi
4    scheme. Fitzwilliam and Betty Saleh knowingly invested in the NASI Ponzi
5    scheme and made a handsome profit.

6        9.     Attached as **Exhibit 4** is a copy of the December 15, 2010 FINRA
7    Order Accepting Offer of Settlement which permanently barred Betty from
8    association with any FINRA member in any capacity. Attached as **Exhibit 5** is a
9    copy of the May 10, 2011 California Insurance Commissioner's Order of
10   Summary Revocation of Betty Saleh's license to sell insurance issued, in part,
11   because she lied to the California Department of Insurance about Exhibit 4.

12       10.    On or about June 25, 2009, Betty Saleh was fired from her
13   investment firm ("Wedbush") for committing securities fraud. In retaliation,
14   Wedbush also froze her investment account at work which contained money
15   deposited in her name and the name of her husband, Patrick Brian Fitzwilliam.
16   See **Exhibit 6**.

17       11.    Needing income, while at the same time wanting to conceal the
18   location of assets from Betty Saleh's creditors, Fitzwilliam and Betty Saleh
19   conspired with the RICO Defendants by entering into an agreement to assist
20   them in the perpetuation of the scheme, in exchange for a guaranteed return of
21   their money, plus profits, and help in hiding the family's assets.

22       12.    Pursuant to the agreement, Fitzwilliam promised to do what was
23   needed to allow the RICO Defendants to continue to use his employer's bank as
24   the vehicle to collect and disburse stolen funds. Pursuant to the conspiracy,
25   Fitzwilliam, as Branch Manager, agreed to and did: (i) deflect and delay
26   investigations by CNB compliance personnel into the business affairs of NASI;
27   (ii) assist NASI by making false factual recommendations to new and old
28   investors; (iii) approve and accept the monthly deposits by purchasers buying

4

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

phantom ATM machines; (iv) transfer funds from the General Account to the Investors' Account; and (v) process payments of phantom rent to the investors. And, pursuant to the conspiracy, Fitzwilliam made a substantial profit on his investment in the Ponzi scheme, and received a final preferential $60,000 return of principal days before NASI collapsed.

13. Based on the above facts and those detailed below, the Plaintiffs file this action against the RICO Defendants for operating a RICO enterprise, and against Betty Saleh and CNB, through Fitzwilliam, for conspiring with the RICO Defendants and for providing substantial assistance to the scheme with actual knowledge of the wrongs being perpetrated against Plaintiffs and the other innocent NASI investors.

## II.

## JURISDICTION AND VENUE

14. This federal district court may exercise federal question jurisdiction over this class action pursuant to 28 U.S.C. §1331, as well as supplemental jurisdiction pursuant to 28 U.S.C §1367. Additionally, or alternatively, based upon information provided by the Receiver to class counsel, which information was compiled by the Federal Bureau of Investigation, this federal district court may exercise jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, codified in part at 28 U.S.C. §1332(d) and §1453. Based upon the FBI information, the putative class is presently believed to consist of 1,251 members. The FBI report indicates that, out of the 1,251 figure, 713 are believed to be California residents, 418 are believed to reside outside of California, and 120 reside in unknown states or places. The claims of losses by the class members exceed the sum or value of $5 million in the aggregate, exclusive of costs and interest. The matter is a complex class action.

15. This Court has personal jurisdiction over all of the Defendants named in this Complaint because they conducted business in California,

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1  participated in a criminal enterprise which injured Californians, or they are
2  citizens of this state.  Venue is proper in this Court because the conduct at issue
3  took place and had an effect in Los Angeles County, California, and the
4  defendants reside or have their principal place of business in Los Angeles
5  County, California.

**III.**

**PARTIES**

**A.   Plaintiffs**

16.     Plaintiff **John Walter Madison ("Madison")** is a natural person
residing and doing business in Los Angeles County, California.  Madison is
presently 73 years old.  Madison invested $108,000 in NASI in 2013 and 2014.
Madison executed NASI ATM purchase and lease contracts on March 6, 2013
and May 30, 2014.   Madison received the fraudulent NASI ATM purchase
contracts, the ATM lease agreements and additional materials related to those
contracts in the U.S. Mail on or about the date the documents were signed. After
the documents were signed, and up until the collapse of the Ponzi scheme in
August 2014 Madison received in the U.S. Mail fraudulent account statements
detailing the traffic at Madison's ATMs on a monthly basis. Additionally, after
the documents were signed, and up until the collapse of the Ponzi scheme in
August 2014 Madison received in the U.S. Mail "rent" payments from the
fictitious traffic at Madison's ATMs on a monthly basis. Madison received
$27,000 as phantom ATM "rent" on his NASI investments.  Accounting for the
phantom ATM "rent," Madison lost $81,000 in the NASI Ponzi scheme.

17.     Plaintiffs **Michael Beresford and Henriette Beresford ("the
Beresfords")** are natural persons residing and doing business in Santa Barbara
County, California.  Michael is presently 74 years old.  Henriette is presently 66
years old. The Beresfords invested $288,000 in NASI in 2010-2014. The
Beresfords executed NASI ATM purchase and lease contracts on January 1,

6

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1   2010; April 5, 2010; August 2, 2010; January 4, 2011; and on or about September

2   13, 2013; February 23, 2013 and February 25, 2014.  The Beresfords received the

3   fraudulent NASI ATM purchase contracts, the ATM lease agreements and

4   additional materials related to those contracts in the U.S. Mail on or about the

5   date the documents were signed.  After the documents were signed, and up until

6   the collapse of the Ponzi scheme in August 2014, the Beresfords received in the

7   U.S. Mail fraudulent account statements detailing the traffic at the Beresfords'

8   ATMs on a monthly basis. Additionally, after the documents were signed, and up

9   until the collapse of the Ponzi scheme in August 2014, the Beresfords received in

10   the U.S. Mail "rent" payments from the fictitious traffic at the Beresfords' ATMs

11   on a monthly basis. The Beresfords received $196,707 as phantom ATM "rent"

12   on their NASI investments.  Accounting for the phantom ATM "rent," the

13   Beresfords lost $91,293 in the NASI Ponzi scheme.

14          18.     Plaintiff **Willard Gardner Bronson, as Trustee of the Willard**

15   **Bronson  Revocable Trust ("Bronson")** is a natural person residing and doing

16   business in Riverside County, California.  Bronson is presently 72 years old.

17   Bronson invested $48,000 in NASI in 2011 and 2013. Bronson executed NASI

18   ATM purchase and lease contracts on May 23, 2011 and October 25, 2013.

19   Bronson received the fraudulent NASI ATM purchase contracts, the ATM lease

20   agreements and additional materials related to those contracts in the U.S. Mail on

21   or about the date the documents were signed.  After the documents were signed,

22   and up until the collapse of the Ponzi scheme in August 2014, Bronson received

23   in the U.S. Mail fraudulent account statements detailing the traffic at Bronson's

24   ATMs on a monthly basis. Additionally, after the documents were signed, and up

25   until the collapse of the Ponzi scheme in August 2014, Bronson received in the

26   U.S. Mail "rent" payments from the fictitious traffic at Bronson's ATMs on a

27   monthly basis. Bronson received $30,879.50 as phantom ATM "rent" on his

28   NASI  investments.  Accounting  for  the  phantom  ATM  "rent,"  Bronson  lost

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

$17,120.50 in the NASI Ponzi scheme.

**Plaintiff Broyco Properties, LLC**

19.     Robert Broyles is a natural person residing and doing business in Phoenix, Arizona.  Mr. Broyles is presently 58 years old.  Mr. Broyles owns or controls **Broyco Properties, LLC ("Broyco Properties")**.  Broyco Properties invested $24,000 in NASI in 2013. Broyco Properties executed NASI ATM purchase and lease contracts on January 28, 2013. Broyco Properties received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed.  After the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Broyco Properties received in the U.S. Mail fraudulent account statements detailing the traffic at Broyco Properties' ATMs on a monthly basis. Additionally, after the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Broyco Properties received in the U.S. Mail "rent" payments from the fictitious traffic at Broyco Properties' ATMs on a monthly basis.   Broyco Properties received $9,979.50 as phantom ATM "rent" on his NASI investments.  Accounting for the phantom ATM "rent," Broyco Properties lost $14,020.50 in the NASI Ponzi scheme.

20.     Plaintiff **Jo Ann Arlene Casso ("Casso")** is a natural person residing and doing business in Contra Costa County, California.  Casso is presently 73 years old. Casso invested $24,000 in NASI in 2013. Casso executed NASI ATM purchase and lease contracts on October 1, 2013.  Casso received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed.  After the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Casso received in the U.S. Mail fraudulent account statements detailing the traffic at Casso's ATMs on a monthly

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

basis. Additionally, after the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Casso received in the U.S. Mail "rent" payments from the fictitious traffic at Casso's ATMs on a monthly basis. Casso received $5,400 as phantom ATM "rent" on her NASI investments.  Accounting for the phantom ATM "rent," Casso lost approximately $18,600 in the NASI Ponzi scheme.

21.    Plaintiff **Pamela Jean Caswell ("Caswell")** is a natural person residing and doing business in Santa Barbara County, California.  Caswell is presently 69 years old. Caswell invested $60,000 in NASI in 2013.  Caswell executed NASI ATM purchase and lease contracts on February 19, 2013. Caswell received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed.  After the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Caswell received in the U.S. Mail fraudulent account statements detailing the traffic at Caswell's ATMs on a monthly basis. Additionally, after the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Caswell received in the U.S. Mail "rent" payments from the fictitious traffic at Caswell's ATMs on a monthly basis. Caswell received $25,130.50 as phantom ATM "rent" on her NASI investments. Accounting for the phantom ATM "rent," Caswell lost $34,869.50 in the NASI Ponzi scheme.

22.    Plaintiff **Pamela J. Geremia ("Geremia")** is a natural person residing and doing business in Santa Barbara County, California.  Geremia is presently 72 years old. Geremia invested $72,000 in NASI in 2013.  Geremia executed NASI ATM purchase and lease contracts on August 1, 2014 and November 1, 2013. Geremia received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed.  After

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Geremia received in the U.S. Mail fraudulent account statements detailing the traffic at Geremia's ATMs on a monthly basis. Additionally, after the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Geremia received in the U.S. Mail "rent" payments from the fictitious traffic at Geremia's ATMs on a monthly basis. Geremia received $15,584.50 as phantom ATM "rent" on her NASI investments. Accounting for the phantom ATM "rent," Geremia lost $56,415.85 in the NASI Ponzi scheme.

23.    Plaintiff **Sylvia Hahn ("Hahn")** is a natural person residing and doing business in Los Angeles County, California. Hahn is presently 53 years old. Hahn invested $36,000 in NASI in 2013. Hahn executed NASI ATM purchase and lease contracts on September 24, 2013. Hahn received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed. After the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Hahn received in the U.S. Mail fraudulent account statements detailing the traffic at Hahn's ATMs on a monthly basis. Additionally, after the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Hahn received in the U.S. Mail "rent" payments from the fictitious traffic at Hahn's ATMs on a monthly basis. Hahn received $7,695 as phantom ATM "rent" on her NASI investments. Accounting for the phantom ATM "rent," Hahn lost $28,305 in the NASI Ponzi scheme.

24.    Plaintiffs **Sandra Kay Kronemeyer and Alan Roy Parness, as Trustees of the Parness Kronemyer Revocable Trust (the "PK Trust")** are natural persons residing and doing business in Los Angeles County, California. Sandra is presently 65 years old. Alan is presently 62 years old. The PK Trust invested $120,000 in NASI in 2013 and 2014. The PK Trust executed NASI ATM purchase and lease contracts on September 24, 2013, November 24, 2013

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1   and April 24, 2014.  The PK Trust received the fraudulent NASI ATM purchase
2   contracts, the ATM lease agreements and additional materials related to those
3   contracts in the U.S. Mail on or about the date the documents were signed.  After
4   the documents were signed, and up until the collapse of the Ponzi scheme in
5   August 2014, the PK Trust received in the U.S. Mail fraudulent account
6   statements detailing the traffic at the PK Trust's ATMs on a monthly basis.
7   Additionally, after the documents were signed, and up until the collapse of the
8   Ponzi scheme in August 2014, the PK Trust received in the U.S. Mail "rent"
9   payments from the fictitious traffic at the PK Trust's ATMs on a monthly basis.
10  The PK Trust received $22,791.50 as phantom ATM "rent" on its NASI
11  investments.  Accounting for the phantom ATM "rent," the PK Trust lost
12  $97,208.50 in the NASI Ponzi scheme.

13       25.    Plaintiff **Wilma K. Kronemeyer, as Trustee of the Kronemeyer**
14  **Family Revocable Trust ("Kronemeyer Family Trust")** is a natural person
15  residing and doing business in Los Angeles County, California.  Wilma is
16  presently 92 years old.  The Kronemeyer Family Trust invested $95,400 in NASI
17  in 2013 and 2014. The Kronemeyer Family Trust executed NASI ATM purchase
18  and lease contracts on July 31, 2013 and January 8, 2014. The Kronemeyer Fam.
19  Trust received the fraudulent NASI ATM purchase contracts, the ATM lease
20  agreements and additional materials related to those contracts in the U.S. Mail on
21  or about the date the documents were signed.  After the documents were signed,
22  and up until the collapse of the Ponzi scheme in August 2014, the Kronemeyer
23  Family Trust received in the U.S. Mail fraudulent account statements detailing
24  the traffic at the Kronemeyer Family Trust's ATMs on a monthly basis.
25  Additionally, after the documents were signed, and up until the collapse of the
26  Ponzi scheme in August 2014, the Kronemeyer Family Trust received in the U.S.
27  Mail "rent" payments from the fictitious traffic at the Kronemeyer Family Trust's
28  ATMs on a monthly basis. The Kronemeyer Family Trust received $20,568 as

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

phantom ATM "rent" on its NASI investments.  Accounting for the phantom ATM "rent," the Kronemeyer Family Trust lost $74,832 in the NASI Ponzi scheme.

26.     Plaintiff **Thomas Madison ("Thomas Madison")** is a natural person residing and doing business in Honolulu County, Hawaii.  Thomas Madison is presently 69 years old. Thomas Madison invested $360,000 in NASI in 2012 and 2013. Thomas Madison executed NASI ATM purchase and lease contracts on December 18, 2013 and May 25, 2013.  Thomas Madison received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed.  After the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Thomas Madison received in the U.S. Mail fraudulent account statements detailing the traffic at Thomas Madison ATMs on a monthly basis. Additionally, after the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Thomas Madison received in the U.S. Mail "rent" payments from the fictitious traffic at Thomas Madison's ATMs on a monthly basis. Thomas Madison received $167,677.50 as phantom ATM "rent" on his NASI investments. Accounting for the phantom ATM "rent," Thomas Madison lost $192,322.50 in the NASI Ponzi scheme.

27.     Plaintiff **Randall L. Shaw ("Shaw")** is a natural person residing and doing business in Honolulu County, Hawaii.  Shaw is presently 67 years old. Shaw invested $492,000 in NASI in 2014. Shaw executed NASI ATM purchase and lease contracts on April 1, 2014, April 22, 2014, June 20, 2014 and June 30, 2014. Shaw received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed.  After the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Shaw received in the U.S. Mail fraudulent account statements detailing the traffic at

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1   Shaw's ATMs on a monthly basis. Additionally, after the documents were

2   signed, and up until the collapse of the Ponzi scheme in August 2014, Shaw

3   received in the U.S. Mail "rent" payments from the fictitious traffic at Shaw's

4   ATMs on a monthly basis. Shaw received $15,856 as phantom ATM "rent" on

5   his NASI investments. Accounting for the phantom ATM "rent," Shaw lost

6   $476,144 in the NASI Ponzi scheme.

7        28.   Plaintiff **Sharyn Simmons, as Trustee of the Sharyn Lynn**

8   **Simmons Living Trust ("Simmons Liv. Trust")** is a natural person residing and

9   doing business in Los Angeles County, California.  Sharyn Simmons is presently

10   68 years old. The Simmons Liv. Trust invested $1,873,000 in NASI between

11   2001 and 2014.   The Simmons Liv. Trust executed NASI ATM purchase and

12   lease contracts on the following dates: September 8, 2001; September 15, 2003;

13   October 14, 2005; April 15, 2006; November 1, 2006; June 1, 2007; December 1,

14   2007; July 1, 2008; May 11, 2009; January 28, 2010; January 30, 2010; May 3,

15   2010; October 16, 2010; June 15, 2011; November 7, 2011; May 9, 2012;

16   October 11, 2012; February 6, 2013; June 10, 2013; October 7, 2013; December

17   17, 2013; February 11, 2014; March 25, 2014; May 14, 2014; and May 29, 2014.

18   The Simmons Liv. Trust received the fraudulent NASI ATM purchase contracts,

19   the ATM lease agreements and additional materials related to those contracts in

20   the U.S. Mail on or about the date the documents were signed.   After the

21   documents were signed, and up until the collapse of the Ponzi scheme in August

22   2014, the Simmons Liv. Trust received in the U.S. Mail fraudulent account

23   statements detailing the traffic at the Simmons Liv. Trust's ATMs on a monthly

24   basis. Additionally, after the documents were signed, and up until the collapse of

25   the Ponzi scheme in August 2014, the Simmons Liv. Trust received in the U.S.

26   Mail "rent" payments from the fictitious traffic at the Simmons Liv. Trust's

27   ATMs on a monthly basis. The Simmons Liv. Trust received $1,353,506 as

28   phantom ATM "rent" on its NASI investments. Accounting for the phantom

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

ATM "rent," the Simmons Liv. Trust lost $519,494 in the NASI Ponzi scheme.

29.     Plaintiff **Kasia Stefanek as Trustee of the Kasia Stefanek Revocable Trust ("Stefanek")** is a natural person residing and doing business in Riverside County, California.   Stefanek is presently 72 years old.  Stefanek invested $24,000 in NASI in 2011. Stefanek executed NASI ATM purchase and lease contracts on May 25, 2011.  Stefanek received the fraudulent NASI ATM purchase contracts, the ATM lease agreements and additional materials related to those contracts in the U.S. Mail on or about the date the documents were signed. After the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Stefanek received in the U.S. Mail fraudulent account statements detailing the traffic at Stefanek's ATMs on a monthly basis. Additionally, after the documents were signed, and up until the collapse of the Ponzi scheme in August 2014, Stefanek received in the U.S. Mail "rent" payments from the fictitious traffic at Stefanek's ATMs on a monthly basis. Stefanek received $1,353,506 as phantom ATM "rent" on her NASI investments.  Accounting for the phantom ATM "rent," Stefanek lost $5,861 in the NASI Ponzi scheme.

30.     The above identified plaintiffs have each agreed to serve as class representatives.  They are collectively referred to herein as "Plaintiffs."

31.     Plaintiffs were defrauded into investing in the subject Ponzi scheme. Plaintiffs have collectively lost substantial funds due to the Defendants' misconduct.  Plaintiffs relied on the same false agreements relied upon by all members of the Class.

**B.     Defendants**

31.     Defendant **Joel Barry Gillis ("Gillis")** was a resident of Woodland Hills, California, but he is now incarcerated in Lompoc, California, at the United States Prison as prisoner number 68556-112.  Gillis was, at all times material to this case, the President of NASI and a signatory on its bank accounts at CNB. Gillis has been convicted of, among other things, wire fraud and mail fraud

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1  arising out of his operation of the Ponzi scheme at NASI.

2     32.   Defendant **Edward W. Wishner ("Wishner")** was a resident of
3  Woodland Hills, California, but he is now incarcerated in San Pedro, California,
4  at Terminal Island as prisoner number 68555-112. Wishner was the Treasurer,
5  Vice President, and Secretary of NASI and a signatory on its bank accounts at
6  CNB.  Wishner has been convicted of, among other things, mail fraud and wire
7  fraud arising out of his operation of the Ponzi scheme at NASI.

8     33.   Defendant **City National Bank, N.A. ("CNB")** was at all relevant
9  times a national banking association with its principal place of business in Los
10  Angeles, California, the depository bank used by the RICO Defendants, and the
11  employer of Patrick Brian Fitzwilliam. CNB was a member of the RICO
12  enterprise.

13     34.   Defendant **Patrick Brian Fitzwilliam ("Fitzwilliam")** is a resident
14  of Agoura Hills, California, and at all times material to this case was Senior Vice
15  President of CNB and Branch Manager of the Woodland Hills branch where the
16  RICO Defendants deposited and laundered the proceeds of the RICO enterprise.
17  Fitzwilliam was identified on NASI bank statements as the person overseeing the
18  NASI accounts at the bank. Fitzwilliam was also co-owner of the dba known as
19  Bribet Services. Fitzwilliam was a member of the RICO enterprise.

20     35.   Defendant **Betty Saleh Fitzwilliam ("Betty Saleh")** is a resident of
21  Agoura Hills, California, the wife of Fitzwilliam, and co-owner of Bribet
22  Services.  Betty Saleh was a member of the RICO enterprise.

23  **C.   Non-Defendant RICO Enterprise Members**

24     36.   Non-defendant **Nationwide Automated Systems, Inc. ("NASI")** is
25  a California corporation headquartered in Calabasas, California.  NASI is not
26  registered with the SEC, and has not registered any offering or class of securities
27  with the SEC. NASI is now in receivership and a stay of litigation against NASI
28  precludes it from being named as a defendant at this time. NASI is a member of

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

the enterprise.

37.     Non-Defendant **Oasis Studio Rentals, LLC ("Oasis #1")** is a California limited liability company headquartered in Houston, Texas which was formed in 2008 to launder stolen money into the enterprise. Wishner is its registered agent. A stay of any litigation against Oasis #1 precludes it from being named a defendant at this time. Oasis #1 is a member of the enterprise.

38.     Non-Defendant **Oasis Studio Rentals #2, LLC ("Oasis #2")** is a California limited liability company headquartered in Woodland Hills, California which was formed in 2012 to launder stolen money into the enterprise. Wishner is its registered agent.  A stay of any litigation against Oasis #2 precludes it from being named a defendant at this time.  Oasis #2 is a member of the enterprise.

39.     Non-Defendant **Oasis Studio Rentals #3, LLC ("Oasis #3")** is a California limited liability company headquartered at the same Woodland Hills address as Oasis Studio Rentals #2, and was also formed in 2012 to launder stolen money into the enterprise.  Wishner is its registered agent and one of its principals.  A stay of any litigation against Oasis #3 precludes it from being named a defendant at this time.  Oasis #3 is a member of the enterprise.

40.     Non-Defendant **Fuel Doctor, LLC ("Fuel Doctor")** is a California limited liability company headquartered in Calabasas, California. Fuel Doctor received large transfers of stolen funds from NASI (approximately $5.7 million) and is a member of the enterprise. Like NASI, Fuel Doctor also had an account at CNB which was monitored by Fitzwilliam, who oversaw the transfers of stolen funds from NASI to Fuel Doctor.

41.     Collectively, NASI, Oasis #1, Oasis #2, Oasis #3, and Fuel Doctor are referred to as the "Non-Defendant RICO Enterprise Members."

///

///

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

## IV.

## DOE ALLEGATIONS

42.    The true names and capacities of defendants sued herein as DOES 1 through 10 are presently not known to Plaintiffs, who therefore sue these defendants by the use of fictitious names. The identities of such defendants are not known because, among other things, the Receiver for NASI only recently began to provide documents to Plaintiffs, and CNB has yet to produce documents to Plaintiffs which will reveal the flow of funds and identify other defendants. Plaintiffs will seek to amend this complaint and include these DOE defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein, and for the injuries suffered by the Plaintiffs and the Class.

## V.

## AGENCY ALLEGATIONS

43.    Plaintiffs allege that the acts and events alleged against the Defendants were in collaboration and collusion with the other Defendants and the Non-Defendant RICO Enterprise Members, and each such Defendant authorized or ratified the acts of each other in furtherance of the scheme to steal and launder the money. All of the acts of Fitzwilliam alleged herein were performed within the course and scope of his employment with CNB, were performed in the normal course of his employment during business hours using the books, records, furniture, fixtures, telephones, computers and other instrumentalities of commerce owned and operated by CNB. The acts of Fitzwilliam were performed substantially within the time and space limits authorized by CNB, were motivated in part by an intention to serve his employer, were of a kind and nature that he was hired and authorized to perform, were in part beneficial to CNB, and were ratified and affirmed by CNB until his recent suspension. All of the acts of Betty Saleh alleged herein were performed by her

17

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

in the course and scope of her family business known as Bribet Services with the

knowledge and consent of its co-owner, Fitzwilliam. Betty Saleh and Fitzwilliam

acted as principals and as the agents of each other.

## VI.

## INFORMATION ALLEGATIONS

44.     The Plaintiffs know they invested in NASI ATMs and their money,

which was deposited at CNB, is now gone.  How the thefts occurred and the role

played by others is ascertainable only by reviewing the documents of NASI and

CNB.  Therefore, allegations made in this Complaint have been based on

information and belief, except those allegations that pertain directly to Plaintiffs,

which are based on their personal knowledge.  Plaintiffs' information and belief

is based on, *inter alia*, the investigation conducted by Plaintiffs and Plaintiffs'

attorneys after their retention.  Each and every allegation and factual contention

contained in this complaint has evidentiary support or, alternatively, is likely to

have evidentiary support after reasonable opportunity for further investigation or

discovery by Plaintiffs or their counsel.  Plaintiffs have had limited access to

NASI and CNB documents.  The files of the Receiver were only recently

delivered to Plaintiffs. An amended complaint may be required to conform to

proof as the facts are further developed.

## VII.

## SUMMARY OF THE PONZI SCHEME

45.     The RICO Defendants' scheme was to sell non-existent automated

teller machines ("ATMs") to unwitting investors and purportedly lease the ATMs

back from the victims.  The RICO Defendants' scheme also included laundering

the stolen money through the operation of purportedly legitimate businesses

which were intended to generate additional funds for the enterprise.

46.     From 2007 to 2014, the RICO Defendants raised over $350 million

by selling phantom ATMs to investors. Since 2013 alone, Defendants raised at

18

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

least $123 million in investor funds through its ATM sale and leaseback transactions. The RICO Defendants told investors in uniform solicitations that NASI was in the business of placing, operating and maintaining ATMs, and that investors could purchase ATMs from NASI, and then lease them back to NASI in return for "rent" of 50 cents per ATM transaction, with a guaranteed return of at least 20% per year.

47.    But none of that was true. Legitimate ATM transaction revenue represented only a tiny fraction—less than 2%—of NASI's actual revenue, and this basic fact was self-evident in NASI's bank records at CNB. The vast majority of NASI's revenue (98%) was comprised of funds from new investors deposited for the specific purpose of acquiring ATM machines. To an overwhelming degree, therefore, investors' funds were not used to acquire, place, operate, and maintain the thousands of ATMs NASI claimed to have sold them, but were instead used to make phony "rent" payments to earlier investors to perpetuate the scheme.  A two-minute cursory review of NASI's account activity at CNB would instantly reveal it was a Ponzi scheme.

## VIII.

## SUMMARY OF CNB'S INVOLVEMENT IN THE PONZI SCHEME

48.    All financial crimes of any substance and duration require the active participation of a bank to receive and disburse the funds. Banks are not the police, and owe no duty to non-customers to investigate the business dealings of customers. However, when a bank discovers crimes being committed by a customer using the bank to facilitate their crimes, the bank is duty bound to report it to regulators and terminate the customer's ongoing relationship with the bank. Failure to fire the customer after actual knowledge of the crime is obtained by the bank may lead to liability to non-customers for aiding and abetting if the bank continues to substantially assist the customer in commission of the crimes. The failure to fire a customer after the bank has actual knowledge the customer

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1   used the services of the bank to commit a crime is also a negligent disregard of

2   the foreseeable risk the customer will continue to do so and others will be

3   harmed.

4   **A.    Real Rent Versus Phantom Rent at NASI**

5        49.    NASI was a long-term and financially significant customer of CNB.

6   CNB first opened an account for NASI in 1996, and was NASI's primary bank

7   from then until Fitzwilliam terminated the relationship on August 27, 2014. Over

8   the nearly two-decade timespan CNB acted as the vehicle for the RICO

9   Defendants' crimes, with hundreds of millions of dollars in fraudulently obtained

10  investment funds flowing through NASI's accounts. Between August 2007 and

11  August 2014 alone, CNB accepted deposits of approximately $350 million of

12  new investor funds. In characteristic Ponzi fashion, almost as soon as deposits of

13  new money cleared the account the funds flowed back out again in a flurry of

14  monthly rent checks to previous investors to cover NASI's obligations under the

15  sale and leaseback agreements.

16       50.    For the life of the fraud, NASI's legitimate ATM rental revenue

17  represented a tiny fraction—less than 2%—of its deposits at CNB. And yet

18  monthly disbursements of purported "rent" to investors invariably exceeded the

19  monthly deposits of actual ATM rental revenue. In all instances the disparity

20  between rent revenue and rent disbursements was beyond staggering. For

21  example, in April, May and June of 2014 (at the end of the scheme), NASI paid

22  investors "rent" of approximately $23.5 million. However, during that time

23  deposits of legitimate ATM rent only totaled approximately $390,000. That is,

24  $23.5 million paid out in phantom "rent" versus the receipt of $390,000 in real

25  "rent." Although the dollar amount by which monthly disbursements exceeded

26  receipts might vary, that the shortfall would occur each month did not; a

27  condition that carried on for *years* and left a paper trail in its wake such that a

28  cursory review of the account statements revealed that the money NASI paid out

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

as "rent" came from deposits of funds received from new NASI investors – a Ponzi scheme.

51.     The fact that "rent" disbursements to investors dramatically exceeded legitimate ATM transaction rent was glaringly obvious with even a cursory inspection of NASI's account activity. It was also obvious at a glance that the true source of disbursements being made to investors was traceable to new investor funds. With only the information available in NASI's account records, and a basic familiarity with NASI's purported business model to provide context, transactions in the record are easily recognizable as "rent" payments to investors, deposits of new investors' funds, or deposits of real ATM transaction revenue because of certain distinguishing characteristics inherent to each type of transaction.

52.     For example, the unwitting victims lured to invest in the NASI Ponzi scheme were private individuals, as opposed to more sophisticated institutional investors, and most of the investors paid for their ATMs with a personal check. Many of the checks deposited in the account indicated on the face that it was for an ATM sale and leaseback investment. Furthermore, NASI only sold ATMs to investors at two price points: typically $12,000, but in some cases $19,800 per ATM. As a result, the dollar amount of a deposit of new investor funds was always some multiple of one price or the other, and more often than not the amount was identical to that of numerous other deposits.

53.     A very relevant NASI deposit slip is set forth in **Exhibit 7**.  Exhibit 7 is a copy of a July 9, 2009 NASI deposit slip at CNB with the notation "checks within Brian's limits largest CK $120,000." As discussed later, the check identified as number 12 on the slip for $120,000 was deposited for the benefit of Fitzwilliam to buy what is known as "Tranche 4," so we assume he knew about and approved of the deposit. The seventeen checks from investors identified in Exhibit 7 total $738,600, and they are all divisible by $12,000 or $19,800.  This

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1   fact was common for the receipt of investor money and Fitzwilliam knew it
2   because he was both an investor and the person at CNB assigned to manage the
3   NASI, Gillis and Wishner accounts.

4       54.   On the other hand, the amount of revenue generated for NASI by
5   legitimate ATM rental transactions varied from month-to-month, and as a
6   consequence monthly revenue deposits lacked any semblance of the pattern and
7   uniformity evident in deposits of new investor funds.  A comparison of real ATM
8   rent and investor deposits can be seen in **Exhibit 8**, which is the July 31, 2009
9   CNB account statement for NASI's "General Account," which contained the
10  $120,000 deposited for the benefit of Fitzwilliam.

11      55.   Exhibit 8 shows the deposits of $738,600 of investor funds depicted
12  in Exhibit 7, as well as two other large even-numbered investor deposits, all three
13  totaling $1,254,000 for the month of July 2009.  Exhibit 8 also shows three
14  uneven deposits for $22,011.20, $72,703.80 and $49,730.94. These three deposits
15  came from the ATM processors used by NASI to collect real rent, as discussed
16  below. The three odd number deposits total $144,445.94 in real ATM rental
17  income for NASI for the month of July 2009.  Page 4 of Exhibit 8 depicts
18  transfers of $1,400,000 and $500,000 from the General Account to the Investors'
19  Account, which was used to pay the NASI investors' phantom rent as set out in
20  **Exhibit 9**. Fitzwilliam was the supervisor of these accounts.

21      56.   For the month of July 2009, a brief review of Exhibits 8 and 9 strike
22  the reader with the obvious:

23              Investors' Deposits:          $1,254,000.00
24              Real Rent Received:            $144,445.94
25      Phantom Rent Paid to Investors:      $1,744,867.75
26

27      57.   Furthermore, unlike deposits of investor funds, deposits of real ATM
28  rent revenue always took the form of a monthly payment from a corporation, not

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

a personal check. NASI only subcontracted with three ATM service providers to operate the approximately two hundred and forty (240) ATMs it actually owned. The names of these three companies—Cardtronics, Inc., National Link, Inc., and Automated Systems America, Inc.— are suggestive of the business they conduct, but far more relevant is the fact that there were only three, and that NASI deposited rent payments received from those three companies on a monthly basis. Recurring monthly deposits of payments received from corporations causes real ATM rental revenue to plainly stand out in NASI's account records, and clearly differentiates it from money remitted by the multitude of unique NASI investors.

58.     In light of the above, a person armed only with a calculator, two IQ points, an entry-level understanding of NASI's business model, and NASI's bank statements could easily detect the underlying Ponzi scheme by classifying transactions based on frequency, dollar amount, and the identity of the payor/payee.   Because of the agreement between the RICO Defendants and Fitzwilliam, as described below, NASI did not take any steps to hide its Ponzi nature from CNB. NASI did not funnel investor funds through accounts at other banks, shuffle funds between DBAs or shell companies to obscure the origin, or engage in any of the other financial or accounting tricks perpetrators of Ponzi schemes often use to mask the fraud. Instead, Wishner and Gillis operated the NASI scheme through the CNB accounts with impunity. In the process, they peppered numerous red flags throughout the CNB account records. However, this made it a simple matter for Fitzwilliam, a CNB executive with access to confidential and detailed account information and a working knowledge of NASI's business, to see NASI for the criminal enterprise that it was and to use his knowledge to obtain preferential treatment from the RICO Defendants for himself and substantial income for his employer.

**B.     Fitzwilliam Was Never an Innocent Investor in NASI.**

59.     At some point in time, but no later than June 30, 2009, CNB obtained

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

actual knowledge through Patrick Brian Fitzwilliam at the branch where NASI and the RICO Defendants did business (in Woodland Hills, California), that NASI was being operated as a Ponzi scheme using the bank to collect and disburse stolen funds.  Plaintiffs who purchased ATM's from NASI after the date of discovery of the scheme by the Branch Manager and who suffered a business loss are included in the Class.

60.     In or about November 2006 Fitzwilliam and his wife, Betty Saleh Fitzwilliam (a/k/a Betty Lynn Saleh, hereinafter "Betty Saleh"), conducted a detailed due diligence investigation into the specific facts regarding the ATM business operated by the RICO Defendants.  Based on their due diligence they concluded that either: (i) NASI was the world's one and only honest ATM leaseback business; or (ii)  NASI was a Ponzi scheme that was safe to invest in so long as Fitzwilliam was able to monitor the NASI accounts at CNB.  As outlined below, this husband and wife team was more than willing to knowingly engage in criminal behavior, making the latter conclusion more likely than the former, and raising the strong inference that the date of CNB's discovery is more properly placed sometime in November 2006 - years before the events of June 30, 2009.

61.     At times material to this case, Betty Saleh, Fitzwilliam's wife, had a social relationship with Jill Wishner, Edward Wishner's daughter-in-law. Just like Edward Wishner, Betty Saleh was an expert in stealing other people's money with the use of lies and fabricated customer account statements.

62.     Betty Saleh was employed as a licensed investment advisor at UBS PaineWebber ("UBS") from 1991 to 2002, at Wachovia Securities ("Wachovia") from 2001 to 2004, and finally Wedbush Morgan Securities ("Wedbush") from November 2004 until June 25, 2009 when she was terminated for securities fraud and then permanently barred from the profession by regulators for willfully violating securities laws.

63.     As noted in Exhibit 4, the regulators' factual findings against

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

Fitzwilliam's wife included:

      (i)     forging her elderly clients' signatures on documents;

      (ii)    preparing fabricated account statements for the clients to conceal her prior thefts;

      (iii)   preparing fabricated documents to deter detection by her employers; and

      (iv)   destroying the fabricated documents.

64.    Betty Saleh's partner in her crimes against trusting investors was her sister, Debra Michelle Saleh ("Debbie Saleh"). Debbie Saleh worked with Betty Saleh at UBS, Wachovia and finally Wedbush before she too was terminated by Wedbush in April 2009 for securities fraud and, finally, permanently barred from acting as a licensed investment advisor for willfully violating securities laws. The regulatory findings about Debbie's "criminal" as well as "premeditated, egregious and unconscionable" conduct mirror the findings against her sister (Betty), except Debbie Saleh was confident enough to appear at her FINRA hearing and make "false and misleading statements" under oath. During Debbie Saleh's sordid career of forgery, fraud and elder abuse, she had 11 customer disputes that resulted in millions of dollars of arbitration awards in favor of the clients she victimized, including Rick Cooper, whose sad story is contained in his declaration which is attached as **Exhibit 10**. Exhibit 10 contains actual forged signatures and fabricated account statements.

65.    To keep the stolen money and avoid paying her victim creditors, on December 30, 2008, Debbie Saleh conveyed her residence on Via Esquina in Calabasas to her father Gensar Saleh, as a trustee.   The transfer was for no consideration to hinder and delay creditors (see **Exhibit 11**.)  Betty Saleh and Brian Fitzwilliam executed an identical fraudulent conveyance of their personal residence on Fairgrange Drive in Agoura Hills on March 11, 2009 (see **Exhibit 12**). The remaining equity in Fitzwilliam's house was removed on February 6,

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

2016 in anticipation of this litigation (see **Exhibit 13**).  As noted in **Exhibit 14**, Debbie Saleh filed bankruptcy and the appointed Trustee prosecuted an adversary proceeding to set aside the fraudulent conveyance of her home to her father.  The case settled for $50,000. After attorneys' fees and administrative costs only $14,761.13 of the settlement amount made it to her creditors, who included Mr. Cooper, whose elder abuse arbitration award against her was discharged by the court. The Saleh sisters know how to abuse our civil system.

66.    The relevance of the above dogleg is this: for all times material to the establishment of knowledge for the purpose of aiding and abetting liability, Brian Fitzwilliam was living in a San Fernando Valley cesspool of corruption with his wife Betty Saleh and sister-in-law Debbie Saleh—two trained financial professionals with a documented track record of stealing from their elderly or otherwise vulnerable clients. Fitzwilliam's moral barometer must be measured in the context of the social environment he voluntarily placed himself. Fitzwilliam's anticipated defense, that he was an innocent investor in NASI just like the Plaintiffs, must be juxtaposed against the more likely inference that he was morally capable and inclined to knowingly participate in a Ponzi scheme.

**C.    Fitzwilliam and Betty Saleh Buy 30 ATM Machines and Are Net Winners.**

67.    In the winter of 2006 Fitzwilliam (employed as Senior Vice President at CNB) and Betty Saleh (employed at Wedbush) decided to participate in the business affairs of NASI as investors in NASI's ATM business to earn, at least, the guaranteed minimum 20% return on their money. An exceptional return that Betty Saleh and Debbie Saleh knew was impossible to obtain without fraud, and this conclusion was required to be communicated by Betty Saleh to her husband and business partner as a financial fact.

68.    To avoid detection by CNB regulatory compliance personnel of Fitzwilliam's investment in NASI and of the subsequent "rent" checks from NASI to Fitzwilliam that would result, on January 12, 2007, Fitzwilliam and

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

Betty Saleh established and recorded the husband & wife fictitious business name of Bribet Services. Using the fictitious name of Bribet Services, they went on to enter sale and leaseback agreements with NASI for the purchase of three tranches of ATMs; the first on November 27, 2006 ("Tranche 1"), the second on June 1, 2007 ("Tranche 2"), and the third on July 1, 2008 ("Tranche 3"). Each of the three tranches comprised of 10 ATMs priced at $12,000 per machine, for a total price of $120,000 per tranche, and an overall investment of $360,000 for all three. See Exhibit 3. To further avoid detection and tracing, the couple used certified checks to pay for their investment, which was not required by NASI. Copies of the certified checks and all of the sale and leaseback agreements between Bribet Services and NASI are contained in **Exhibit 15**, including the fourth Tranche ("Tranche 4"), as discussed below.

**D.    No Later Than June of 2009 Fitzwilliam Discovers the Ponzi and Enters Into a Conspiracy to Assist the Ponzi.**

69.    In exchange for their substantial investment, and ultimately Fitzwilliam's silence and knowing assistance at the bank he managed, the couple was paid, over time, $603,601 in stolen money through NASI's accounts at CNB. Based on his own investigation of NASI, his own financial experience, as well as that of his cohorts, Debbie Saleh and his wife Betty Saleh, Fitzwilliam knew that the victims of the NASI scheme included people many over 65 years of age.

70.    In April of 2009 Debbie Saleh was fired from Wedbush while at the same time creditors' claims were being asserted against her. On June 25, 2009, Betty Saleh was also fired from Wedbush while creditors' claims were being asserted against her. At this point in time the entire Saleh family and Fitzwilliam are in financial jeopardy, which is evidenced by the no-consideration transfers of their two residences to the Saleh sisters' father, Gensar Saleh, in an attempt to place the assets beyond the reach of creditors. (See Exhibits 11 and 12.) To exacerbate their immediate need for money, on June 25, 2009, Wedbush

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

unilaterally and wrongfully froze the accounts of Betty Saleh and Brian Fitzwilliam at Wedbush which contained their cash and cash equivalents, plus some other investments.  (See Exhibit 6.)

71.   In June of 2009 Fitzwilliam knows facts to support the couple's previous conclusion that: (i) NASI was being operated by the RICO Defendants as a Ponzi scheme using his Woodland Hills CNB branch as the bank to perpetuate the scheme; (ii) the family's $360,000 investment in NASI ATMs was at serious risk of loss if the scheme was exposed; and (iii) the RICO Defendants would accommodate the couple for Fitzwilliam's ongoing silence and assistance. Therefore, in exchange for Fitzwilliam's help covering up the scheme at the bank, the RICO Defendants, through NASI, agreed to: (i) conceal the source of Bribet Services' additional rental income by accepting the payment for Tranche 4 from a third party; (ii) buy back 20 of the machines the couple had owned for more than two years; and (iii) guarantee preferential repayment of their invested principal prior to the ultimate collapse of the Ponzi scheme, whenever that should occur. Evidence of the agreement comes from the ultimate performance by both sides of the promises contained within, as discussed below.

72.   On June 30, 2009, Fitzwilliam and Betty Saleh, doing business as Bribet Services, entered into a fourth standard form ATM Equipment Purchase Agreement to buy an additional ten ATMs from NASI for $120,000 ("Tranche 4"). The Tranche 4 documents are attached as **Exhibit 15,** along with the contracts for the purchase and lease of the other thirty ATMs owned by Bribet Services. In the Tranche 4 documents it can be seen that NASI acknowledged receipt of $120,000 from Bribet Services to pay for Tranche 4. However, Fitzwilliam and Betty Saleh never paid the $120,000. The $120,000 payment was made by Gensar Saleh, as Trustee of the S&J Agreement of Trust, as set out in **Exhibit 16**. The funds were deposited by NASI on July 9, 2009, and approved by Fitzwilliam, as set out in Exhibit 7.  Bribet Services paid no consideration for the

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

ten ATMs in Tranche 4, and NASI did not convey any consideration to the S&J Agreement of Trust in exchange for the $120,000. Each and every monthly "rent" payment attributable to Tranche 4 was paid to Bribet Services. The money was transferred by the trust outside of the trust to NASI for the benefit of the owners of Bribet Services to conceal the source of funds, which it did for the Plaintiff's when they drafted and filed the original complaint.

73.    The $120,000 transfer was voidable for lack of consideration and therefore a special accommodation by NASI. The transfer also breached Paragraph 8 of the standard form ATM Lease Agreement (See Exhibit 15) because the lessor (Bribet Services) had to warrant to NASI that it was the owner of the leased ATMs and the ATMs were free and clear of all interests and claims. NASI, the RICO Defendants, Fitzwilliam and Betty Saleh all knew this warranty of ownership was false because Bribet Services did not pay for the machines. NASI accepted the at-risk money ostensibly held in trust to pay for machines not held in trust as an accommodation to Fitzwilliam pursuant to their agreement. There is no other business justification.  In the alternative, if not evidence of an agreement then, at a minimum, NASI's acceptance of the tainted money is evidence enough for Fitzwilliam to conclude on June 30, 2009 that NASI was not the legitimate business it purported to be.

74.    In accord with the June 2009 agreement to protect Fitzwilliam's principal investment, two checks were written by NASI to Gensar Saleh, as set out in **Exhibit 17**.  One for $60,000 on or about February 12, 2012, made payable to S&J Agreement of Trust, and another for $60,000 written on August 6, 2014, made payable directly to Gensar Saleh, and not in his capacity as a trustee of anything. The February 12, 2012 check for $60,000 was written at the same time Fitzwilliam wrote a promotional letter for NASI on CNB letterhead, which is attached as **Exhibit 18**. The August 6, 2014 check was written on the eve of the scheme's collapse, and a mere 20 days later Fitzwilliam terminated NASI as a

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

client of the bank. See **Exhibit 19**. Both checks were written pursuant to the agreement reached back in June of 2009 to return at risk principal.

75.    On September 21, 2009, the Wall Street Journal published an article about the arrest of two men in North Carolina charged with stealing $80 million from investors by selling them 4,000 phantom ATMs under purported sale and leaseback agreements, just like the NASI scheme. Also just like the NASI scheme, 90% of the ATMs sold to investors in the Ponzi scheme detailed by the article did not exist. The article is attached as **Exhibit 20**.

76.    Likely concerned by the widespread exposure and attention being garnered by national news of the North Carolina ATM sale and leaseback Ponzi scheme, and worried his own ATM sale and leaseback Ponzi scheme at CNB might be subjected to increased scrutiny as a result, on October 26, 2009 (close to 4 months after receiving the ten phantom machines with two-year resale restrictions) Fitzwilliam and Betty Saleh directed NASI in a fax from CNB (see **Exhibit 21**) to repurchase the 20 phantom machines they had previously acquired on November 27, 2006 (Tranche 1) and June 1, 2007 (Tranche 2). NASI promptly complied, and within the week paid them $240,000 that they all knew had been stolen from other investors. The $240,000 payment cleared NASI's account at CNB on November 2, 2009 under the watchful eye of Fitzwilliam.

77.    Buying a fourth restricted tranche for $120,000 while simultaneously selling back two prior unrestricted tranches for $240,000 has no legitimate business justification, except for the one proffered by Plaintiffs. Fitzwilliam felt undue risk when he saw the Wall Street Journal article and decided to reduce his exposure in the Ponzi scheme, even if the receipt of funds outside the scheme made them vulnerable to attachment by Betty Saleh's creditors.

**E.    Fitzwilliam and CNB, Through Fitzwilliam, Assist the Ponzi Scheme.**

78.    In addition to being a substantial investor in the Ponzi scheme,

30

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

Fitzwilliam performed multiple services and favors for the RICO enterprise to knowingly assist its continued existence.  For instance, on December 3, 2009 (one month after receiving the $240,000 payment from NASI's repurchase of the Tranche 1 and Tranche 2 machines) Fitzwilliam sought to clear through the bank a $7,307.50 "rent" check made payable to his fictitious Bribet Services by NASI for the agreed-upon increased phantom transaction fees (see Exhibit 3 and the 12/03/2009 entry). With daily access to the NASI bank records and a warning by a fellow CNB employee, Fitzwilliam knew there were insufficient funds in a NASI account to pay all of the pending checks. Armed with this inside information, Fitzwilliam assisted the perpetuation of the scheme by covering the NASI bounced check, which otherwise could not clear because of insufficient funds. As with all Ponzi schemes, Fitzwilliam knew that the failure to timely fund one payment could result in adverse publicity for NASI, panic by investors, and a collective call for the return of funds which could never be returned.

79.    Fitzwilliam also assisted the scheme by agreeing to act as the banking referral source used by NASI and its sales force to help convince new investors to part with their funds (see Exhibit 18), and to assuage the concerns of older investors contemplating redemption after expiration of the two-year holding period. When NASI investors performing due diligence called CNB to investigate NASI's financial health, as they were directed to do by the RICO Defendants and Fitzwilliam, they would be connected with Fitzwilliam at his desk in the Woodland Hills branch.

80.    One of these calls occurred in late February or early March of 2009. At this point in time, Bernie Madoff and Alan Sanford had both been arrested for running long-term Ponzi schemes, Lehman Brothers had filed for bankruptcy, the stock market had collapsed and investors across America were worried. One such NASI investor, referred to herein by the initials "JC," was worried his investment in NASI might be part of a Ponzi scheme. JC met with Gillis to discuss his

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

investment in NASI. Gillis assured him it was not a scam, and suggested he meet with NASI's account manager at CNB, Fitzwilliam, who would readily confirm the legitimacy of NASI and address his concerns.

81.    JC went to Woodland Hills to meet with Fitzwilliam, but Fitzwilliam was not in the office when he did. Soon thereafter, JC telephoned Fitzwilliam at CNB to relate his concern that NASI might be a Ponzi scheme like the Madoff Ponzi scheme. Fitzwilliam assured him that NASI was not a Ponzi scheme, but was instead a legitimate business and valued client of the bank. During the conversation JC also conveyed that Gillis had told him NASI itself owned the majority of the ATMs it managed. If so, based on JC's own calculations he believed and that these NASI-owned machines should generate net income for NASI approaching $1 million per month. JC then asked Fitzwilliam if NASI's internal bank records at CNB "jived" with this description of monthly rental income received by NASI from its own machines, and Fitzwilliam responded in the affirmative. JC relied upon Fitzwilliam's representations and decided to maintain his investment in NASI ATMs, a decision that ultimately led to his detriment.

82.    The facts belie Fitzwilliam's representation that NASI's internal account records confirmed the accuracy of the description offered by JC. Either Fitzwilliam lied to JC if he did not know that NASI's actual rental income was only a small fraction of its monthly deposits ($144,445.94 in Exhibit 8) and nowhere close to the numbers believed by JC (close to $1 million), or Fitzwilliam lied to JC if he looked at NASI's bank records and knew it was a Ponzi scheme. Being a significant investor in NASI with 24/7 access to NASI's bank records precludes the inference that Fitzwilliam did not look. It was his job to look. CNB's own bank records identify Fitzwilliam as the person to contact to answer questions about NASI's accounts because he managed the accounts and could provide the answers (Exhibit 22).  It defies logic to infer that Fitzwilliam did not

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1  look or if he looked, he did not understand.

2      83.    In conformity with Fitzwilliam's oral assurances over the phone to

3  JC, on February 14, 2012, Fitzwilliam was asked to and did write a letter with

4  false facts to be disseminated by the RICO Defendants to potential NASI

5  investors to induce them to part with their money. The letter is attached as

6  Exhibit 18 and was written at or about the time NASI paid the first $60,000

7  installment to Gensar Saleh, as the Trustee of the S&J Agreement of Trust

8  (Exhibit 17). Fitzwilliam's letter, written on CNB letterhead and addressed "To

9  Whom it May Concern", stated that NASI was a valued client of CNB and had

10  been a valued client of CNB since 1996, and that NASI maintained average

11  balances of over $4,000,000 in the NASI operating account at CNB. The

12  representations in the letter were false and known by Fitzwilliam to be false.

13      84.    NASI was not, and had never been, a valued client of CNB, and

14  Fitzwilliam knew the average balance of $4 million in NASI's account was stolen

15  money. Fitzwilliam, a highly trained and experienced senior-level bank

16  executive, knew that NASI, as the vehicle used by the RICO Defendants to

17  operate a Ponzi scheme through CNB, posed a serious threat to the financial well-

18  being of his employer. NASI was a customer that exposed the bank to the risk of

19  incurring substantial liability to non-customers, and nothing close to a valued

20  client.

21      85.    In addition, Fitzwilliam's letter to the public (Exhibit 18) promoting

22  NASI failed to include information known by its drafter which, if disclosed,

23  would have made his promotional piece less misleading. That true information

24  known to Fitzwilliam would have included:

25          (i)    NASI's business model includes the illegal issuance of

26      securities without obtaining proper registration or satisfying any

27      exemptions to registration;

28          (ii)    NASI accepted a check for $120,000 from a third party and,

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

without any supporting documentation in NASI's files, allocated 10 ATMs to Fitzwilliam's Bribet Services which did not pay for the machines;

(iii)   Bribet Services sold back to NASI 20 machines on October 26, 2009 to reduce its ongoing risk in the investment;

(iv)   NASI had paid Gensar Saleh $60,000 for machines he did not own at the same time Fitzwilliam wrote his letter;

(v)   NASI's real ATM rental income of approximately $150,000 per month represented only a small fraction of the "rent" being paid out to investors every month, and the majority of which was actually paid with money from new investors, which comprised the $4 million referred to in Fitzwilliam's letter; and

(vi)   Fitzwilliam was a direct investor in NASI, in violation of banking laws and CNB's personnel policies, which motivated him to keep NASI attracting new investors so he did not lose his investment.

86.   In addition to helping the RICO Defendants solicit money from new investors and helping them convince current NASI investors not to cash out because their money was safe, Fitzwilliam also assisted the scheme by helping NASI avoid detection by the compliance department at CNB.

87.   Pursuant to the Bank Secrecy Act and Anti-Money Laundering Manual used by member banks like CNB, privately owned ATM businesses are identified as high-risk for fraud and money laundering.  Special rules have been drafted into the BSA/AML Examination Manual to assist compliance in identifying fraudulent ATM businesses such as the one Plaintiffs identified in Exhibit 20.  These rules, which existed in 2010, are set out in **Exhibit 23**.  As set out in **Exhibit 24**, CNB compliance personnel attempted to comply with Exhibit 23 and requested Fitzwilliam, as the manager of the NASI account, to update the NASI file by collecting documentation verifying the legitimacy of NASI's ATM business to satisfy the "know your customer" requirements all banks are subject

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

to.

88.    On or about May 19, 2010 (and annually, according to Fitzwilliam), the CNB compliance personnel requested that Fitzwilliam obtain for the NASI account under Fitzwilliam's supervision:

- Documents establishing ownership of the ATMS; and
- Documents showing the number and locations of client's ATMs (Exh. 24.)

89.    Based on the language in the request for documents, it appears as though CNB compliance believed NASI owned all of the ATMs from which it derived the income it deposited at the bank. In Exhibit 24, Fitzwilliam transmits Gillis' email response to compliance and, thereby knowingly approves, endorses and ratifies Gillis' false representations that NASI **installs** and **purchases** ATMs, when Fitzwilliam knows NASI **sells** ATMs to investors and then **leases** them back, including, at the time, at least 20 machines still allocated to Fitzwilliam's Bribet Services.

90.    Fitzwilliam also ratifies Gillis' truthful and factual representation that **all** of NASI's ATM machines (whether owned or leased) were serviced by NASI's "processing companies, including Cardtronics, which "is one of the main processors that handles everything for" NASI. Therefore, according to Fitzwilliam in Exhibit 24, all of NASI's thousands of ATMs – the ATMs it owns outright and the ATMs it sells to investors – are processed by the ATM processing companies utilized by NASI. Therefore, if compliance needs evidence of NASI's ownership of ATMs, the documents sent to NASI each month by the processors, as independent third parties, would be the natural source of unbiased information on the issue.

91.    As set out in **Exhibit 8**, the ATM processing companies used by NASI to process **all** of NASI's machines only paid NASI approximately $144,000 per month in income. Exhibit 8 reflects the universe of NASI's real

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1    ATM machine income and the only real source of legitimate income generated

2    from machines that actually existed. The information contained in Exhibit 8 was

3    known by Fitzwilliam by his access to the bank records of NASI contained in the

4    General Account.

5         92.    Attached as **Exhibit 25** is the Declaration of Peter F. Del Greco

6    ("Del Greco"), which contains two exhibits that would have been relevant to

7    Fitzwilliam's response to compliance about NASI's ownership of the ATM

8    machines. Exhibit 20 of Exhibit 25 identifies 86 real ATMs that National Link

9    serviced for NASI.  Exhibit 25 of Exhibit 25 identifies 149 real ATMs that

10   Cardtronics serviced for NASI, for a total of 235 real ATMs. Del Greco testified

11   that, based on his review of the documents produced by National Link and

12   Cardtronics, National Link paid NASI $3,252,414 over a 54-month timespan for

13   an average monthly payment of $60,229 and Cardtronics paid NASI $3,563,845

14   over 55 months for an average of $64,797 per month, totaling $125,026 in real

15   ATM income each month.  Automated Systems, the third processor identified,

16   processed only a few ATMs for NASI.

17        93.    Assume Fitzwilliam was an innocent investor with no knowledge of

18   the scheme and not hiding from his employer the fact he and his wife invested

19   family money into a depositor's business; a depositor he was delegated the duty

20   to supervise. When CNB compliance personnel requested documentation about

21   the ownership and location of NASI's ATMs, Fitzwilliam, if innocent, would

22   have readily produced his own documents evidencing proof of his historic

23   ownership and the location of his 30 (maybe 40) ATM machines found in Exhibit

24   15. He also had proof of ownership and location in the rental statements he

25   received each month (Exhibit 2), along with his checks to Bribet Services, as set

26   out in Exhibit 3.  Fitzwiliam's failure to produce these documents is evidence of

27   knowledge they would be construed against himself and NASI by CNB

28   compliance personnel.

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

94.    If Fitzwilliam was concerned about the appearance of impropriety in buying into a client's business, he could still have readily obtained the list of NASI-owned machines processed by National Link and Cardtronics as depicted in Exhibits 20 and 25 of Exhibit 25 and produced them to help CNB compliance personnel establish the number, location and ownership of NASI's ATMs. However, these Exhibits would have revealed that NASI only owned approximately 240 ATMs and not the 31,417 ATMs purchased by the Plaintiffs and others with funds that flowed every month through CNB accounts controlled by Fitzwilliam.

95.    The fact that Fitzwilliam failed to produce readily available documents to compliance personnel about NASI, a  depositor he was invested in and had bank oversight over, is strong evidence that Fitzwilliam was a bad faith investor with knowledge of the fraud.

**F.    Fitzwilliam's Assistance in NASI's Ponzi Was, In Part, for the Benefit of CNB.**

96.    Plaintiffs anticipate that CNB will contend Fitzwilliam's conduct with regard to NASI was in direct violation of banking laws and CNB policy manuals, was for his own individual advantage and gain, was directly contrary to the interests of CNB, because it exposed CNB to substantial risk of financial, reputational, and regulatory harm, and it was effectively concealed by Fitzwilliam. Plaintiffs anticipate that CNB will also contend Fitzwilliam was merely an innocent investor who lacked the business acumen to read and understand NASI's bank records. In response to the assumed defense, Plaintiffs allege the following:

97.    The NASI Ponzi scheme existed at CNB prior to Fitzwilliam's assignment as Branch Manager with direct oversight over the NASI account, and prior to his personal investment in the scheme. Regrettably, it is not uncommon within the banking industry for banks to discover the existence of a Ponzi scheme

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

or other financial crime being committed by one of its depositors and make the conscious executive decision to do nothing.  The decision to "let sleeping dogs lie" is made to avoid, or at least delay, the civil litigation which will surely follow disclosure. To delay and possibly avoid litigation claims is beneficial to a bank for obvious reasons, and was most likely a part of the reason Fitzwilliam delayed writing Exhibit 19. The fact that CNB was conducting discussions with another large bank regarding the possibility of an acquisition or merger provides additional motive for Fitzwilliam and benefit to CNB in delaying disclosure.

98.     Finally, CNB may not blame Fitzwilliam for all of the losses caused to Plaintiffs, because it too, with the input of other executives, intentionally delayed action, which exacerbated the Plaintiffs' injuries.  The SEC subpoenaed CNB on June 25, 2014 for NASI account documents which, at most banks, would have caused some concern at levels above Fitzwilliam's paygrade. But not at CNB. After receiving the subpoena, CNB continued to process NASI transactions for another two full months before the relationship was terminated by Fitzwilliam's letter of August 27, 2014. Because CNB refused to stop knowingly assisting the scheme, in that time over $10 million was fleeced from innocent NASI investors, deposited with CNB, and then lost forever as to those late investors when the scheme collapsed within a matter of weeks. (See **Exhibit 26**.)


# IX.

## PREDICATE ACTS OF WIRE FRAUD AND MAIL FRAUD

99.     The RICO Defendants sold the Plaintiffs and other NASI investors ATMs through a standard package of agreements that contained numerous false statements and uniform material misrepresentations. The form agreements were comprised of: (i) an ATM Equipment Purchase Agreement ("Purchase Agreement"); (ii) an ATM Equipment Lease Agreement ("Lease Agreement");

**EXHIBIT A**

and (iii) an Addendum To Owner Lease Agreement ("Addendum"). The three documents were mailed or emailed to and executed by the Plaintiffs, with Gillis signing on behalf of NASI, at the time or times the Plaintiffs bought their machines, as set forth above.

100.   In its ATM sale and leaseback agreements and other written communications, NASI made the following uniform representations to investors, including the Plaintiffs, regarding their investment with NASI. All of these statements were false and deceptive, and made by the RICO Defendants in furtherance of a fraudulent scheme through the use of the mail and wires:

> (a) Buyers were buying from NASI an actual ATM, identified by serial number, "free and clear of all liens, claims, debts, encumbrances, security interests, or other charges." **Not true.**

> (b) The ATMs purchased would then be installed by NASI at a designated place—typically, hotels, convenience stores, and gas stations located across the United States. **Not true.**

> (c) Following the sales transaction, buyers' ATMs would remain, at all times, their "sole and exclusive personal property." **Not true.**

> (d) During the lease term, NASI would "operate and maintain the ATMs ... includ[ing] ... processing and accounting for all ATM transactions, obtaining, the [sic] delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs," "maintain insurance coverage on the ATMs," and "pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs." **Not true.**

> (e) During the lease term, NASI would pay to buyers 50 cents per transaction occurring in their ATMs, with NASI agreeing that in the event of a shortfall, it would guarantee a 20% annual

39

**EXHIBIT A**

return on investment; NASI said that it was able to make this guarantee because with ATM transaction fees typically being in the range of $2.50-$3.00—well above the 50 cents per transaction in rent owed by NASI under the lease—NASI could guarantee a 20% return by shifting part of its share of the ATM transaction revenue back ATM buyers. **Not true.**

(f)  Each month, NASI would send buyers transaction reports that purportedly detailed the performance of the ATMs that they owned; these transaction figures would then form the basis for NASI's monthly payments to investors. **Not true.**

NASI did not own or operate the tens of thousands of ATMs it claimed to have sold and leased back.

101.  The RICO Defendants ran a Ponzi scheme through the use of thousands of predicate acts of mail fraud and wire fraud. Every month, each NASI investor received a transaction report reflecting monthly transaction figures for the ATMs that they "owned." These reports were sent in the mail or over the wires, and each and every one was a complete fabrication, in which the RICO Defendants reported false figures to represent transactions that never occurred on ATMs they never owned, never operated, and never existed.

# X.

## CLASS ACTION ALLEGATIONS

102.  Plaintiffs bring this action on their own behalf and as class representatives pursuant to Federal Rule of Civil Procedure § 23.  The Class and the Sub-Classes are respectively defined, for now, as follows:

a.  All investors in ATMs purchased from NASI who sustained business losses calculated as principal paid minus rents received.

b.  All investors in ATMs purchased from NASI after the date CNB obtained knowledge NASI was committing intentional torts who

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1              sustained business losses on their post-knowledge investments

2              calculated as principal paid minus rents received; and

3         c.  All class members aged 65 or older at the time of their payment of

4              principal to NASI.

5      103.  Excluded from the definition of the Class are the Defendants and any

6  person, corporation, or other entity related to, controlled by or affiliated with any

7  defendant. Included in the term "investors" in the definition of the Class are

8  entities and representatives of these entities.

9      104.  The members of the Class are so numerous that joinder of all of them

10  is impracticable. There are at least 1,251 victims of the Defendants' conduct

11  residing in several states.

12      105.  There are questions of law and fact which are common to the Class

13  and which predominate over questions affecting any individual class member.

14  The common questions include, but are not limited to, the following:

15         a.  whether Defendants Gillis and Wishner engaged in mail

16       fraud and wire fraud as part of a pattern of racketeering;

17         b.  whether the knowledge of Fitzwilliam is imputed to CNB

18       to support the charge of aiding and abetting against CNB; and

19         c.  whether CNB provided material assistance to the Ponzi

20       scheme with knowledge it was a scheme.

21      106.  Plaintiffs' claims are typical of the claims of the Class as a whole.

22  Plaintiffs are members of the Class and have suffered harm and are likely to

23  continue to suffer harm due to their loss of funds.

24      107.  Plaintiffs will fairly and adequately protect the interests of the Class.

25  Plaintiffs' interests are consistent with and not antagonistic to the interest of the

26  Class.  Plaintiffs lost tens of thousands of dollars and have sought out and

27  retained counsel experienced in Ponzi scheme litigation and receiverships in an

28  effort to get the money back and other damages repaid.  Plaintiffs have agreed to

**EXHIBIT A**

act for the benefit of all of the victims similarly situated and not to put Plaintiffs' individual interest ahead of any member of the Class.

108.   The prosecution of separate actions by numerous individual members of the Class may create a risk that inconsistent or varying adjudications would establish incompatible standards of conduct for the parties opposing the Class, and may substantially impair or impede the interests of other members of the Class to protect their interests.

109.   The acts and actions of Defendants applicable to the Plaintiffs apply generally to the Class, thereby making the final relief granted by the Court applicable to the Class as a whole.

110.   This class action would be superior to other available methods for the fair and efficient adjudication of the controversy between the parties.   The interest of most members of the Class in individually controlling the prosecution of separate actions appears low, due to the complexity of the case.   Most members would be unable or unwilling to individually prosecute an action without joining their claims with other claimants which is generally difficult. The amount of damages at stake for each victim varies radically from a few thousand dollars to millions of dollars. Claimants with excessively large claims will most likely opt out and prosecute their own cases. Separate suits on the smaller claims would be impractical yet settlements with Defendants and the insurers will require complete closure of all claims by all claimants favoring the use of the class mechanism.   Concentrating litigation in one forum will also promote judicial efficiency.

111.   This proposed class action is manageable.   There are hundreds of victims with relatively large claims compared to most class actions involving a multitude of claimants with minimal claims.   Participation in the case by class members who do not opt out will be assured by the size of the loss sustained by each member.

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

# XI.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## RICO Liability – Violations of 18 U.S.C. § 1962 (c) and (d);

## Civil RICO and Conspiracy to Commit Civil RICO

## (Against Defendants Gillis and Wishner)

112.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

113.   Defendants Gillis and Wishner have been convicted.   Defendants Gillis and Wishner, as well as the Non-Defendant RICO Enterprise Members, are (within the meaning of 18 U.S.C. § 1961), persons involved in the creation and maintenance of a racketeering enterprise as defined in § 1964.  Defendants Gillis and Wishner have been employed by and/or associated with the enterprise, and while so employed and/or associated, conducted, directed, managed or participated in, either directly or indirectly, the conduct of the affairs and business of the enterprise affecting interstate commerce through the pattern of racketeering activity described above.

### The Scheme

114.   The scheme was to run the NASI Ponzi scheme to make money off of the Plaintiffs and other unsuspecting victims.   The scheme required the passage of time and time could be obtained only by defrauding new investors to fund older obligations which could not fund because those persons' funds had been misappropriated.

115.   Defendants Gillis and Wishner assisted the enterprise by (i) misappropriating funds with false promises, (ii) investing the stolen funds into the enterprise, (iii) concealing their thefts by making lulling payments back to older investors with newer investors' money based on fabricated account statements; and (iv) obtaining the active assistance of Fitzwilliam, the Vice President at CNB, to help conceal and perpetuate the scheme.

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

116.   The success of the scheme was dependent upon the ability to mislead investors regarding the use and security of the funds and to hide the ever worsening financial condition of NASI which required the active participation of CNB, through its Branch Manager.

### The RICO Enterprise

117.   The enterprise is a group of persons and entities associated together for a common purpose of engaging in a course of conduct.  The enterprise here consisted of Gillis, Wishner, NASI and its employees, the Non-Defendant RICO Enterprise Members, CNB and its Branch Manager as well as Betty Saleh.  Each person employed by or associated with the enterprise had separate identities apart from the criminal enterprise itself. Each person associated with the enterprise managed and directed specific components of the enterprise, each component being critical to the success of the enterprise.

118.   The enterprise operated nationwide.  One primary location was a suite of offices located in Calabasas, California, but enterprise affairs were conducted in various parts of the United States by using interstate wires and communications, and otherwise affecting interstate commerce. At all times herein mentioned, Defendants Gillis, Wishner and the others listed above, operated as an "enterprise" as defined by 18 U.S.C. § 1961.

### The Pattern of Racketeering

119.   In furtherance of the ongoing scheme, those in the enterprise committed thousands of predicate acts.  With the knowledge of the theft of the funds, Defendants Gillis and Wishner, as well as the others, knowingly aided and abetted and provided substantial assistance in the commission of the predicate acts proscribed by 18 U.S.C. § 1961(1)(b), between at least 2009 and 2014, including mail and wire fraud (*i.e.*, sending out in the mail and the wires fraudulent marketing materials, agreements, fabricated "rental" income statements and rental checks for rent on phantom ATMs.) Thereafter, the pattern

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1 of racketeering continued and other efforts were undertaken to ensure the
2 misconduct of the enterprise was concealed in an effort to avoid civil and/or
3 criminal liability.

4 **Injury to Business or Property**

5 120.   As the actual and proximate cause of the operation and affairs of the
6 enterprise through the pattern of racketeering activity and commission of
7 predicate acts, Plaintiffs and the class members have been damaged in amounts to
8 be shown at trial, including but not limited to the loss of funds provided to the
9 enterprise, and they have incurred additional damages as a proximate and
10 foreseeable result, including but not limited to: (i) lost interest; (ii) adverse tax
11 consequences; (iii) professional fees incurred in mitigating adverse tax
12 consequences; and (iv) lost opportunity.   Plaintiffs are entitled to an award of
13 actual damages in an amount to be determined at trial.   The conduct of
14 Defendants Gillis and Wishner was intentional, willful, malicious, and
15 oppressive, by virtue of which Plaintiffs pray for an award of treble damages.

16 **SECOND CAUSE OF ACTION**

17 **Fraud**

18 **(Against Gillis and Wishner)**

19 121.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

20 122.   Gillis and Wishner, conspiring with CNB and Saleh, knowingly
21 issued or caused to be issued uniform material misrepresentations to Plaintiffs,
22 which were reasonably relied upon by Plaintiffs.

23 123.   The Defendants' fraudulent misrepresentations caused the Plaintiffs
24 to transfer funds to NASI in exchange for non-existent ATMs.

25 124.   The Defendants' fraud and deceit proximately caused damages to the
26 Plaintiffs and to the Class in amounts to be shown at trial. The Defendants'
27 misconduct was despicable and malicious (justifying exemplary and punitive
28 damages).

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

**THIRD CAUSE OF ACTION**

**Aiding and Abetting Fraud**

**(Against CNB, Fitzwilliam and Betty Saleh)**

125.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

126.   Defendants CNB, Fitzwilliam and Betty Saleh had actual knowledge of the primary wrong of fraud being committed by Gillis and Wishner through NASI and provided substantial assistance to the intentional tort committed by the primary wrongdoers.

127.   As the direct and proximate result of Defendants' aiding and abetting the fraud committed by Gillis and Wishner, the Ponzi scheme ensnared the Plaintiffs and class members causing them to be damaged in amounts to be proven at trial. The conduct of Defendants CNB, Fitzwilliam and Betty Saleh was intentional, willful, malicious, and oppressive, by virtue of which Plaintiffs pray for an award of exemplary and punitive damages.

**FOURTH CAUSE OF ACTION**

**Conspiracy to Commit Fraud**

**(Against Defendants Gillis, Wishner, CNB, and Betty Saleh)**

128.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

129.   In June of 2009, Fitzwilliam and Betty Saleh became desperate for money and needed to conceal assets from victims of Betty Saleh's investment scams.  In exchange for accommodations and preferential payments from NASI, the Defendants, and each of them, conspired with each other to promote the perpetuation of the  Ponzi scheme through NASI's accounts at CNB for as long as possible.

130.   The Defendants' conspiracy to commit fraud was done with evil intent and each defendant is guilty of oppression, fraud and malice, justifying the imposition of a penalty on Defendants to make an example of them to deter others from such behavior in the future.

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

**FIFTH CAUSE OF ACTION**

**Aiding and Abetting Conversion**

**(Against Defendants Gillis, Wishner and CNB)**

131.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

132.   Plaintiffs had the right to possess the ATMs purportedly sold to them by NASI or the money transferred to NASI for the specific purpose of buying the machines. CNB knew the money transferred to NASI by Plaintiffs was to be used for a specific purpose, and no other purpose. NASI wrongfully interfered with Plaintiffs' possessory interest in the money designated to buy the ATMs. CNB, with actual knowledge, provided substantial assistance to NASI's wrongful interference with Plaintiffs' possessory interest in the money designated to buy the ATMs.

133.   As the direct and proximate result of Defendants' aiding and abetting conversion, Plaintiffs and the Class Members have been damaged in amounts to be proven at trial.

**SIXTH CAUSE OF ACTION**

**Aiding and Abetting Breach of Fiduciary Duty**

**(Against Defendants Fitzwilliam and CNB)**

134.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

135.   The money transferred by the Plaintiffs to NASI was to be held and used by NASI solely to buy ATMs for Plaintiffs, and for no other purpose, creating a fiduciary duty on the part of NASI in favor of Plaintiffs.  CNB knew the money deposited into its NASI account was specifically earmarked to be used to buy ATMs for each Plaintiff and for no other purpose. The form lease agreement between NASI and each Plaintiff created  a fiduciary relationship of trust and confidence between the parties arising out of NASI's duty to collect, account and then remit to Plaintiffs' the rent earned by their ATMs. CNB knew the terms and conditions of the lease agreement because Fitzwilliam was himself

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1    an owner and lessor of NASI ATMs through Bribet Services.

2         136.   Fitzwilliam and CNB had actual knowledge that NASI was breaching

3    fiduciary duties owed to each Plaintiff by not acquiring the ATMs with the

4    money specifically earmarked to be used to buy ATM machines and by

5    fabricating the rental receipts. Fitzwilliam and CNB substantially assisted NASI's

6    breaches of fiduciary duty by paying the Plaintiffs' phantom rent based on

7    fabricated transaction fees with money specifically earmarked to acquire ATM

8    machines.

9         137.   As the direct and proximate result of Defendants' aiding and abetting

10   the breaches of fiduciary duties owed to Plaintiffs by NASI, Plaintiffs have been

11   damaged in amounts to be proven at trial.

12                        **SEVENTH CAUSE OF ACTION**

13                   **Intentional Interference with Contracts**

14                  **(Against Defendants Fitzwilliam and CNB)**

15        138.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

16        139.   NASI had a contractual relationship with each Plaintiff and the

17   Defendants knew the specific terms, conditions and obligations articulated in

18   each contract entered into between each Plaintiff and NASI.

19        140.   Fitzwilliam and CNB induced, promoted, facilitated and assisted

20   NASI in breaching each contract with each Plaintiff by knowingly using the

21   investors' money deposited to buy ATMs to pay phantom rental income to other

22   investors in breach of each contract.

23        141.   The Defendants knowing, tortious and unprivileged interference of

24   the business relationship between NASI and each Plaintiff damaged Plaintiffs by

25   the breach of NASI's contractual obligations in an amount to be proven at trial.

26   ///

27   ///

28   ///

---

48

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

**EIGHTH CAUSE OF ACTION**

**Negligence**

**(Against Defendant CNB)**

142.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

143.   CNB owes a duty of care to all Plaintiffs to act as a reasonably prudent bank under the same or similar circumstances.

144.   After CNB obtained the knowledge, through its employees, that NASI was a Ponzi scheme hurting innocent investors, it had the duty to act like a reasonably prudent bank.

145.   A reasonably prudent bank that obtains actual knowledge through its employees that a customer is using it as the vehicle to perpetrate financial crimes would immediately terminate its banking relationship with that wrongdoing customer. CNB breached its legal duty when it failed to terminate NASI as a depositor as soon as it discovered NASI was a fraud and using the bank to accomplish its scheme.   Instead, CNB unreasonably maintained a banking relationship with NASI which proximately caused the foreseeable harm suffered by Plaintiffs.

146.   CNB failed to act as a reasonably prudent bank, which caused Plaintiffs to suffer losses in an amount to be shown at trial**.**

**NINTH CAUSE OF ACTION**

**Negligent Supervision**

**(Against Defendant CNB)**

147.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein, but allege this cause of action as an alternative remedy.

148.   CNB may argue that Fitzwilliam acted outside the course and scope of his employment for his own individual advantage and gain precluding the imputation of his acts and knowledge to CNB for purposes of establishing knowledge and/or vicarious liability.

49

**EXHIBIT A**

149.   Assuming the above argument, CNB placed Fitzwilliam in a position of immense power to act as the manager of the branch without any vetting, supervision or control over his actions. Such a delegation of authority and control over the instruments of commerce was unreasonable, and it caused Plaintiffs to suffer damages, according to proof at trial.

**TENTH CAUSE OF ACTION**

**Financial Elder Abuse**

**(Against Defendants Gillis, Wishner and CNB)**

150.   Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

151.   The Defendants violated the Elder Abuse and Dependent Adult Civil Protection Act by taking financial advantage of the Sub-Class Members and by failing to report the abuse, which would have terminated the Ponzi scheme.

152.   Each Sub-Class Member was 65 years of age or older, or was a dependent adult at the time of the misconduct.

153.   Each Defendant took, hid, appropriated, obtained or retained the Sub-Class Members' property (*i.e.*, a Plaintiff's check for an ATM purchase, a Plaintiff's ATM machine, rent due to a Plaintiff from the Plaintiff's ATM machine, etc.).

154.   Alternatively, each Defendant assisted in taking, hiding, appropriating, obtaining, or retaining the Sub-Class Members' property.

155.   The Defendants took, hid, appropriated, obtained, retained, or assisted in taking, hiding, appropriating, obtaining or retaining the Sub-Class Members' property for a wrongful use, with the intent to defraud, or by undue influence. Additionally, or alternatively, each Defendant's conduct was committed in bad faith.

156.   Each Defendant knew or should have known that: (i) their misconduct was likely to be harmful to the Sub-Class Members; and/or (ii) the Sub-Class Members had the right to have their money or property transferred and

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

1    made readily available to them.

2        157.   Each Sub-Class Member was legally and proximately harmed by

3    each Defendant's violation of the Act.

4                                      **XII.**

5                            **PRAYER FOR RELIEF**

6        158.   WHEREFORE, Plaintiffs pray for Judgment against the Defendants

7    as follows:

8            a.   For certification of the Class as defined;

9            b.   For the appointment of Plaintiffs as the Class Representatives
                  and Plaintiffs' counsel as counsel for the Class;

10

11           c.   For special and consequential damages to Plaintiffs and Class
                  members measured, in part,  by the net loss of their stolen

12                funds;

13           d.   For exemplary and/or punitive damages, as applicable;

14           e.   For pre-judgment interest;

15           f.   For costs of this action, including reasonable attorneys' fees
                  as  afforded by any applicable law; and

16

17           g.   For all other relief the Court deems just and proper.

18                                    **XIII.**

19                            **JURY DEMAND**

20       Plaintiffs demand a jury trial.

21   Dated:  April 15, 2016                Respectfully submitted,

22                                            /s/ Robert L. Brace

23                                           Robert L. Brace

24

25                                        HOLLISTER & BRACE, PC

26                                    By  /s/ Michael P. Denver

27                                       Michael P. Denver

28                                       Attorneys for Plaintiffs
                                         and all others similarly situated

                                        51

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

## LIST OF EXHIBITS

| Exhibit No. | Description | Paragraph No.(s) |
|---|---|---|
| 1 | Form ATM Purchase Agreement, ATM Lease Agreement, and Addendum used by Nationwide Automated Systems, Inc. ("NASI") | 2 |
| 2 | Examples of fabricated "rental income" statements sent to investors by NASI each month with rent check | 3 |
| 3 | Receiver's summary of payments from Patrick Brian Fitzwilliam ("Fitzwilliam") to NASI and from NASI to Fitzwilliam's dba Bribet Services | 7, 68, 78, 93 |
| 4 | December 15, 2010 FINRA Order Accepting Offer of Settlement which permanently barred Betty Saleh ("Saleh") from association with any FINRA member in any capacity | 9, 63 |
| 5 | May 10, 2011 California Insurance Commissioner's Order of Summary Revocation of Saleh's license to sell insurance | 9 |
| 6 | August 2013 FINRA Dispute Resolution Arbitration Award in dispute between Fitzwilliam and Saleh against Wedbush | 10, 70 |
| 7 | July 9, 2009 NASI deposit slip at City National Bank ("CNB") with the notation "checks within Brian's limits largest CK $120,000."  Check number 12 for $120,000 was from Fitzwilliam's father-in-law Gensar Saleh as trustee. | 53, 55, 72 |
| 8 | July 31, 2009 CNB account statement for NASI's "General Account" showing comparison of real ATM rent and investor deposits | 54, 55, 56, 82, 91 |
| 9 | NASI Investors Account Statement showing deposits of $1,400,000 and $500,000 from the NASI  General Account, payment of $1.7 million to investors by paying 794 checks | 55, 56 |
| 10 | Declaration of Rick Cooper submitted in Debra Saleh bankruptcy matter, with attached forged signatures and fabricated account statements by Debra Saleh | 64 |
| 11 | December 30, 2008 "no consideration" Grant Deed for Via Esquina Calabasas, Ca., wherein Debra Saleh conveyed residence  to her father Gensar Saleh, as a trustee. | 65 |

52

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

| 12 | March 11, 2009 "Quitclaim Deed," conveying of Fairgrange Drive, Agoura Hills, Ca. residence for no consideration to Gensar Saleh. Deed executed by Betty Saleh and Fitzwilliam | 65 |
|----|----|----|
| 13 | February 6, 2016 "Short Form Open-End Deed of Trust" for Fairgrange Drive, Agoura Hills, CA, removing equity in Fitzwilliam's residence prior to Plaintiffs filing the Complaint | 65 |
| 14 | March 5, 2015 Chapter 7 "Final Account and Distribution Report" filed by Trustee in Debra Saleh bankruptcy distributing $14,761.13 to pay over $4 million in creditors' claims | 65 |
| 15 | Contracts and supporting documents for the acquisition of 40 ATMs by Fitzwilliam and Saleh from NASI | 68, 72, 73, 93 |
| 16 | June 30, 2009 check for $120,000 to NASI signed by Gensar Saleh, as Trustee of the S&J Agreement of Trust | 68, 72, 73, 93 |
| 17 | Two $60,000 checks written from NASI to Gensar Saleh and S&J Agreement of Trust to return $120,000 principal on purchase of Tranche 4 | 74, 83 |
| 18 | February 14, 2012 promotional letter written by Fitzwilliam for NASI on CNB letterhead | 74, 79, 83, 85 |
| 19 | August 27, 2014 termination letter for NASI account written by Fitzwilliam | 74, 97 |
| 20 | September 21, 2009 Wall Street Journal article titled "Two Charged in ATM Ponzi Scheme" relating to ATM investment scam similar to NASI's. | 75, 87, 92 |
| 21 | October 26, 2009 Facsimile transmitted from CNB by Fitzwilliam and Betty Saleh directing NASI to repurchase the 20 phantom machines they had previously acquired on November 27, 2006 (Tranche 1) and June 1, 2007 (Tranche 2) | 76 |
| 22 | CNB statement identifying Fitzwilliam as the contact regarding accounts in name of NASI, Gillis and Wishner. Account 4410 was the General Account | 82 |
| 23 | 2010 BSA/AML Examination Manual used by member banks investigating businesses involved in privately-owned Automated Teller Machines | 87 |
| 24 | May 19, 2010 email exchange between Fitzwilliam , Gillis and CNB compliance personnel investigating NASI's ATM business | 87, 89, 90 |

53

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

| | | as part of its annual review to prevent fraud and money laundering by its depositers | |
|---|---|---|---|
| | 25 | Declaration of Peter F. Del Greco of the SEC with certain relevant exhibits attached, including:<br>- Exhibit 20 of Exhibit 25 – Monthly accounting statement from National Link identifying 86 ATMs owned by NASI with their locations;<br>- Exhibit 22 of Exhibit 25 – Excel spreadsheet prepared by Del Greco showing National Link paid NASI $3,252,414 over 54 months;<br>- Exhibit 25 of Exhibit 25- Monthly fee settlement from Cardtronics identifying 149 ATMs owned by NASI with their locations; and<br>- Exhibit 26 of Exhibit 25- Excel spreadsheet prepared by Del Greco showing Cardtronics paid NASI $3,563,845.65 over 55 months | 92 |
| | 26 | June 2014 – August 2014 CNB account statements showing over $10 million deposited into NASI's General Account by NASI investors after June 25, 2014 subpoena served on CNB | 98 |

FIRST AMENDED CLASS ACTION COMPLAINT

**EXHIBIT A**

## NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

### ATM EQUIPMENT PURCHASE AGREEMENT

_____, 20____

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on "Exhibit A" which will be forth coming within 45 days of this purchase.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
| | |

TOTAL PURCHASE PRICE:               $_____

LESS BUYERS DEPOSIT                 $_____

BALANCE DUE ON SIGNING:             $_____

SELLER shall deliver the ATM(s) to location written on Exhibit A and forwarded to the buyer within sixty (60) days of the date hereof. If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom. The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

R00001887

**EXHIBIT 1**

**EXHIBIT A**

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By:_____

Title:  PRESIDENT

By:_____

Title:_____

BUYER:

By: X_____

Title:  OWNER

_____
(Address)

_____
(Telephone Number)
Social Security Number: _____

-2-

R00001888

**EXHIBIT 1**

**EXHIBIT A**



## NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

### ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of _____, 20___ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and
_____    _____
_____    _____("Lessor").

### RECITALS

A.    NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.    Lessor is the owner of the ATM(s) listed and described on Schedule A which will be forwarded within 45 days.

C.    NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.    Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.    Lease of Equipment.  Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A which will be forwarded to Lessor within forty five (45) days from the date of this Agreement.

2. Term.  The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above.   The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

R00001881

**EXHIBIT 1**
EXHIE, ,

**EXHIBIT A**

3.    Rent.  NASI shall pay to Lessor as rent an amount equal to $0.50 for each "approved transaction" (as defined herein) produced by the ATMs for each calendar month during the term of this Agreement.  For purposes of this Agreement, an "approved transaction" is defined as a transaction produced by the ATMs for which the appropriate ATM system, (i.e. STAR, PLUS, CIRRUS, AMEX, VISA, PULSE, etc.), and federal, state and local laws permit a transaction fee to be charged to ATM users.

Commencing with the first month of this Agreement and continuing during its term, including any extensions thereof, NASI shall provide Lessor with an accounting of the number of approved transactions produced by the ATMs during the previous calendar month.  Concurrently therewith, NASI shall pay Lessor the required rent payments as provided for herein.  All such accounting and rent payments will be due no later than thirty (30) days after the end of each calendar month.

4.  Relocation of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, may relocate with lessors permission any or all of the ATMs to other location(s) in the United States of America at any time or times; provided, however, that prior to moving or relocating any ATM, NASI shall provide Lessor with a thirty (30) day written notice advising it of the new location(s) of the ATMs. Any ATM owned by Lessor that has been terminated by sale of the location or by destruction whereby the ATM becomes non operational, shall be replaced immediately by Nationwide with one or more of their ATMs which is producing a like amount of transactions.

5.    Operation/Maintenance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall operate and maintain the ATMs and provide all services relating thereto.  Such services include, but are not limited to, processing and accounting for all ATM transactions, obtaining, the delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs.

6.    Insurance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall maintain insurance coverage on the ATMs in an amount not less than the full replacement value of the ATMs. All insurance proceeds on the ATMs shall be payable directly to Nationwide Upon the occurrence of any such insurable event, Nationwide shall immediately replace the ATM.

-2-

R00001882

**EXHIBIT 1**

**EXHIBIT A**

NASI shall also maintain liability insurance (both public liability and property damage) covering the operation of the ATMs. NASI shall inform Lessor in writing at least fifteen (I5) days in advance of any policy cancellation.

7.    **Indemnity.**  NASI shall indemnify and hold Lessor harmless from and against any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, (including attorney's fees), arising out of, connected with, or resulting from the possession, use, operation, maintenance, or repair of the ATMs by NASI, to the fullest extent permitted by law.

8.    **Authority/Ownership of Lessor.**  Lessor has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement, without the approval or consent of any other persons.  Lessor is the owner of the ATMs, free and clear of all liens, encumbrances, pledges, security interests, claims, charges, and restrictions of any kind. The ATMs is/are and shall at all times remain the sole and exclusive personal property of Lessor, and NASI shall have no right or interest therein except as expressly set forth in this Agreement.

9. **Taxes/License Fees.**   During the term of this Agreement, including any extensions thereof, Nationwide shall pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs.

10.    **Condition of Equipment.**  Lessor makes no representation as to the condition of the ATMs and NASI acknowledges and agrees that all of the ATMs listed on Schedule "A" is/are being leased in its/their "As-Is," "Where-Is" condition, without representations or warranties of any kind by Lessor.

11.    **Non-Interference.**  During the term of this Agreement, including any extensions thereof, and provided that NASI is not in default under the terms hereof, Lessor agrees not to interfere with the operation of the ATMs by NASI in any manner including, but not limited to, contacting the locations where the ATMs is/are installed and/or any service providers under contract with NASI relating to the operation of such ATMs.

12.    **Return of ATMs to Lessor.**  Upon termination of this Agreement, NASI

-3-

R00001883

**EXHIBIT 1**

**EXHIBIT A**

shall, at its sole cost and expense, deliver the ATMs to Lessor's designation or return the initial investment back to Lessor. This is the option of the Lessor.

13.   **Miscellaneous Provisions**

A.   This Agreement, including any exhibits and schedules, constitutes the entire Agreement between the parties pertaining to the subject matter contained in it and supersedes any and all prior agreements between them. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties.

B.   All of the parties' rights and remedies hereunder shall be deemed to be cumulative and not exclusive. No waiver by either party to this Agreement of any of the provisions hereof shall be deemed, or shall constitute, a waiver of any other provision, covenant or condition of this Agreement, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

C.   This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of California.

D.   If any dispute or claim arising out of or related to this Agreement, or the breach or enforcement thereof, results in a legal action or other proceeding, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

E.   All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

TO NASI:       Nationwide Automated Systems, Inc.
5000 No. Parkway Calabasas, Suite 303
Calabasas, CA. 91302

TO LESSOR:

F.   This Agreement shall be binding on, and shall inure to, the benefit of the parties to it and their respective heirs, legal representatives,

-4-

R00001885

**EXHIBIT 1**

**EXHIBIT A**

successors, and assigns.

      G.    The parties hereto each agree to execute, acknowledge and deliver any additional documents and instruments, and to take any other action consistent with the terms of this Agreement that may reasonably be requested by the other party to give effect to the provisions hereof.

      H.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

      I.    If any provision of this Agreement shall be held to be unlawful, void or unenforceable by any court of competent jurisdiction for any reason, such provision or provisions shall be deemed severable from and shall in no way affect the validity or enforceability of the remaining provisions of this Agreement.

      J.    ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR THE BREACH THEREOF, SHALL BE SETTLED BY ARBITRATION, TO BE CONDUCTED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AT THE REQUEST OF EITHER PARTY, IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AND JUDGMENT UPON AN AWARD RENDERED BY THE ARBITRATOR(S) MAY BE RENDERED IN ANY COURT HAVING JURISDICTION THEREOF.

THE PARTIES SHALL HAVE THE RIGHT TO DISCOVERY IN AID OF THE ARBITRATION IN ACCORDANCE WITH CODE OF CIVIL PROCEDURE SECTION 1283.05; PROVIDED, HOWEVER, THAT THE ARBITRATOR'S PERMISSION SHALL NOT BE REQUIRED FOR SUCH DISCOVERY.

EACH OF THE PARTIES RESERVES THE RIGHT TO FILE A JUDICIAL ACTION TO ENABLE THE RECORDING OF A NOTICE OF PENDING ACTION, OR TO APPLY FOR ORDERS OF ATTACHMENT, RECEIVERSHIP, INJUNCTION, OR OTHER PROVISIONAL REMEDIES ON THE GROUNDS THAT THE ARBITRATION AWARD TO · WHICH THE APPLICANT MAY BE ENTITLED MAY BE RENDERED INEFFECTUAL IN THE ABSENCE OF SUCH RELIEF.  ANY SUCH ACTION BY A PARTY HERETO SHALL NOT CONSTITUTE A WAIVER OF THE RIGHT TO ARBITRATION UNDER THIS PROVISION.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.

-5-

R00001884

EXHIBIT 1

EXHIBIT A

A California Corporation

By:_____          _____

Title: ┌RESIDENT

LESSOR:

By:__X_____

Title: LESSOR

-6-

R00001886

**EXHIBIT 1**

**EXHIBIT A**

Nationwide Automated Systems, Inc.

## ADDENDUM TO OWNER LEASE AGREEMENT

1) If at anytime the owner's ATM machine fails to make enough transactions
   To pay the owner a monthly check equivalent to a twenty (20%) percent
   Annual return on the owner's investment of $12,000. Nationwide Automated
   Systems, Inc. guarantees to pay owner the difference between what the
   Owner has received and $2,400. This is based on a rental fee of $.50
   Per transaction. This is done on an annual basis calculating and commencing
   with the first month of the lease as stated under paragraph 3 of the "ATM
   Equipment Lease Agreement".

2) At anytime after the first two years of ownership, should the owner wish to
   .... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
   Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _____

Owner

X _____

R00001889

**EXHIBIT 1**

**EXHIBIT A**

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA  92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period: 01-Mar 2014

<u>Investor Summary for John Madison</u>

| <u>Serial Nbr</u> | <u>Hotel Name</u> | <u>Location</u> | <u>Transaction</u> |
|---|---|---|---|
| EA-311728 | Crossroads Conv. Mart | Kensington, Mn. | 604 |
| EA-311753 | BP Conv. Mart | St. Paul, Mn. | 582 |
| EA-311799 | Conoco Conv. Mart | St. Louis, Mo. | 660 |
| EA-641273 | QC Discount Mini Mart | Violet, LA. | 625 |
| EA-641277 | Pride One Stop | Zachary, LA. | 646 |
| EA-641284 | Sunshine Express | Ocala, FL. | 659 |
| EA-641288 | Planet Ozone Mini Mart | Stuart, FL. | 705 |

Total            4,481

$ .50

**$2,240.50**

**EXHIBIT 2**

**EXHIBIT A**

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA   92123

DISTRIBUTOR:   NATIONWIDE AUTOMATED SYSTEMS

Processing Period:   01-Apr   2014

Investor Summary for John Madison

| Serial Nbr | Hotel Name | Location | Transaction |
|------------|------------|----------|-------------|
| EA-311728 | Crossroads Conv. Mart | Kensington, Mn. | 615 |
| EA-311753 | BP Conv. Mart | St. Paul, Mn. | 593 |
| EA-311799 | Conoco Conv. Mart | St. Louis, Mo. | 652 |
| EA-641273 | QC Discount Mini Mart | Violet, LA. | 635 |
| EA-641277 | Pride One Stop | Zachary, LA. | 655 |
| EA-641284 | Sunshine Express | Ocala, FL. | 670 |
| EA-641288 | Planet Ozone Mini Mart | Stuart, FL. | 715 |

|  |  |  |  |
|--|--|--|--|
|  |  | Total | 4,535 |
|  |  |  | $ .50 |
|  |  |  | $2,267.50 |

**EXHIBIT 2**

**EXHIBIT A**

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA  92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-May  2014

Investor Summary for John Madison

| Serial Nbr | Hotel Name | Location | Transaction |
|---|---|---|---|
| EA-311728 | Crossroads Conv. Mart | Kensington, Mn. | 624 |
| EA-311753 | BP Conv. Mart | St. Paul, Mn. | 604 |
| EA-311799 | Conoco Conv. Mart | St. Louis, Mo. | 665 |
| EA-641273 | QC Discount Mini Mart | Violet, LA. | 626 |
| EA-641277 | Pride One Stop | Zachary, LA. | 648 |
| EA-641284 | Sunshine Express | Ocala, FL. | 661 |
| EA-641288 | Planet Ozone Mini Mart | Stuart, FL. | 707 |

|  |  |  |  |
|---|---|---|---|
|  |  | Total | 4,535 |
|  |  |  | $ .50 |

$2,267.50

**EXHIBIT 2**

**EXHIBIT A**

**Equity Receivership over Nationwide Automated Systems, Inc., et al.**
**Schedule of Investor Payments to and from NASI**
**Bribet Services (Fitzwilliams, Brian & Bette)**
**Investor Acct. REDACTED**

|  |  |  | Deposits (Investment) | Payments Received | Total ((Profit)/ Loss) |
|---|---|---|---|---|---|
| Bribet Services | Acct. No. | REDACTED | $ 360,000.00 | $ (603,601.50) | $ (243,601.50) |

**Bribet Services - Deposits:**

| Bank Name | Account # | Trans Type | Date | Check # | Payor/Payee | Memo/Notes | Amount | Cumulative Total |
|---|---|---|---|---|---|---|---|---|
| CNB | REDACTED | Deposit | 11/25/06 | 3707825 |  | Cashier's Check | $ 120,000.00 | $ 120,000.00 |
| CNB | REDACTED | Deposit | 06/27/07 | 808322411 |  | Cashier's Check | $ 120,000.00 | $ 240,000.00 |
| CNB | REDACTED | Deposit | 08/07/08 | 2344601755 |  | Cashier's Check | $ 120,000.00 | $ 360,000.00 |
|  |  |  |  |  |  | Total | $ 360,000.00 |  |

**Bribet Services - Payments from NASI:**

| Bank Name | Account # | Trans Type | Date | Check # | Payor/Payee | Memo/Notes | Amount | Cumulative Total | 20% Monthly Payment (Per Contract) | Payments in (Excess)/Shortage of 20% |
|---|---|---|---|---|---|---|---|---|---|---|
| CNB | REDACTED | Withdrawal | 03/01/07 |  | Bribet Services |  | $ (1,995.50) |  | $ (2,000.00) | $ 4.50 |
| CNB |  | Withdrawal | 04/01/07 |  | Bribet Services |  | $ (1,953.00) |  | $ (2,000.00) | $ 47.00 |
| CNB |  | Withdrawal | 05/01/07 |  | Bribet Services |  | $ (2,019.00) |  | $ (2,000.00) | $ (19.00) |
| CNB |  | Withdrawal | 06/01/07 |  | Bribet Services |  | $ (1,998.00) |  | $ (2,000.00) | $ 2.00 |
| CNB |  | Withdrawal | 07/01/07 |  | Bribet Services |  | $ (2,063.00) |  | $ (2,000.00) | $ (63.00) |
| CNB |  | Withdrawal | 08/01/07 |  | Bribet Services |  | $ (2,013.50) |  | $ (2,000.00) | $ (13.50) |
| CNB |  | Withdrawal | 09/05/07 | 34797 | Bribet Services |  | $ (3,947.00) | $ (3,947.00) | $ (4,000.00) | $ 53.00 |
| CNB |  | Withdrawal | 10/03/07 | 35399 | Bribet Services |  | $ (3,926.50) | $ (7,873.50) | $ (4,000.00) | $ 73.50 |
| CNB |  | Withdrawal | 11/05/07 | 35987 | Bribet Services |  | $ (3,884.50) | $ (11,758.00) | $ (4,000.00) | $ 115.50 |
| CNB |  | Withdrawal | 12/05/07 | 36569 | Bribet Services |  | $ (3,884.50) | $ (15,642.50) | $ (4,000.00) | $ 115.50 |
| CNB |  | Withdrawal | 01/09/08 | 37151 | Bribet Services |  | $ (3,891.00) | $ (19,533.50) | $ (4,000.00) | $ 109.00 |
| q |  | Withdrawal | 02/04/08 | 37751 | Bribet Services |  | $ (3,863.50) | $ (23,397.00) | $ (4,000.00) | $ 136.50 |
| l |  | Withdrawal | 02/20/08 | 38285 | Bribet Services |  | $ (521.50) | $ (23,918.50) |  |  |
| CNB |  | Withdrawal | 03/05/08 | 38357 | Bribet Services |  | $ (3,857.00) | $ (27,775.50) | $ (4,000.00) | $ 143.00 |
| CNB |  | Withdrawal | 04/04/08 | 38979 | Bribet Services |  | $ (3,883.50) | $ (31,659.00) | $ (4,000.00) | $ 116.50 |
| CNB |  | Withdrawal | 05/05/08 | 39620 | Bribet Services |  | $ (3,777.00) | $ (35,436.00) | $ (4,000.00) | $ 223.00 |
| CNB |  | Withdrawal | 06/03/08 | 40297 | Bribet Services |  | $ (3,822.50) | $ (39,258.50) | $ (4,000.00) | $ 177.50 |
| CNB |  | Withdrawal | 07/03/08 | 40941 | Bribet Services |  | $ (3,889.00) | $ (43,147.50) | $ (4,000.00) | $ 111.00 |
| CNB |  | Withdrawal | 08/04/08 | 41590 | Bribet Services |  | $ (3,777.50) | $ (46,925.00) | $ (4,000.00) | $ 222.50 |
| CNB |  | Withdrawal | 09/03/08 | 42248 | Bribet Services |  | $ (3,759.50) | $ (50,684.50) | $ (4,000.00) | $ 240.50 |
| CNB |  | Withdrawal | 10/06/08 | 42906 | Bribet Services |  | $ (5,686.00) | $ (56,370.50) | $ (6,000.00) | $ 314.00 |
| CNB |  | Withdrawal | 10/06/08 | 43551 | Bribet Services | 20% Adjustment | $ (799.50) | $ (57,170.00) |  |  |
| CNB |  | Withdrawal | 11/04/08 | 43642 | Bribet Services |  | $ (5,659.50) | $ (62,829.50) | $ (6,000.00) | $ 340.50 |
| CNB |  | Withdrawal | 12/03/08 | 44404 | Bribet Services |  | $ (5,525.00) | $ (68,354.50) | $ (6,000.00) | $ 475.00 |
| CNB |  | Withdrawal | 01/06/09 | 45169 | Bribet Services |  | $ (5,312.50) | $ (73,667.00) | $ (6,000.00) | $ 687.50 |
| CNB |  | Withdrawal | 02/03/09 | 45947 | Bribet Services |  | $ (5,232.50) | $ (78,899.50) | $ (6,000.00) | $ 767.50 |
| CNB |  | Withdrawal | 02/25/09 | 47445 | Bribet Services | 20% Adjustment | $ (1,520.00) | $ (80,419.50) |  |  |
| CNB |  | Withdrawal | 03/03/09 | 46774 | Bribet Services |  | $ (5,113.50) | $ (85,533.00) | $ (6,000.00) | $ 886.50 |
| CNB |  | Withdrawal | 04/03/09 | 47606 | Bribet Services |  | $ (4,977.00) | $ (90,510.00) | $ (6,000.00) | $ 1,023.00 |
| CNB |  | Withdrawal | 05/12/09 | 48397 | Bribet Services |  | $ (4,978.50) | $ (95,488.50) | $ (6,000.00) | $ 1,021.50 |
| CNB |  | Withdrawal | 06/01/09 | 49175 | Bribet Services |  | $ (4,991.50) | $ (100,480.00) | $ (6,000.00) | $ 1,008.50 |
| CNB |  | Withdrawal | 07/06/09 | 49981 | Bribet Services |  | $ (5,082.00) | $ (105,562.00) | $ (6,000.00) | $ 918.00 |
| CNB |  | Withdrawal | 08/10/09 | 50799 | Bribet Services |  | $ (5,040.50) | $ (110,602.50) | $ (6,000.00) | $ 959.50 |
| CNB |  | Withdrawal | 09/04/09 | 51651 | Bribet Services |  | $ (7,290.50) | $ (117,893.00) | $ (6,000.00) | $ (1,290.50) |
| CNB |  | Withdrawal | 09/28/09 | 53286 | Bribet Services | 20% Adjustment | $ (2,549.50) | $ (120,442.50) |  |  |
| CNB |  | Withdrawal | 09/28/09 | 53287 | Bribet Services | 20% Adjustment | $ (3,363.50) | $ (123,806.00) |  |  |
| CNB |  | Withdrawal | 10/07/09 | 52518 | Bribet Services |  | $ (7,313.00) | $ (131,119.00) | $ (6,000.00) | $ (1,313.00) |
| CNB |  | Withdrawal | 11/02/09 | 8396 | Bribet Services | Buyback of 20 ATMS | $ (240,000.00) | $ (371,119.00) |  |  |
| CNB |  | Withdrawal | 11/03/09 | 53414 | Bribet Services |  | $ (7,209.50) | $ (378,328.50) | $ (2,000.00) | $ (5,209.50) |
| CNB |  | Withdrawal | 12/03/09 | 54279 | Bribet Services |  | $ (7,307.50) | $ (385,636.00) | $ (2,000.00) | $ (5,307.50) |
| CNB |  | Withdrawal | 12/15/09 | 55094 | Bribet Services | 20% Adjustment | $ (6,673.50) | $ (392,309.50) |  |  |
| CNB |  | Withdrawal | 01/04/10 | 55192 | Bribet Services |  | $ (3,900.50) | $ (396,210.00) | $ (2,000.00) | $ (1,900.50) |
| CNB |  | Withdrawal | 02/08/10 | 56105 | Bribet Services |  | $ (3,885.50) | $ (400,095.50) | $ (2,000.00) | $ (1,885.50) |
| CNB |  | Withdrawal | 03/03/10 | 57062 | Bribet Services |  | $ (3,847.00) | $ (403,942.50) | $ (2,000.00) | $ (1,847.00) |
| CNB |  | Withdrawal | 04/01/10 | 59096 | Bribet Services |  | $ (3,969.00) | $ (407,911.50) | $ (2,000.00) | $ (1,969.00) |
| CNB |  | Withdrawal | 05/04/10 | 60051 | Bribet Services |  | $ (4,062.00) | $ (411,973.50) | $ (2,000.00) | $ (2,062.00) |
| B |  | Withdrawal | 06/07/10 | 61036 | Bribet Services |  | $ (4,081.50) | $ (416,055.00) | $ (2,000.00) | $ (2,081.50) |
| B |  | Withdrawal | 07/07/10 | 62032 | Bribet Services |  | $ (4,048.00) | $ (420,103.00) | $ (2,000.00) | $ (2,048.00) |
| CNB |  | Withdrawal | 08/03/10 | 63045 | Bribet Services |  | $ (4,139.00) | $ (424,242.00) | $ (2,000.00) | $ (2,139.00) |
| CNB |  | Withdrawal | 09/02/10 | 64068 | Bribet Services |  | $ (4,119.50) | $ (428,361.50) | $ (2,000.00) | $ (2,119.50) |
| CNB |  | Withdrawal | 09/20/10 | 66037 | Bribet Services | 20% Adjustment | $ (2,468.00) | $ (430,829.50) |  |  |

**EXHIBIT 3**

**EXHIBIT A**

| Rank | Account # | Trans Type | Date | Check # | Payor/Payee | Memo/Notes | Amount | Cumulative Total | 20% Monthly Payment (Per Contract) | Payments in (Excess)/Shortage of 20% |
|---|---|---|---|---|---|---|---|---|---|---|
| | REDACTED | Withdrawal | 10/06/10 | 65114 | Bribet Services | | $ (4,185.50) | $ (435,015.00) | $ (2,000.00) | $ (2,185.50) |
| CNB | | Withdrawal | 11/04/10 | 66189 | Bribet Services | | $ (4,103.50) | $ (439,118.50) | $ (2,000.00) | $ (2,103.50) |
| CNB | | Withdrawal | 12/03/10 | 67241 | Bribet Services | | $ (4,264.00) | $ (443,382.50) | $ (2,000.00) | $ (2,264.00) |
| CNB | | Withdrawal | 01/05/11 | 68303 | Bribet Services | | $ (4,299.50) | $ (447,682.00) | $ (2,000.00) | $ (2,299.50) |
| CNB | | Withdrawal | 02/02/11 | 69393 | Bribet Services | | $ (4,336.00) | $ (452,018.00) | $ (2,000.00) | $ (2,336.00) |
| CNB | | Withdrawal | 03/03/11 | 70548 | Bribet Services | | $ (4,351.50) | $ (456,369.50) | $ (2,000.00) | $ (2,351.50) |
| CNB | | Withdrawal | 04/04/11 | 71730 | Bribet Services | | $ (4,230.00) | $ (460,599.50) | $ (2,000.00) | $ (2,230.00) |
| CNB | | Withdrawal | 05/03/11 | 72895 | Bribet Services | | $ (4,344.50) | $ (464,944.00) | $ (2,000.00) | $ (2,344.50) |
| CNB | | Withdrawal | 06/03/11 | 74083 | Bribet Services | | $ (4,228.00) | $ (469,172.00) | $ (2,000.00) | $ (2,228.00) |
| CNB | | Withdrawal | 07/11/11 | 75292 | Bribet Services | | $ (4,206.50) | $ (473,378.50) | $ (2,000.00) | $ (2,206.50) |
| CNB | | Withdrawal | 08/15/11 | 77133 | Bribet Services | | $ (4,298.50) | $ (477,677.00) | $ (2,000.00) | $ (2,298.50) |
| CNB | | Withdrawal | 09/06/11 | 78346 | Bribet Services | | $ (4,210.50) | $ (481,887.50) | $ (2,000.00) | $ (2,210.50) |
| CNB | | Withdrawal | 10/03/11 | 79601 | Bribet Services | | $ (4,285.50) | $ (486,173.00) | $ (2,000.00) | $ (2,285.50) |
| CNB | | Withdrawal | 11/02/11 | 80902 | Bribet Services | | $ (4,200.50) | $ (490,373.50) | $ (2,000.00) | $ (2,200.50) |
| CNB | | Withdrawal | 12/02/11 | 82426 | Bribet Services | | $ (4,200.50) | $ (494,574.00) | $ (2,000.00) | $ (2,200.50) |
| CNB | | Withdrawal | 01/04/12 | 83784 | Bribet Services | | $ (4,208.00) | $ (498,782.00) | $ (2,000.00) | $ (2,208.00) |
| CNB | | Withdrawal | 02/06/12 | 85112 | Bribet Services | | $ (4,257.00) | $ (503,039.00) | $ (2,000.00) | $ (2,257.00) |
| CNB | | Withdrawal | 03/05/12 | 86482 | Bribet Services | | $ (4,315.00) | $ (507,354.00) | $ (2,000.00) | $ (2,315.00) |
| CNB | | Withdrawal | 04/04/12 | 87912 | Bribet Services | | $ (4,224.50) | $ (511,578.50) | $ (2,000.00) | $ (2,224.50) |
| CNB | | Withdrawal | 05/07/12 | 96743 | Bribet Services | | $ (4,372.00) | $ (515,950.50) | $ (2,000.00) | $ (2,372.00) |
| CNB | | Withdrawal | 06/05/12 | 93659 | Bribet Services | | $ (3,222.50) | $ (519,173.00) | $ (2,000.00) | $ (1,222.50) |
| CNB | | Withdrawal | 07/03/12 | 95114 | Bribet Services | | $ (3,249.00) | $ (522,422.00) | $ (2,000.00) | $ (1,249.00) |
| CNB | | Withdrawal | 08/02/12 | 92108 | Bribet Services | | $ (3,252.00) | $ (525,674.00) | $ (2,000.00) | $ (1,252.00) |
| CNB | | Withdrawal | 09/05/12 | 90559 | Bribet Services | | $ (3,233.50) | $ (528,907.50) | $ (2,000.00) | $ (1,233.50) |
| CNB | | Withdrawal | 10/02/12 | 89170 | Bribet Services | | $ (3,251.00) | $ (532,158.50) | $ (2,000.00) | $ (1,251.00) |
| CNB | | Withdrawal | 11/05/12 | 10160 | Bribet Services | | $ (3,177.50) | $ (535,336.00) | $ (2,000.00) | $ (1,177.50) |
| CNB | | Withdrawal | 12/03/12 | 11775 | Bribet Services | | $ (3,259.50) | $ (538,595.50) | $ (2,000.00) | $ (1,259.50) |
| CNB | | Withdrawal | 01/07/13 | 13425 | Bribet Services | | $ (3,240.50) | $ (541,836.00) | $ (2,000.00) | $ (1,240.50) |
| CNB | | Withdrawal | 02/04/13 | 15112 | Bribet Services | | $ (3,234.00) | $ (545,070.00) | $ (2,000.00) | $ (1,234.00) |
| CNB | | Withdrawal | 03/04/13 | 16829 | Bribet Services | | $ (3,318.00) | $ (548,388.00) | $ (2,000.00) | $ (1,318.00) |
| CNB | | Withdrawal | 04/03/13 | 18586 | Bribet Services | | $ (3,291.50) | $ (551,679.50) | $ (2,000.00) | $ (1,291.50) |
| CNB | | Withdrawal | 05/06/13 | 22202 | Bribet Services | | $ (3,253.50) | $ (554,933.00) | $ (2,000.00) | $ (1,253.50) |
| CNB | | Withdrawal | 06/04/13 | 22780 | Bribet Services | | $ (3,190.50) | $ (558,123.50) | $ (2,000.00) | $ (1,190.50) |
| CNB | | Withdrawal | 07/02/13 | 24881 | Bribet Services | | $ (3,276.00) | $ (561,399.50) | $ (2,000.00) | $ (1,276.00) |
| 3 | | Withdrawal | 08/01/13 | 26626 | Bribet Services | | $ (3,279.50) | $ (564,679.00) | $ (2,000.00) | $ (1,279.50) |
| 3 | | Withdrawal | 09/04/13 | 28463 | Bribet Services | | $ (3,295.50) | $ (567,974.50) | $ (2,000.00) | $ (1,295.50) |
| CNB | | Withdrawal | 10/02/13 | 30683 | Bribet Services | | $ (3,296.00) | $ (571,270.50) | $ (2,000.00) | $ (1,296.00) |
| CNB | | Withdrawal | 11/04/13 | 33897 | Bribet Services | | $ (3,351.50) | $ (574,622.00) | $ (2,000.00) | $ (1,351.50) |
| CNB | | Withdrawal | 12/02/13 | 35807 | Bribet Services | | $ (3,315.00) | $ (577,937.00) | $ (2,000.00) | $ (1,315.00) |
| CNB | | Withdrawal | 01/08/14 | 38957 | Bribet Services | | $ (3,299.50) | $ (581,236.50) | $ (2,000.00) | $ (1,299.50) |
| CNB | | Withdrawal | 02/06/14 | 40961 | Bribet Services | | $ (3,320.50) | $ (584,557.00) | $ (2,000.00) | $ (1,320.50) |
| CNB | | Withdrawal | 03/10/14 | 43111 | Bribet Services | | $ (3,104.50) | $ (587,661.50) | $ (2,000.00) | $ (1,104.50) |
| CNB | | Withdrawal | 04/10/14 | 32694 | Bribet Services | | $ (3,022.50) | $ (590,684.00) | $ (2,000.00) | $ (1,022.50) |
| CNB | | Withdrawal | 05/05/14 | 48630 | Bribet Services | | $ (3,114.00) | $ (593,798.00) | $ (2,000.00) | $ (1,114.00) |
| CNB | | Withdrawal | 06/04/14 | 50990 | Bribet Services | | $ (3,198.50) | $ (596,996.50) | $ (2,000.00) | $ (1,198.50) |
| CNB | | Withdrawal | 07/02/14 | 53401 | Bribet Services | | $ (3,287.50) | $ (600,284.00) | $ (2,000.00) | $ (1,287.50) |
| CNB | | Withdrawal | 08/05/14 | 55836 | Bribet Services | | $ (3,317.50) | $ (603,601.50) | $ (2,000.00) | $ (1,317.50) |
| | | | | | | Total | $ (603,601.50) | | $ (258,000.00) | $ (107,341.00) |

**EXHIBIT 3**

**EXHIBIT A**

| # | Box | Bates Stamp # | Name | Date of Contract | # of ATMs | Date of Check | Amount of Contract | Amount of Check | Total Amount of Investor | Notes |
|---|-----|--------------|------|-----------------|-----------|---------------|-------------------|-----------------|-------------------------|-------|
| 632 | 3 | R00005004 | Brian Fitzwilliam | 07/01/08 | 10 | 07/19/08 | $120,000.00 | $120,000.00 | | Bribet Services |
| 633 | 3 | R00005011 | Brian Fitzwilliam | 06/01/07 | 10 | 06/27/07 | $120,000.00 | $120,000.00 | | Bribet Services |
| 634 | 3 | R00005014 | Brian Fitzwilliam | 11/27/06 | 10 | 11/25/06 | $120,000.00 | $120,000.00 | | Bribet Services |
| 635 | 3 | R00005031 | Brian Fitzwilliam | 06/30/09 | 10 | | $120,000.00 | | | Bribet Services |

**EXHIBIT 3**

**EXHIBIT A**

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| Department of Enforcement, | DISCIPLINARY PROCEEDING |
| Complainant, | No. 2008012738001 |
| v. | Hearing Officer – SNB |
| BETTY LYNN SALEH, (CRD No. 2146402) | **ORDER ACCEPTING OFFER OF SETTLEMENT** |
| Respondent. | Date: December 15, 2010 |

### INTRODUCTION

Disciplinary Proceeding No. 2008012738001 was filed on September 30, 2010, by the

Department of Enforcement of the Financial Industry Regulatory Authority (FINRA)

(Complainant). Respondent Betty Lynn Saleh (Respondent) submitted an Offer of Settlement

(Offer) to Complainant dated December 13, 2010. Pursuant to FINRA Rule 9270(e), the

Complainant and the National Adjudicatory Council (NAC), a Review Subcommittee of the

NAC, or the Office of Disciplinary Affairs (ODA) have accepted the uncontested Offer.

Accordingly, this Order now is issued pursuant to FINRA Rule 9270(e)(3). The findings,

conclusions and sanctions set forth in this Order are those stated in the Offer as accepted by the

Complainant and approved by the NAC.

Under the terms of the Offer, Respondent has consented, without admitting or denying

the allegations of the Complaint, and solely for the purposes of this proceeding and any other

proceeding brought by or on behalf of FINRA, or to which FINRA is a party, to the entry of

000050350 2010

EXHIBIT 4

**EXHIBIT A**

findings and violations consistent with the allegations of the Complaint, and to the imposition of the sanctions set forth below, and fully understands that this Order will become part of Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA.

## BACKGROUND

From June 10, 1991 through December 21, 2001, Saleh was registered with a FINRA member firm. From December 21, 2001 through October 24, 2004, Saleh was registered with Wachovia Securities, LLC (formerly known as First Union Securities, and now known as Wells Fargo Advisors, LLC), a FINRA member. From October 29, 2004 through June 25, 2009, Saleh was registered with Wedbush Morgan Securities, Inc., a FINRA member. Saleh presently is not registered.

Although Saleh has not been associated with a FINRA member firm since June 25, 2009, she remains subject to FINRA's jurisdiction for purposes of this proceeding, pursuant to Article V, Section 4 of FINRA's By-Laws, because (1) the Complaint was filed within two years after the date upon which she ceased to be associated with a FINRA member firm and (2) the Complaint charges her with misconduct committed while she was associated with a FINRA member.

## FINDINGS AND CONCLUSIONS

It has been determined that the Offer be accepted and that findings be made as follows:

## <u>SUMMARY</u>

This case involves a pattern of violations of NASD and FINRA rules and the antifraud provisions of the federal securities laws by Respondent Betty Lynn Saleh during the period from about November 2004 through April 2009 (the relevant period), arising from her activities as a

2

**EXHIBIT 4**

**EXHIBIT A**

registered representative with a FINRA member firm. During the relevant period, with no apparent benefit to her customers, while accumulating large commissions, Saleh engaged in a pattern of unsuitable transactions, exercised widespread discretion without written authorization, and, in certain circumstances, engaged in unauthorized trading. Saleh usually began with unsuitable recommendations to her customers that they purchase variable annuities and, subsequently, that they make unsuitable partial and full annuity withdrawals to make other investments. Initially, Saleh switched the variable annuity withdrawal proceeds into new annuities, which often were unauthorized and unapproved transactions. Over time, and as scrutiny of her variable annuity business increased, Saleh began using the variable annuity withdrawals and surrenders as a source of funds to switch investors into offerings of closed end funds (CEFs), unit investment trusts (UITs), reverse convertible securities, and an occasional mutual fund. Even though these pooled and structured products are intended for long term investing, Saleh held the products for less than a year before she switched her customers into similar investments, often in a new offering, earning concessions and commissions as her clients' losses mounted.

Saleh accomplished these transactions through deceitful practices, including falsifying documents with forged signatures and false contact information, mismarking tickets, destroying transaction documents, and causing false entries on customer statements. Saleh also often made misstatements or omissions directly to customers, her firms, and the variable annuity issuers, including that many of the variable annuity transactions constituted annuity exchanges, thus avoiding additional supervisory review, and that she was not being compensated for the transactions she recommended.

3

**EXHIBIT 4**

**EXHIBIT A**

Saleh carefully chose the customers who were subjected to her misconduct, picking those customers who were unsophisticated and/or very trusting. Among Saleh's victim customers were a conservative retiree with little investment expertise who developed dementia and cancer; a successful older businessman who owned and operated a heavy machinery transportation company and was not a sophisticated investor; and an attorney who relied fully on Saleh's management of his pension plan. All of these customers placed their trust in Saleh and were either too naïve or too trusting to realize fully the impact of Saleh's transactions in their investment portfolios. They also generally were not aware of the fee, commission and concession charges they were paying Saleh as she aggressively recommended high-commission annuities, surrendered and switched the annuities, often using forgeries, and then traded the annuity proceeds in the three individual customers' portfolios to substantial losses in the CEFs, UITs, mutual funds and reverse convertible securities.

By virtue of this conduct, Saleh violated Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 promulgated thereunder, and, during respective periods as noted below, NASD Conduct Rules 2110, 2120, 2310, 2510(b), and 3110, and FINRA Rules 2010 and 2020.

### GENERAL ALLEGATIONS

Customer BN

Customer BN first opened an account with Saleh approximately 20 years ago and followed her as she moved from firm to firm. From the commencement of their business relationship, BN placed his account and investment choices under Saleh's control. By November 2005, Saleh had essentially all of BN's liquid net worth under her management. BN, born in 1926, was a career chemical engineer, and holds a masters degree from Tuskegee University. Since he retired in or about 1991, BN's annual income from his pension and social security

4

**EXHIBIT 4**

**EXHIBIT A**

benefits is approximately $25,000.00. BN has always been a conservative investor, with an investment objective of growth and a low risk tolerance. His investment accounts comprise a trust account, which held the funds BN received when he retired, an Individual Retirement Account, and an account he inherited in 2002 from his sister, DN. BN's accounts invested under Saleh's control represent his life savings and the entirety of BN's liquid net worth. Saleh's transactions in BN's trust and two retirement accounts are set forth in Schedules A1, A2, and A3 to the Complaint.

Before 2004, BN relied on his investment portfolios primarily for large purchases and extraordinary expenses. In 2005, BN was diagnosed with early dementia; he also presently suffers from a life-threatening illness. Since approximately 2004, BN has relied on funds in his investment portfolios to cover his increasing medical and living expenses, which Saleh knew.

On or about November 8, 2005, BN executed a Durable Power of Attorney (POA1) granting his son, PN, authority to make decisions on his investment accounts. At or about that time, Saleh was aware that BN's capacity to make investment decisions had diminished, and she solicited PN to become involved with decision making in his father's accounts. At that time, PN had no significant investment experience. As his father did, PN placed his father's accounts and investment choices under Saleh's control. In or about November 2007, RN-H, BN's daughter, also was designated as an authorized agent on her father's accounts. RN-H also had no significant investment experience and placed her father's accounts and investment choices under Saleh's control.

Between about December 2004 and February 2009, Saleh engaged in a pattern of unsuitable transactions in BN's accounts. During this period, Saleh recommended and caused BN to surrender funds in whole or in part from approximately ten annuities, and to reinvest the

5

**EXHIBIT 4**

**EXHIBIT A**

proceeds in either a new annuity from a different issuer, or in over 50 issues, mostly initial public offerings (IPOs) in which, for the most part, Saleh's firm participated as an underwriter. These latter investments included, but were not limited to, CEFs, UITs, and structured products such as reverse convertible securities, and an occasional Class A share mutual fund, which generally are designed for long term investing. Saleh then engaged in excessive and short term trading as she routinely sold the CEF, UIT and reverse convertible securities in less than one year, and immediately used the proceeds to invest in new but similar positions, often IPOs, generating concessions and commissions on the round trip transactions. During this period, after withdrawing funds from annuities, Saleh engaged in over 100 purchases and 150 sales of long term investment products, mostly IPOs, in BN's accounts, with an average holding period of approximately 231 days, 162 days, and 182 days in his trust and two retirement accounts, respectively. Saleh's excessive and short term trading in BN's accounts generated approximately $97,000.00 in commissions and concessions while BN suffered approximately $260,0050.00 in realized market losses, net of income.

Separately, in November 2005, even as she was aware of his declining health, Saleh also recommended and effected an unsuitable switch from mutual funds to a variable annuity product in BN's trust account that he also owned in his retirement accounts. Shortly before BN executed POA1, Saleh arranged for BN to transfer to her firm his remaining outside holdings - nine stock and bond mutual funds, of which seven were Class A funds, with a market value of approximately $300,000.00. At that time, due to his declining health, Saleh assisted BN to designate his son with power of attorney over BN's investment accounts. On or about November 4, 2005, only four days before BN executed POA1, Saleh's firm received the fund positions into BN's living trust account and Saleh promptly liquidated the mutual funds. On or about

6

**EXHIBIT 4**

**EXHIBIT A**

November 9, 2005, the day after BN executed POA1, Saleh used the proceeds of the mutual fund sales to purchase in BN's trust account a $300,000 variable annuity product that he also held in his two retirement accounts. To effect the transaction, Saleh placed or caused to be placed BN's purported signature on the annuity's transaction documents, without BN's or PN's knowledge, authorization, or consent. Saleh then caused BN's annuity purchase to be invested in variable annuity subaccounts that were substantially similar to the mutual fund investments that she had liquidated only five days before. Shortly thereafter, Saleh began taking withdrawals in BN's two retirement accounts from the same variable annuity product she had just purchased in the trust account. In connection with these transactions, Saleh failed to disclose to BN or PN that the annuity subaccounts were substantially similar to the mutual funds that she liquidated, or that she was taking annuity withdrawals in BN's retirement accounts at or about the same time that she had purchased the same product in BN's trust account. She also failed to disclose to BN or PN the features and risks of the new annuity, or the compensation she received as a result of the switch from equity mutual funds to a variable annuity.

Customer DH

Customer DH was referred to Saleh approximately ten years ago by his nephew, customer SH. DH, born in 1942, is a retired businessman who owned and operated a heavy machinery transportation company in Chicago, Illinois. DH's accounts invested with Saleh mainly comprised a living trust account and an IRA. DH transferred his accounts as Saleh changed firms, and at all times placed his accounts and investment choices under Saleh's control. DH's accounts invested under Saleh's control represent his life savings and the entirety of DH's liquid net worth, and he relies upon them to support himself in retirement, which Saleh knew. DH's investment objective was moderate growth up until 2004, when it became more conservative as

7

**EXHIBIT 4**

**EXHIBIT A**

he moved into retirement.  Between approximately November 2004 and June 2009, DH took income withdrawals of approximately $193,000.00 from the accounts under Saleh's control. Saleh's transactions in DH's trust, IRA, and Roth IRA accounts are set forth in Schedules B1, B2, and B3 to the Complaint.

Between about January 2005 and April 2009 of the relevant period, Saleh engaged in a pattern of unsuitable transactions in DH's accounts.  During this period, Saleh recommended and caused DH to surrender funds in whole or in part from approximately 17 annuities, and to reinvest the proceeds in either a new annuity from a different issuer, or in over 50 issues, mostly IPOs in which Saleh's firm participated, including, but not limited to, CEFs, UITs, and structured products such as reverse convertible securities, which generally are designed for long term investing.  Saleh then engaged in excessive and short term trading as she routinely sold the CEF, UIT and reverse convertible securities in less than one year, and immediately used the proceeds to invest in new positions, often IPOs, generating concessions and commissions on the round trip transactions.  During this period, after withdrawing funds from annuities, Saleh engaged in at least 200 purchases and sales of CEFs, UITs and reverse convertible securities in DH's accounts, with an average holding period of approximately 165 days in both the trust and retirement accounts.  While Saleh usually spoke with DH concerning the short term trading, these conversations often occurred after the trade or the close of the market.  Saleh's excessive and short term trading in DH's accounts generated at least about $62,000.00 in commissions and concessions while DH suffered approximately $170,000.00 in realized market losses, net of income.

Between February 2005 and April 2006, Saleh also recommended and caused DH to take partial withdrawals from six annuities; Saleh then used the proceeds to purchase three new

8

**EXHIBIT 4**

**EXHIBIT A**

variable annuities from different issuers. In October and November 2005, Saleh also recommended to DH and caused a full surrender of a variable annuity policy and used the proceeds to purchase immediately another variable annuity policy with a different issuer.

On or about February 6, 2009, February 25, 2009, February 26, 2009, and April 23, 2009, Saleh engaged in unauthorized trading in DH's accounts when she executed six short term transactions in IPO CEFs and UITs without DH's prior knowledge, authorization, or consent.

Conduct Common to BN and DH

Saleh recommended and effected the switch transactions and short term trading described above with no apparent benefit to the customers and without a reasonable basis to believe that the transactions would benefit the customers or were consistent with each customer's financial position, investment goals and objectives. Saleh knew or should have known that these transactions provided no additional benefit to the customers, decreased liquidity, and caused each customer's portfolio to become unduly concentrated in variable annuities and in equities subject to market risk. In connection with the foregoing transactions, Saleh generated substantial sales commissions and concessions, caused the customers to lose the annuities' benefits that each had purchased and paid for, and to assume greater market risk, in particular in connection with the short term trading.

Certain of the foregoing variable annuity transactions, those reflected on Schedules A2 and A3 (BN) and B2 and B3 (DH) of the Complaint, were effected in tax-qualified accounts for which Saleh's firm served as custodian. Saleh was able to effect these transactions without the customer's knowledge, authorization, or consent, by obtaining necessary signatures directly from the firm's custodian to authorize the transactions, and then by re-using the custodian's signatures on subsequent transactions.

9

**EXHIBIT 4**

**EXHIBIT A**

To facilitate the transactions noted above, Saleh created or caused to be created and submitted to the annuity issuer documents that reflected false signatures and false signature guarantees and medallion stamps when Saleh knew or should have known that the annuity issuer would rely on the guarantee or medallion stamp as evidence that the signatures were genuine.

In at least seven instances in connection with BN's transactions described above, and in at least eight instances in connection with DH's transactions described above, Saleh placed or caused to be placed the customer's or his agent's signatures on annuity withdrawal forms, prospectus receipts, or firm disclosure documents without the knowledge, authorization, or consent of the customer or his agent, as reflected on Schedule D to the Complaint.

Following the foregoing annuity transactions, Saleh routinely destroyed or caused the false insurance documents to be destroyed and not to be maintained in the firm's books and records.

Saleh also entered or caused false information to be entered into the firm's electronic account records for BN's and DH's accounts to reflect as "interest" the receipt of funds in connection with annuity surrenders. Once entered into the firm's system, the firm provided this false information to the customers and their agents on customer statements, as Saleh knew or should have known would occur.

In certain instances, Saleh caused the firm's books and records for DH's accounts to reflect false and inaccurate information, including telephone numbers and addresses, so that she could conduct business in DH's accounts in a state in which she was not licensed.

Saleh failed to disclose to either customer or his agents that the annuity transactions were surrenders that included principal withdrawals, causing the customer and agents to believe that funds coming out of the annuities represented interest or return on investment. She also failed to

10

**EXHIBIT 4**

**EXHIBIT A**

disclose that surrender fees applied to certain of the transactions, that the surrenders would result in the loss of policy benefits for which the customer had paid, or that the customer's funds could be subject to greater market risk when invested outside of the annuities in equities or traded funds. Saleh also failed to disclose to either customer or his agents that the customer's transactions were resulting in investment losses. To induce each customer and his agents to approve the annuity withdrawals, to invest the proceeds into the CEFs, UITs, and reverse convertible securities, mostly IPOs, and then subsequently to approve excessive and short term transactions, Saleh falsely represented to the customer or his agents that she would not receive compensation in connection with the recommended transactions and failed to disclose that she received a concession on the opening IPO transactions. Saleh often discounted the commission charged upon the liquidation of an IPO position so that it would appear to the customer or his agents that she was not compensated for the IPO transactions.

Customer SH

Customer SH is an attorney in Los Angeles who began working with Saleh in 2000. From at least the time he became Saleh's customer, SH's investment objective has been growth and his risk tolerance has been medium. SH has a busy real estate and business litigation practice, and at all times placed his accounts and investment choices under Saleh's control. SH transferred his accounts as Saleh changed firms and referred several family members to Saleh, including DH.

SH opened approximately nine accounts with Saleh, including an account for a defined benefit pension plan (Pension Account), in which, as Saleh knew, an employee of SH also is enrolled. Certain of Saleh's transactions in SH's Pension Account are set forth in Schedule C to the Complaint.

**EXHIBIT 4**

**EXHIBIT A**

Between January 2005 and June 2009, Saleh engaged in a pattern of unsuitable
transactions in SH's Pension Account. Among those transactions, in January 2005, Saleh
purchased a variable annuity in the Pension Account without SH's prior knowledge,
authorization or consent, in the approximate amount of $175,000.00.

Because Saleh had not told SH about the annuity purchase before executing the
transaction, Saleh failed to disclose to SH any of the risks associated with investing pension
assets in the variable annuity, including that SH's Pension Account would receive no benefit
from the deferral of taxes on the annuity's return or the increased costs associated with the
insurance product. When SH's accountant later questioned the suitability of the transaction,
Saleh represented to SH that the annuity's principal guarantee outweighed the additional costs of
using an insurance product in a qualified account. As a result of Saleh's representation, SH
understood the variable annuity was not to be subject to any market risk. Saleh failed to disclose
to SH that the principal guarantee was limited to a death benefit. Less than three years later, in
August and September 2007, Saleh recommended and caused SH to fully surrender the foregoing
variable annuity. In connection with the variable annuity surrender, Saleh failed to disclose to
SH that the issuer would and did assess a substantial surrender penalty for early termination of
the annuity contract.

Upon surrender, Saleh recommended to SH that he immediately reinvest the annuity
proceeds in four initial public offerings of CEF and UIT funds in which the firm participated and
which had substantially similar characteristics to the variable annuity's subaccount options. Less
than one year later, in June 2008, Saleh subsequently recommended and caused SH to sell the
foregoing CEF and UIT funds and to invest the proceeds immediately in IPOs of reverse
convertible securities. At that time and through February 2009, Saleh recommended that SH

12

**EXHIBIT 4**


**EXHIBIT A**

purchase and hold reverse convertible preferred notes in his Pension Account and failed to disclose fully to SH the nature and characteristics of the notes, including, but not limited to, the risk that the principal value of the investment is not guaranteed and is subject to market risk of the reference asset, and that the customer could suffer a loss of principal on the investment.

Saleh recommended and effected the above transactions without a reasonable basis to believe that the transactions would benefit SH or were consistent with SH's financial position, investment goals and objectives. In connection with the foregoing transactions, Saleh generated sales commissions and concessions, caused SH to forego the annuities' benefits in which SH had invested, and to suffer greater market risk and decreased liquidity.

## FIRST CAUSE OF ACTION

Unsuitable Recommendations

During the period from about December 2004 through February 2009, Saleh recommended to customer BN and to PN on BN's behalf, and effected for BN's accounts approximately 390 purchases and sales of securities, as set forth in Schedules A1, A2, and A3 to the Complaint.

During the period from about January 2005 through April 2009, Saleh recommended to customer DH, and effected for DH's accounts approximately 301 purchases and sales of securities, as set forth in Schedules B1, B2, and B3 to the Complaint.

During the period from January 2005 through June 2009, Saleh recommended to customer SH, and effected for SH's accounts approximately 29 unsuitable purchases and sales of securities, as set forth in Schedule C to the Complaint.

Saleh made the foregoing recommendations without a reasonable basis to believe that the recommendations and resultant transactions would benefit the customers or were consistent with

13

**EXHIBIT 4**

**EXHIBIT A**

the customers' financial position, investment goals and objectives, based upon the information known to her about their other security holdings and their financial situations and needs. The annuity transactions were unsuitable for each of the customers because the costs of the annuities outweighed the benefits. With respect to BN's and DN's annuities, the transactions were unsuitable because of undue concentration in variable annuities and equities, lack of liquidity, and high fees and costs. With respect to BN's, DN's, and SH's annuities placed in qualified retirement accounts, the customers received no benefit from tax-deferred earnings while incurring additional and unnecessary costs.

In the accounts of BN, DH, and SH, Saleh also engaged in a pattern of withdrawing funds from annuities, primarily to raise cash with which she generated production credits, often with IPOs in which her firm participated. In that regard, Saleh routinely applied the withdrawal proceeds immediately to purchase CEFs, UITs mutual funds or reverse convertibles, which often had substantially similar investment objectives as the annuity subaccounts from which the funds were withdrawn. Saleh then engaged in unsuitable excessive and short term trading by selling those positions within one year to purchase similar funds, causing the customers' to incur costs with no substantial benefit, and for their portfolios to suffer undue concentration in equities and resulting market risk and losses.

With respect to BN, DH and SH, the recommendations to purchase reverse convertible securities were unsuitable because the transactions were effected in a retired customer's account on which the customer relied for income, or in a retirement or pension account and because there existed a risk of loss of substantially the entire investment should the security to which the note is linked decline in value.

14

**EXHIBIT 4**

**EXHIBIT A**

With respect to conduct alleged above that occurred before December 15, 2008, the aforementioned acts, practices and conduct constitute separate and distinct violations of NASD Conduct Rules 2310 and 2110.  With respect to conduct that occurred on or after December 15, 2008, the aforementioned acts, practices and conduct constitute separate and distinct violations of NASD Conduct Rule 2310 and FINRA Rule 2010.

## SECOND CAUSE OF ACTION

Unsuitable Switching

At various times during the period from in or about December 2004 through August 2007, Saleh recommended and caused customers BN and DH to surrender variable annuities in whole or in part and to purchase other variable annuities, as set forth on Schedules A1, A2, A3, B1, and B2, respectively, to the Complaint.

Saleh made the foregoing recommendations without a reasonable basis to believe that the transactions would benefit customers BN and DH, respectively, or were consistent with the customers' financial position, investment goals and objectives.  The transactions were unsuitable because the costs of the transactions outweighed any benefit to the customers and the transactions resulted in decreased liquidity.

By reason of the foregoing conduct, Saleh violated NASD Conduct Rule 2310 and FINRA Rule 2010.

## THIRD CAUSE OF ACTION

Forgery

Without the knowledge, authorization or consent of customer BN or PN, Saleh placed or caused to be placed false customer signatures on at least eight variable annuity documents requiring a signature relating to transactions reflected on Schedule D to the Complaint.

15

**EXHIBIT 4**

**EXHIBIT A**

Without the knowledge, authorization or consent of customer DH, Saleh placed or caused to be placed false customer signatures on at least seven firm records and variable annuity documents requiring a signature relating to transactions reflected on Schedule D to the Complaint.

By reason of the foregoing conduct, Saleh violated NASD Conduct Rule 2110.

### FOURTH CAUSE OF ACTION

Falsification

During the relevant period, Saleh placed or caused to be placed false and inaccurate information on firm and issuer documents relating to customers BN and DH, including, but not limited to, false addresses, false telephone numbers, false customer signatures, false signature guarantees and false medallion stamp signature guarantees, tickets mismarked as unsolicited, and, mismarked transaction documents to omit to disclose that the transactions were annuity exchanges. Saleh then submitted the documents to her firm and to issuers, knowing that they would rely upon the accuracy of the documents and the information stated thereon as to the customers and the transactions.

Saleh also entered or caused false information to be entered into the firm's electronic account records to reflect annuity partial surrenders as "interest" payments. Once entered into the firm's system, the firm provided this false information to BN and DH on customer statements, as Saleh knew or should have known would occur.

By reason of the foregoing conduct, Saleh violated NASD Conduct Rule 2110.

16

**EXHIBIT 4**

**EXHIBIT A**

## FIFTH CAUSE OF ACTION

<u>Unauthorized Transactions</u>

On or about February 6, 2009, February 25, 2009, February 26, 2009, and April 23, 2009, Saleh executed six purchases and sales of securities in DH's accounts, as set forth as Transaction Nos. 207 through 210 on Schedule B1 and Nos. 98 and 99 on Schedule B2 to the Complaint, without DH's knowledge, authorization or consent.

On or about January 31, 2005, Saleh effected the purchase of a variable annuity in SH's Pension Account without SH's prior knowledge, authorization or consent, in the approximate amount of $175,000.00, as set forth as Transaction No. 1 in Schedule C to the Complaint. With respect to conduct alleged above concerning SH, the aforementioned acts, practices and conduct constitute separate and distinct violations of NASD Conduct Rule 2110. With respect to conduct concerning DH, the aforementioned acts, practices and conduct constitute separate and distinct violations of FINRA Rule 2010.

## SIXTH CAUSE OF ACTION

<u>Exercising Discretion Without Written Authorization</u>

During the period from about December 2004 through February 2009, Saleh effected approximately 390 purchases and sales of securities in the accounts of customer BN, as set forth in Schedules A1, A2, and A3, to the Complaint, without receiving from the customer or his authorized persons prior written authorization to exercise discretion and without the firm's written acceptance of the accounts as discretionary.

During the period from about January 2005 through April 2009, Saleh effected approximately 301 purchases and sales of securities in the accounts of customer DH, as set forth

**EXHIBIT 4**

**EXHIBIT A**

in Schedules B1, B2, and B3 to the Complaint, without receiving from the customer or his authorized persons prior written authorization to exercise discretion and without the firm's written acceptance of the accounts as discretionary.

During the period from about January 2005 through June 2009, Saleh effected approximately 13 purchases and sales of securities in the account of customer SH, as set forth in Schedule C to the Complaint, without receiving from SH prior written authorization to exercise discretion and without the firm's written acceptance of the account as discretionary. With respect to conduct alleged above that occurred before December 15, 2008, the aforementioned acts, practices and conduct constitute separate and distinct violations of NASD Conduct Rules 2510(b) and 2110.  With respect to conduct alleged above that occurred on or after December 15, 2008, the aforementioned acts, practices and conduct constitute separate and distinct violations of NASD Conduct Rule 2510(b) and FINRA Rule 2010.

## SEVENTH CAUSE OF ACTION

Fraud

Saleh intentionally or recklessly engaged in the conduct referenced above as a scheme and course of business to enhance her commissions without regard to the consequences to the customers or the firm with which she was associated.  She failed to disclose material, transaction-related information to the customers or the firm, including the failure to disclose that the certain annuity transactions constituted annuity exchanges, and that customers would incur surrender penalties and decreased liquidity.  She further failed to disclose to customers that investing the proceeds of the annuity surrenders in closed end funds, structured products and UITs caused the customers to give up certain benefits for which they had paid or that investment options within the annuities were substantially similar to the products in which Saleh invested

18

**EXHIBIT 4**

**EXHIBIT A**

the annuity surrender proceeds. She further failed to disclose that withdrawing funds from the annuities and investing the proceeds in CEFs, UITs and structured products increased the investors' risk of loss of principal, or that the subsequent short-term trading further increased the risk of loss. With respect to transactions in structured products, Saleh failed to disclose to customers that there existed a risk of loss of substantially the entire investment should the security to which the note is linked decline in value. Saleh further misrepresented the basis of her compensation when she told the customers that she was not earning a commission or otherwise "being paid" for transactions involving initial public offerings when, in fact, she was paid a concession by the offeror.

Saleh concealed the foregoing course of conduct from the customers and the firm by causing the transaction records to reflect inaccurate information regarding the customers' investments in variable annuities, including, but not limited to, false addresses, false phone numbers, false customer signatures, mismarking solicited transactions as unsolicited, false representations that the transactions did not constitute an exchange of a variable annuity, and false representations that surrender proceeds constituted "interest."

Saleh, by engaging in the conduct referenced above, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter: 1) employed devices, schemes or artifices to defraud; 2) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or 3) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

19

**EXHIBIT 4**

**EXHIBIT A**

The aforementioned acts, practices and conduct also are inconsistent with high standards of commercial honor and just and equitable principles of trade.

By reason the foregoing conduct, Respondent Saleh willfully violated Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. With respect to conduct alleged above that occurred before December 15, 2008, the aforementioned acts, practices and conduct also constitute separate and distinct violations of NASD Conduct Rules 2120 and 2110. With respect to conduct alleged above that occurred on or after December 15, 2008, the aforementioned acts, practices and conduct also constitute separate and distinct violations of FINRA Rules 2020 and 2010.

## EIGHTH CAUSE OF ACTION

Causing the Firm to Have Inaccurate Books and Records

During the relevant period, Saleh placed or caused to be placed and reflected in her member firm's books and records false information, including, but not limited to, false addresses, false telephone numbers, false customer signatures, false signature guarantees and false medallion stamp signature guarantees, tickets mismarked as unsolicited, and, further, mismarked transaction documents to omit to disclose that the transactions were annuity exchanges. Saleh also destroyed or caused false documents to be destroyed and not to be maintained in her firm's books and records. Saleh also entered or caused false information to be entered into the firm's electronic account records to reflect annuity partial surrenders as "interest" payments. Saleh also mismarked certain solicited transactions as "unsolicited."

By reason of the foregoing conduct, Saleh violated NASD Conduct Rules 2110 and 3110, by causing the firm to have and maintain inaccurate records regarding securities transactions.

20

---

**EXHIBIT 4**

**EXHIBIT A**

Based on these considerations, the sanctions hereby imposed by the acceptance of the Offer are in the public interest, are sufficiently remedial to deter Respondent from any future misconduct, and represent a proper discharge by FINRA, of its regulatory responsibility under the Securities Exchange Act of 1934.

## SANCTIONS

It is ordered that Respondent be a barred from association with any FINRA member in any capacity.

The sanctions imposed herein shall be effective on a date set by FINRA staff.   Pursuant to FINRA Rule 8313(e), a bar or expulsion shall become effective upon approval or acceptance of this Order.

SO ORDERED.

FINRA

Signed on behalf of the
Director of ODA, by delegated authority

*Cynthia A. Kittle*

Cynthia A. Kittle
Senior Regional Counsel
FINRA Department of Enforcement
300 S. Grand Avenue, Suite 1600
Los Angeles, CA 90071
Phone: 213 613-2616; Fax: 213-617-1570

**EXHIBIT 4**

**EXHIBIT A**

STATE OF CALIFORNIA

# DEPARTMENT OF INSURANCE

SACRAMENTO

| | | |
|---|---|---|
| In the Matter of the Licenses and Licensing Rights of | ) ) ) | ORDER OF SUMMARY REVOCATION |
| BETTY LYNN SALEH | ) ) | File No. LBB 6666-AP (AR) |
| Respondent | ) ) ) | |

WHEREAS, Respondent, BETTY LYNN SALEH, was from February 17, 1993, and now is, the holder of a license issued by the Insurance Commissioner of the State of California to act as an accident and health agent and life-only agent with variable contracts authority; and was from May 17, 2008, and now is, the holder of a license issued by the Insurance Commissioner of the State of California to act as a fire and casualty broker-agent; and,

WHEREAS, on December 15, 2010, in Case No. 2008012738001, before the Financial Industry Regulatory Authority (FINRA), following allegations of violation of Securities and Exchange Commission (SEC) section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10B-5, FINRA Rules 2010, 2020, National Association of Securities Dealers (NASD) Rules 2110, 2120, 2310, 2510(b), and 2110: while accumulating large commissions, with no apparent benefit to her customers, engaged in a pattern of unsuitable recommendations and transactions, exercised widespread discretion without receiving prior written authorization to exercise discretion, Respondent, was permanently barred from association with any member firm; and,

WHEREAS, Respondent filed her January, 2011 renewal application for the licenses referred to above. Question No.2 of the License Renewal Details Inquiry reads:

**EXHIBIT 5**

**EXHIBIT A**

LBB 6666-AP (AR)
Page 2

"Have you been involved in any administrative disciplinary action which has not been previously reported to the California Department of Insurance?"

Respondent answered "No" to said question.  Such answer was false and known to Respondent to be false in that Respondent had been permanently barred as alleged above; and,

WHEREAS, California Insurance Code Section 1729.2(a), in conjunction with California Insurance Code Section 1729.2(d), requires that an applicant or licensee notify the Commissioner when any of the background information set forth in said section changes after the application has been submitted or the license has been issued within thirty (30) days of the date the applicant or licensee learns of the change in said background information.  California Insurance Code Section 1729.2(c)(2) defines background information as follows:

> " "Background information" means any of the following: a misdemeanor or felony conviction; a filing of felony criminal charges in state or federal court; an administrative action regarding a professional or occupational license; any licensee's discharge or attempt to discharge, in a personal or organizational bankruptcy proceeding, an obligation regarding any insurance premiums or fiduciary funds owed to any company, including a premium finance company, or managing general agent; and any admission, or judicial finding or determination, of fraud, misappropriation or conversion of funds, misrepresentation, or breach of fiduciary duty."

Respondent failed to notify the Commissioner of Respondent's permanent bar alleged above, in violation of the provisions of California Insurance Code Section 1729.2; and,

WHEREAS, California Insurance Code Section 1669(d), in conjunction with Section 1738, authorizes the Insurance Commissioner to revoke without hearing, the licenses and licensing rights of a person who has had a previously issued professional, occupational, or vocational license suspended or revoked for cause by any licensing authority; and

WHEREAS, California Code of Regulations, Title 10, Section 2533.1(g)(2) requires any person licensed as a variable contract agent to immediately report to the Commissioner the imposition of any disciplinary sanction (including suspension or expulsion from membership,

**EXHIBIT 5**

**EXHIBIT A**

LBB 6666-AP (AR)
Page 3

suspension or denial of registration) imposed upon on him by any national securities exchange, or

national securities association, or any federal, or state or territorial agency with jurisdiction over

securities or contracts on a variable basis, any order, judgment or injunction entered against him on

the basis of conduct deemed to have involved fraud, deceit, misrepresentation, or violation of any

insurance or securities law or regulation; and

WHEREAS, California Code of Regulation, Title 10, Section 2533.1(h) authorizes

the Commissioner to reject any application or suspend or revoke or refuse to renew any variable

contract agent's license upon any ground that would bar such applicant or such agent from being

licensed to sell life insurance contracts in this state;

NOW, THEREFORE, pursuant to the authority of California Insurance Code Section

1669(d), in conjunction with Section 1738, the Insurance Commissioner hereby orders that the

licenses and licensing rights of Respondent be, and the same hereby are, REVOKED effective 30

days from the date of this order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal

this 10th day of May, 2011.


STEVE POIZNER
Insurance Commissioner

By:      /s/

ROBERT  HAGEDORN
Assistant Chief Counsel


**EXHIBIT 5**

**EXHIBIT A**

**Award**
**FINRA Dispute Resolution**

In the Matter of the Arbitration Between:

Claimants
Patrick "Brian" FitzWilliam
Betty Lynn FitzWilliam (a/k/a Betty Saleh)

Case Number: 11-03452

vs.

Respondents
Michael Gerald Gardner
Richard Anthony Lanni
Edward William Wedbush
Wedbush Securities Inc.

Hearing Site: Los Angeles, California

Counter-Claimant
Wedbush Securities Inc.

vs.

Counter-Respondents
Patrick "Brian" FitzWilliam
Betty Lynn FitzWilliam (a/k/a Betty Saleh)

Nature of the Disputes:  Customer and Associated Person vs. Member and

Associated Persons; and

Member vs. Associated Person and Customer

The case proceeded under the Optional All Public Panel Rule/ All Public Panel

### REPRESENTATION OF PARTIES

For Claimants/Counter-Respondents Patrick "Brian" FitzWilliam, and Betty Lynn
FitzWilliam (a/k/a Betty Saleh) ("Saleh"), hereinafter collectively referred to as
"Claimants": Maxwell M. Blecher, Esq., Blecher & Collins, P.C., Los Angeles, California

For Respondents Michael Gerald Gardner, Richard Anthony Lanni, Edward William
Wedbush, and Respondent/Counter-Claimant Wedbush Securities Inc., hereinafter
collectively referred to as "Respondents": John Erikson, Esq., Wedbush Securities Inc.,
Los Angeles, California.

### CASE INFORMATION

Statement of Claim filed on or about: September 7, 2011.

**EXHIBIT 6**

**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No. 11-03452
Award Page 2 of 7

Claimants signed the Submission Agreement: September 1, 2011.

Respondents' Statement of Answer and Counterclaim of Wedbush Securities Inc. filed on or about: November 18, 2011.

Claimants submitted a Statement of Answer to Respondent Wedbush Securities Inc.'s Counterclaim filed on or about: December 12, 2011.

Michael Gerald Gardner signed the Submission Agreement: October 14, 2011.

Wedbush Securities Inc. signed the Submission Agreement: November 10, 2011.

Richard Anthony Lanni signed the Submission Agreement: November 16, 2011.

Edward William Wedbush signed the Submission Agreement: November 16, 2011.

## CASE SUMMARY

Claimants asserted the following causes of action: breach of contract, conversion and money had and received. The causes of action relate to Saleh's employment relationship with Wedbush Securities Inc., and allegations of Wedbush Securities Inc. blocking the transfer of Claimants' personal investment accounts consisting of cash, cash equivalents, unspecified mutual funds, equities and municipal bonds to another brokerage firm after Saleh's employment relationship with Wedbush Securities Inc. ended.

Unless specifically admitted in their Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Wedbush Securities Inc. asserted the following causes of action: implied indemnity, comparative indemnity, equitable indemnity, and contribution. The causes of action relate to Wedbush Securities Inc.'s request for reimbursement for damages paid to former customers of Saleh, and damages incurred regarding a FINRA regulatory action.

Unless specifically admitted in their Statement of Answer to Wedbush Securities Inc.'s Counterclaim, Claimants denied the allegations made in the Counterclaim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimants requested:
1. The Panel order the immediate release of Claimants' accounts and immediate return of Claimants' funds together with pre-judgment interest thereon at the legal rate, and the costs of suit, including reasonable attorneys' fees;
2. Claimants recover compensatory damages in the amount of $487,000.00 and punitive damages in the amount of $1,500,000.00;
3. The Panel recommend appropriate disciplinary action and fines against all Respondents under FINRA Rules; and
4. Such other relief as the Panel may deem just and proper.

**EXHIBIT 6**

**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No. 11-03452
<u>Award Page 3 of 7</u>

In Respondents' Statement of Answer and Counterclaim of Wedbush Securities Inc.,
Respondents requested:

1. Dismissal of all Claimants' claims in their entirety with prejudice;
2. An award declaring the percentage of fault between Saleh and Wedbush Securities Inc. in connection with the $90,000.00 settlement of customer DH's claim;
3. An award declaring the percentage of fault between Saleh and Wedbush Securities Inc. in connection with the settlements of customers SH's and BN's claims;
4. An award declaring the percentage of fault between Saleh and Wedbush Securities Inc. in connection with any settlement of the FINRA regulatory action;
5. An award in favor of Wedbush Securities Inc. against Claimants for approximately fifty percent of the loss incurred by Wedbush Securities Inc. in connection with the $90,000.00 settlement of the DH claim;
6. An award in favor of Wedbush Securities Inc. against Claimants for approximately fifty percent of the loss incurred by Wedbush Securities Inc. in connection with the settlement of SH's and BN's claims and the FINRA regulatory action, including legal fees and costs incurred by Wedbush Securities Inc.;
7. An award stating that Wedbush Securities Inc. is entitled to be indemnified by Claimants in connection with the $90,000.00 settlement of DH's claim entered into by Wedbush Securities Inc.;
8. An award stating that Wedbush Securities Inc. is entitled to be indemnified by Claimants in connection with any settlement of SH's and BN's claims and the FINRA regulatory action claim entered into by Wedbush Securities Inc.;
9. An award of compensatory damages in favor of Wedbush Securities Inc. in connection with the matters referenced above for no less than $500,000.00 with the specific amount to be proven at the hearing of this matter;
10. An award of attorneys' fees, forum fees and other expenses incurred in the defense of, and prosecution of this arbitration claim, according to proof; and
11. Such other and further relief as the Panel may deem just and proper.

In the Statement of Answer to Wedbush Securities Inc.'s Counterclaim, Claimants requested:

1. Respondents take nothing and that judgment be entered in favor of Claimants;
2. Claimants be awarded all costs of suit incurred in their defense of this action, including reasonable attorneys' fees pursuant to the agreement alleged in the Statement of Claim and/or to the extent allowed pursuant under applicable law; and
3. Claimants be granted such other and further relief as the Panel may deem just and proper.

<u>**OTHER ISSUES CONSIDERED AND DECIDED**</u>

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On May 14, 2012, the Panel held a recorded pre-hearing conference to consider Claimants' Motion to Dismiss the Counterclaim, which was opposed by Wedbush Securities Inc. The Panel denied the Motion to Dismiss without prejudice.

**EXHIBIT 6**

**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No. 11-03452
Award Page 4 of 7

At the start of the evidentiary hearing, Claimants moved to exclude certain evidence. The Panel denied the request.

At the conclusion of the evidentiary hearing, Claimants withdrew two causes of action including breach of contract and money had and received.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant Betty Lynn FitzWilliam (a/k/a Betty Saleh) is liable for and shall pay to Wedbush Securities Inc. compensatory damages for its Counterclaim in the sum of $34,200.00 for the DH settlement. Wedbush Securities Inc. and Edward William Wedbush are jointly and severally liable for and shall pay to Claimants compensatory damages for their Statement of Claim in the sum of $295,383.36. Wedbush Securities Inc.'s award in the amount of $34,200.00 is an offset to Claimants' award. Accordingly, Claimant Betty Lynn FitzWilliam (a/k/a Betty Saleh's) obligation is extinguished by the offset. As such, Wedbush Securities Inc. and Edward William Wedbush are jointly and severally liable for and shall pay to Claimants compensatory damages in the net sum of $261,183.36.

2. Wedbush Securities Inc. and Edward William Wedbush are jointly and severally liable for and shall pay to Claimants simple interest on the aforementioned award of $261,183.36 at the rate of 10% per annum from June 25, 2009 until the award is paid in full.

3. As punitive damages, Wedbush Securities Inc. and Edward William Wedbush are jointly and severally liable for and shall pay to Claimants $162,755.00 in attorneys' fees pursuant to equitable principles. As to the imposition of punitive damages, the Panel deems such damages warranted by the unjustifiable withholding of all funds in Claimants' accounts, and finds that such withholding by Respondents was oppressively designed to gain an unfair advantage over Claimants with respect to possible future damages assessments against Respondents, which had not yet been determined, and with respect to the FINRA award against Respondents, as to which Respondents presented no evidentiary basis to justify holding Claimants responsible for said award, or legal or equitable basis for withholding Claimants' funds hostage to Respondents' desire that Claimants pay all or a portion of said award.

4. Wedbush Securities Inc. and Edward William Wedbush are jointly and severally liable for and shall pay to Claimants costs in the sum of $6,329.18 and expert costs in the sum of $5,115.00.

5. Claimants' claims against Respondents Michael Gerald Gardner and Richard Anthony Lanni are denied.

**EXHIBIT 6**

**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No. 11-03452
<u>Award Page 5 of 7</u>

6.  Any and all relief not specifically addressed herein is denied.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 1,800.00 |
| Counterclaim Filing Fee | =$ 2,125.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute.  Accordingly, as a party, Wedbush Securities Inc. is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 2,800.00 |
| Pre-Hearing Processing Fee | =$ 750.00 |
| Hearing Processing Fee | =$ 5,000.00 |

### Adjournment Fees
Adjournments granted during these proceedings for which fees were waived:

| | |
|---|---|
| February 4-5, 2013, adjournment by Claimants | = waived |
| February 6-8, 2013, adjournment by parties | = waived |

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less.  Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Four (4) Pre-hearing sessions with the Panel @ $1,200.00/session | | | = $4,800.00 |
| Pre-hearing conferences: | February 16, 2012 | 1 session | |
| | May 14, 2012 | 1 session | |
| | August 29, 2012 | 1 session | |
| | January 11, 2013 | 1 session | |
| | | | |
| Six (6) Hearing sessions @ $1,200.00/session | | | = $7,200.00 |
| Hearing Dates: | June 11, 2013 | 2 sessions | |
| | June 12, 2013 | 2 sessions | |
| | June 13, 2013 | 2 sessions | |

| | |
|---|---|
| Total Hearing Session Fees | =$12,000.00 |

The Panel has assessed $6,000.00 of the hearing session fees jointly and severally to Claimants.

**EXHIBIT 6**

**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No.  11-03452
Award Page 6 of 7

The Panel has assessed $6,000.00 of the hearing session fees jointly and severally to Respondents.

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

**EXHIBIT 6**

**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No.  11-03452
Award Page 7 of 7

## ARBITRATION PANEL

| Robert A. Lombardi | - | Public Arbitrator, Presiding Chairperson |
| Dennis A. Torres | - | Public Arbitrator |
| Robert Dean McKinley | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

**Concurring Arbitrators' Signatures**

_____
Robert A. Lombardi
Public Arbitrator, Presiding Chairperson

_____          Signature Date
Dennis A. Torres
Public Arbitrator

                                                *14 August 2013*
                                                Signature Date


_____          Signature Date
Robert Dean McKinley
Public Arbitrator


_____*August 16, 2013*_____
Date of Service (For FINRA Dispute Resolution office use only)


**EXHIBIT 6**


**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No. 11-03452
Award Page 7 of 7

## ARBITRATION PANEL

| | | |
|---|---|---|
| Robert A. Lombardi | - | Public Arbitrator, Presiding Chairperson |
| Dennis A. Torres | - | Public Arbitrator |
| Robert Dean McKinley | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_____
Robert A. Lombardi
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Dennis A. Torres
Public Arbitrator

_____
Signature Date

_____
Robert Dean McKinley
Public Arbitrator

_8) 15) 2015_
Signature Date

_August 16, 2015_
Date of Service (For FINRA Dispute Resolution office use only)

**EXHIBIT 6**

**EXHIBIT A**

FINRA Dispute Resolution
Arbitration No.  11-03452
Award Page 7 of 7

## ARBITRATION PANEL

| | | |
|---|---|---|
| Robert A. Lombardi | - | Public Arbitrator, Presiding Chairperson |
| Dennis A. Torres | - | Public Arbitrator |
| Robert Dean McKinley | - | Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

## Concurring Arbitrators' Signatures

_Robert A Lombardi_          _August 16, 2013_
Robert A. Lombardi                              Signature Date
Public Arbitrator, Presiding Chairperson

_____          _____
Dennis A. Torres                                Signature Date
Public Arbitrator

_____          _____
Robert Dean McKinley                       Signature Date
Public Arbitrator

_August 20, 2013_
Date of Service (For FINRA Dispute Resolution office use only)

**EXHIBIT 6**

**EXHIBIT A**

EXHIBIT 7

**EXHIBIT A**

```
##    '9DPCSTM        07310900022414410
```

Page 1    (78)

Account #: 22414410

This statement: July 31, 2009            Contact us:
Last statement: June 30, 2009            213 673-7700

                                         Woodland Hills Office
                                         21800 Oxnard Street
022                        0830G          Woodland Hills CA 91367
NATIONWIDE AUTOMATED SYSTEMS, INC.
(GENERAL ACCOUNT)                        cnb.com
22048 SHERMAN WAY # 111
CANOGA PARK CA 91303

IMPORTANT POLICY CHANGE: THE STATE OF CALIFORNIA MAY ISSUE REGISTERED
WARRANTS TO PAY ITS OBLIGATIONS. OUR ACCEPTANCE OF SUCH WARRANTS FROM YOU
IS SUBJECT TO RESTRICTED TERMS AND CONDITIONS CONTAINED IN OUR "NOTICE
TO ALL CITY NATIONAL CLIENTS". BEFORE SUBMITTING ANY REGISTERED
WARRANTS TO US, YOU MUST CAREFULLY REVIEW OUR NOTICE AND POLICIES AT
WWW.CNB.COM /ABOUTUS /CA-IOU-NOTICE.ASP OR CALL
800-773-7100 FOR A COPY.

A.   .d Business Checking

| Account Summary | | Account Activity | | | |
|---|---|---|---|---|---|
| Account number | 22414410 | Beginning bal | (6/30/2009) | | $4,049,838.12 |
| Minimum balance | $2,406,897.29 | Deposits | (8) | + 1,399,445.94 | |
| Average balance | $2,989,517.13 | Electronic cr | (0) | + 0.00 | |
| Avg. collect bal | $2,869,402.00 | Other credits | (0) | + 0.00 | |
| | | Total credits | | +$1,399,445.94 | |
| | | Checks paid | (78) | - 1,060,306.83 | |
| | | Electronic db | (2) | - 1,417.28 | |
| | | Other debits | (6) | - 1,980,662.66 | |
| | | Total debits | | - $3,042,386.77 | |
| | | Ending balance | (7/31/2009) | $2,406,897.29 | |

DEPOSITS
| Date | Description | Reference | Credits | Control Number |
|---|---|---|---|---|
| 7-3 | Deposit | | 300,000.00 | 00000010694530 |
| 7-9 | Deposit | | 738,600.00 | 00000010265940 |
| 7-14 | Deposit | | 500.00 | 00000041318740 |
| 7-15 | Deposit | | 22,011.20 | 00000010282930 |
| 7-23 | Deposit | | 500.00 | 00000040952940 |
| 7-23 | Deposit | | 72,703.80 | 00000040952800 |
| 7-27 | Deposit | | 49,730.94 | 00000010258690 |
| 7-27 | Deposit | | 215,400.00 | 00000010258710 |

EXHIBIT 8

EXHIBIT A

##   ^9DPCSTM          07310900022414410


                NATIONWIDE AUTOMATED SYSTEMS, INC.       Page 2
                July 31, 2009                           Account #: 22414410


        CHECKS PAID


| Number | Date | Amount | Control |
|---|---|---|---|
| 1352 | 07-28 | 6,500.00 | 00000041148360 |
| 8062 * | 07-06 | 1,500.00 | 00000040916790 |
| 8068 * | 07-01 | 82.02 | 00000040024700 |
| 8069 | 07-03 | 107.42 | 00000010245880 |
| 8070 | 07-03 | 57.20 | 00000010233350 |
| 8071 | 07-01 | 922.00 | 00000040087500 |
| 8074 * | 07-01 | 1,556.56 | 00000040203920 |
| 8075 | 07-01 | 600.00 | 00000040456620 |
| 8076 | 07-03 | 120,000.00 | 00000010308020 |
| 8077 | 07-06 | 39,600.00 | 00000040312700 |
| 8078 | 07-08 | 8,390.50 | 00000040390490 |
| 8C | 07-07 | 5,000.00 | 00000040399460 |
| 8L | 07-02 | 2,820.00 | 00000040672730 |
| 8082 | 07-01 | 6,500.00 | 00000010454800 |
| 8083 | 07-06 | 19,000.00 | 00000010191890 |
| 8084 | 07-01 | 12,500.00 | 00000040503720 |
| 8086 * | 07-03 | 20,000.00 | 00000040240760 |
| 8087 | 07-09 | 95.00 | 00000040140710 |
| 8088 | 07-06 | 60.00 | 00000010047820 |
| 8089 | 07-09 | 2,077.00 | 00000040130030 |
| 8090 | 07-06 | 131.10 | 00000040759740 |
| 8091 | 07-06 | 49.11 | 00000040590250 |
| 8092 | 07-03 | 28.65 | 00000010020040 |
| 8093 | 07-07 | 226.64 | 00000040268380 |
| 8094 | 07-06 | 1,258.18 | 00000040638510 |
| 8095 | 07-06 | 1,499.60 | 00000040926370 |
| 8096 | 07-03 | 2,783.14 | 00000010286980 |
| 8097 | 07-06 | 48.62 | 00000040590240 |
| 8098 | 07-03 | 1,250.00 | 00000040298060 |
| 8101 * | 07-08 | 24,000.00 | 00000040390480 |
| 8102 | 07-03 | 200.00 | 00000010328610 |
| 8103 | 07-09 | 3,000.00 | 00000040880480 |
| 8105 * | 07-16 | 2,854.00 | 00000040676100 |
| 8106 | 07-14 | 180,000.00 | 00000040192120 |
| 8107 | 07-15 | 19,800.00 | 00000040719610 |
| 8108 | 07-17 | 24,000.00 | 00000040664240 |
| 8109 | 07-20 | 720.00 | 00000040152330 |

* Skip in check sequence


                                **EXHIBIT 8**


                                **EXHIBIT A**

0022414410        PAGE

## ##    ˙9DPCSTM        0731090002414410


NATIONWIDE AUTOMATED SYSTEMS, INC.      Page 3
July 31, 2009                           Account #: 22414410


CHECKS PAID (Continued)

| 8110   | 07-16 | 24.95     | 00000040164850 |
|--------|-------|-----------|----------------|
| 8111   | 07-14 | 624.01    | 00000040141630 |
| 8112   | 07-15 | 49.62     | 00000040304160 |
| 8113   | 07-14 | 35.88     | 00000040068810 |
| 8114   | 07-13 | 87.13     | 00000010005500 |
| 8115   | 07-14 | 28.65     | 00000040013620 |
| 8116   | 07-10 | 11,500.00 | 00000040873220 |
| 8117   | 07-13 | 300.00    | 00000010436380 |
| 8118   | 07-10 | 15,000.00 | 00000040873240 |
| 8119   | 07-17 | 11,435.88 | 00000040279900 |
| 8120   | 07-14 | 5,500.00  | 00000041318730 |
| 8121   | 07-16 | 5,500.00  | 00000041018930 |
| 8122   | 07-29 | 24,000.00 | 00000040523060 |
| 8123   | 07-16 | 1,231.16  | 00000040505060 |
| 8?     | 07-15 | 25,000.00 | 00000010282750 |
| 8∟     | 07-15 | 9,335.42  | 00000010466800 |
| 8127 * | 07-27 | 66.61     | 00000040067610 |
| 8128   | 07-27 | 48.12     | 00000040067600 |
| 8129   | 07-24 | 50.84     | 00000040187480 |
| 8130   | 07-28 | 149.44    | 00000010000140 |
| 8131   | 07-28 | 2.05      | 00000040740740 |
| 8132   | 07-27 | 82.02     | 00000040067590 |
| 8133   | 07-23 | 16,170.61 | 00000040295740 |
| 8134   | 07-28 | 1,302.68  | 00000040475540 |
| 8135   | 07-21 | 600.00    | 00000040333110 |
| 8136   | 07-17 | 5,000.00  | 00000010329410 |
| 8137   | 07-23 | 80.84     | 00000040434860 |
| 8138   | 07-27 | 27.23     | 00000040067630 |
| 8140 * | 07-24 | 35.14     | 00000040187490 |
| 8141   | 07-27 | 28.49     | 00000040067620 |
| 8142   | 07-28 | 376.50    | 00000040349740 |
| 8143   | 07-24 | 24,000.00 | 00000040530290 |
| 8144   | 07-30 | 8,389.00  | 00000040664270 |
| 8145   | 07-28 | 7,355.00  | 00000010008710 |
| 8146   | 07-22 | 1,500.00  | 00000040646020 |
| 8150 * | 07-29 | 40,000.00 | 00000040573560 |
| 8151   | 07-23 | 35,000.00 | 00000040952830 |
| 8152   | 07-27 | 300.00    | 00000040506470 |
| 8153   | 07-31 | 468.79    | 00000040568930 |
| 8155 * | 07-31 | 404.03    | 00000040104330 |

* Skip in check sequence


**EXHIBIT 8**


**EXHIBIT A**

```
0022414410          PAGE


#      9DPCSTM          07310900022414410




              NATIONWIDE AUTOMATED SYSTEMS, INC.      Page 4
              July 31, 2009                           Account #: 22414410



CHECKS PAID (Continued)
8167 *            07-28          300,000.00     0000010560970
* Skip in check sequence

ELECTRONIC DEBITS
Date   Description                                            Debits  Control Number
7-6    Preauthorized Debit ALLIANZ LIFE INS INS.PREM 090706   674.26  91000011169717
7-6    Preauthorized Debit ALLIANZ LIFE INS INS.PREM 090706   743.02  91000011169718

OTHER DEBITS
Date   Description                          Reference      Debits  Control Number
7-1    Transfer Debit TRANSFER TO DEPOSIT ACCOUNT 0022414399   1,400,000.00  468000701173446
7-17   Transfer Debit TRANSFER TO DEPOSIT ACCOUNT 0022414402      20,000.00  468000717143058
7-21   Acct Analysis Chg ANALYSIS ACTIVITY FOR 06/09               662.66  0000000000000
7-27   Transfer Debit TRANSFER TO DEPOSIT ACCOUNT 0022414402      50,000.00  468000727144625
7-     Transfer Debit TRANSFER TO DEPOSIT ACCOUNT 0022414399     500,000.00  468000729124944
7-     Transfer Debit TRANSFER TO DEPOSIT ACCOUNT 0022414402      10,000.00  468000730121826

DAILY BALANCES




Date       Amount  Date        Amount  Date        Amount
06-30  4,049,838.12  07-10  3,385,178.10  07-22  3,093,399.94
07-01  2,627,677.54  07-13  3,384,790.97  07-23  3,115,352.29
07-02  2,624,857.54  07-14  3,199,102.43  07-24  3,091,266.31
07-03  2,780,431.13  07-15  3,166,928.59  07-27  3,305,844.78
07-06  2,715,867.24  07-16  3,157,318.48  07-28  2,990,159.11
07-07  2,710,640.60  07-17  3,096,882.60  07-29  2,426,159.11
07-08  2,678,250.10  07-20  3,096,162.60  07-30  2,407,770.11
07-09  3,411,678.10  07-21  3,094,899.94  07-31  2,406,897.29
```

**EXHIBIT 8**

**EXHIBIT A**


**CITY NATIONAL BANK**
The way up.®

Page 1          (794)

**Account #:** 22414399

This statement: July 31, 2009
Last statement: June 30, 2009

**Contact us:**
213 673-7700

Woodland Hills Office
21800 Oxnard Street
Woodland Hills CA 91367

022                              0830G
NATIONWIDE AUTOMATED SYSTEMS, INC.
(INVESTORS ACCOUNT)
22048 SHERMAN WAY # 111
CANOGA PARK CA 91303

cnb.com

IMPORTANT POLICY CHANGE: THE STATE OF CALIFORNIA MAY ISSUE REGISTERED WARRANTS TO PAY ITS OBLIGATIONS. OUR ACCEPTANCE OF SUCH WARRANTS FROM YOU IS SUBJECT TO RESTRICTED TERMS AND CONDITIONS CONTAINED IN OUR "NOTICE TO ALL CITY NATIONAL CLIENTS". BEFORE SUBMITTING ANY REGISTERED WARRANTS TO US, YOU MUST CAREFULLY REVIEW OUR NOTICE AND POLICIES AT WWW.CNB.COM /ABOUTUS /CA-IOU-NOTICE.ASP OR CALL 800-773-7100 FOR A COPY.

**Analyzed Business Checking**

| Account Summary | | Account Activity | | |
|---|---|---|---|---|
| Account number | 22414399 | Beginning balance (6/30/2009) | | $326,681.15 |
| Minimum balance | $-2,924.10 | | | |
| Average balance | $380,527.98 | **Credits** Deposits    (0) | + 0.00 | |
| Avg. collected balance | $380,527.00 | Electronic cr   (0) | + 0.00 | |
| | | Other credits   (2) | + 1,900,000.00 | |
| | | **Total credits** | | + $1,900,000.00 |
| | | **Debits** Checks paid  (794) | - 1,744,867.75 | |
| | | Electronic db (0) | - 0.00 | |
| | | Other debits  (0) | - 0.00 | |
| | | **Total debits** | | - $1,744,867.75 |
| | | **Ending balance  (7/31/2009)** | | $481,813.40 |

**OTHER CREDITS**

| Date | Description | Reference | Credits |
|---|---|---|---|
| 7-1 | Transfer Credit TRANSFER FROM DEPOSIT ACCOUNT 0022414410 | | 1,400,000.00 |
| 7-29 | Transfer Credit TRANSFER FROM DEPOSIT ACCOUNT 0022414410 | | 500,000.00 |

**CHECKS PAID**

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 47115 | 7-2 | 333.00 | 49416 * | 7-31 | 345.50 | 49838 * | 7-2 | 1,650.00 | 49900 | 7-3 | 1,792.50 |
| 48419 * | 7-13 | 990.00 | 49421 * | 7-3 | 805.50 | 49854 * | 7-27 | 160.50 | 49901 | 7-7 | 12,867.50 |
| 49039 * | 7-27 | 155.00 | 49494 * | 7-10 | 660.00 | 49882 * | 7-1 | 1,039.50 | 49902 | 7-6 | 660.00 |
| 49111 * | 7-8 | 660.00 | 49514 * | 7-7 | 5,227.50 | 49892 * | 7-6 | 1,646.00 | 49903 | 7-8 | 330.00 |
| 49150 * | 7-7 | 5,053.00 | 49518 * | 7-2 | 6,244.00 | 49893 | 7-6 | 162.00 | 49905 * | 7-6 | 660.00 |
| 49166 * | 7-20 | 158.50 | 49544 * | 7-21 | 501.50 | 49894 | 7-9 | 1,320.00 | 49906 | 7-6 | 330.00 |
| 49197 * | 7-13 | 990.00 | 49655 * | 7-8 | 660.00 | 49895 | 7-7 | 168.00 | 49907 | 7-6 | 1,037.00 |
| 49277 * | 7-3 | 840.00 | 49659 * | 7-8 | 330.00 | 49897 * | 7-3 | 527.50 | 49908 | 7-7 | 330.00 |
| 49280 * | 7-2 | 660.00 | 49739 * | 7-9 | 1,980.00 | 49898 | 7-3 | 2,640.00 | 49909 | 7-21 | 499.00 |
| 49298 * | 7-14 | 2,970.00 | 49817 * | 7-3 | 3,984.50 | 49899 | 7-6 | 330.00 | 49910 | 7-6 | 815.00 |

**EXHIBIT 9**

**EXHIBIT A**



**CITY NATIONAL BANK**
The way up.®

NATIONWIDE AUTOMATED SYSTEMS, INC.          Page 2
July 31, 2009                                Account #: 22414399

## CHECKS PAID (Continued)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 49911 | 7-3 | 163.50 | 49959 | 7-6 | 660.00 | 50008 | 7-6 | 990.00 | 50058 | 7-22 | 330.00 |
| 49912 | 7-6 | 660.00 | 49960 | 7-7 | 2,640.00 | 50009 | 7-7 | 1,650.00 | 50059 | 7-6 | 330.00 |
| 49913 | 7-3 | 1,758.00 | 49961 | 7-9 | 164.00 | 50010 | 7-3 | 748.00 | 50060 | 7-6 | 1,980.00 |
| 49914 | 7-3 | 1,015.50 | 49962 | 7-3 | 660.00 | 50011 | 7-8 | 1,535.50 | 50061 | 7-3 | 4,290.00 |
| 49915 | 7-3 | 327.00 | 49963 | 7-3 | 3,149.50 | 50013 * | 7-6 | 316.00 | 50062 | 7-3 | 330.00 |
| 49916 | 7-3 | 990.00 | 49964 | 7-9 | 1,320.00 | 50014 | 7-6 | 839.00 | 50063 | 7-3 | 2,158.00 |
| 49917 | 7-8 | 660.00 | 49965 | 7-20 | 1,282.00 | 50015 | 7-7 | 345.50 | 50064 | 7-3 | 5,891.50 |
| 49919 * | 7-9 | 445.50 | 49966 | 7-6 | 33,433.50 | 50016 | 7-3 | 4,773.00 | 50066 * | 7-17 | 1,650.00 |
| 49920 | 7-3 | 839.00 | 49967 | 7-6 | 1,042.00 | 50017 | 7-3 | 2,640.00 | 50067 | 7-3 | 1,785.00 |
| 49921 | 7-7 | 5,140.00 | 49968 | 7-9 | 170.50 | 50019 * | 7-8 | 82.50 | 50068 | 7-3 | 2,970.00 |
| 49922 | 7-7 | 969.00 | 49969 | 7-3 | 837.50 | 50020 | 7-10 | 330.00 | 50070 * | 7-6 | 179.00 |
| 49923 | 7-10 | 3,158.50 | 49970 | 7-6 | 330.00 | 50022 * | 7-3 | 330.00 | 50071 | 7-9 | 6,668.00 |
| 49924 | 7-15 | 990.00 | 49971 | 7-6 | 19,141.50 | 50023 | 7-7 | 330.00 | 50072 | 7-9 | 368.50 |
| 49925 | 7-6 | 481.50 | 49972 | 7-7 | 684.00 | 50025 * | 7-7 | 341.00 | 50073 | 7-2 | 512.00 |
| 49926 | 7-2 | 4,600.00 | 49973 | 7-24 | 153.50 | 50026 | 7-7 | 923.50 | 50075 * | 7-7 | 160.00 |
| 49927 | 7-6 | 331.00 | 49974 | 7-6 | 331.00 | 50027 | 7-6 | 5,932.50 | 50076 | 7-16 | 6,158.00 |
| 49928 | 7-6 | 339.75 | 49975 | 7-3 | 660.00 | 50028 | 7-3 | 990.00 | 50077 | 7-16 | 2,778.00 |
| 49929 | 7-7 | 660.00 | 49976 | 7-6 | 1,775.50 | 50029 | 7-16 | 5,087.00 | 50078 | 7-3 | 181.00 |
| 49930 | 7-9 | 330.00 | 49977 | 7-9 | 660.00 | 50030 | 7-7 | 336.00 | 50079 | 7-8 | 990.00 |
| 49931 | 7-7 | 6,600.00 | 49978 | 7-15 | 833.50 | 50031 | 7-15 | 330.00 | 50080 | 7-21 | 355.00 |
| 49932 | 7-7 | 3,300.00 | 49979 | 7-6 | 1,303.50 | 50032 | 7-7 | 847.00 | 50081 | 7-7 | 155.00 |
| 49933 | 7-9 | 1,242.50 | 49980 | 7-3 | 330.00 | 50033 | 7-14 | 2,037.50 | 50082 | 7-3 | 164.50 |
| 49934 | 7-2 | 678.50 | 49981 | 7-6 | 5,082.00 | 50034 | 7-2 | 1,329.50 | 50083 | 7-7 | 9,516.00 |
| 49935 | 7-2 | 1,374.00 | 49982 | 7-3 | 2,310.00 | 50035 | 7-14 | 4,266.00 | 50084 | 7-7 | 4,414.00 |
| 49936 | 7-6 | 1,101.00 | 49983 | 7-7 | 1,521.00 | 50036 | 7-13 | 340.00 | 50085 | 7-3 | 843.00 |
| 49937 | 7-7 | 672.00 | 49984 | 7-2 | 2,755.00 | 50037 | 7-9 | 660.00 | 50086 | 7-9 | 2,002.00 |
| 49938 | 7-6 | 5,225.00 | 49986 * | 7-7 | 1,078.00 | 50038 | 7-6 | 2,188.50 | 50087 | 7-16 | 330.00 |
| 49939 | 7-6 | 1,844.00 | 49987 | 7-17 | 623.00 | 50039 | 7-3 | 2,809.50 | 50088 | 7-2 | 660.00 |
| 49940 | 7-7 | 1,494.00 | 49988 | 7-7 | 3,308.00 | 50040 | 7-13 | 3,014.50 | 50089 | 7-9 | 244.00 |
| 49941 | 7-14 | 1,949.00 | 49989 | 7-7 | 184.00 | 50041 | 7-9 | 4,782.50 | 50090 | 7-13 | 503.00 |
| 49942 | 7-20 | 1,320.00 | 49990 | 7-30 | 169.00 | 50042 | 7-2 | 1,712.50 | 50091 | 7-3 | 350.50 |
| 49944 * | 7-8 | 342.00 | 49991 | 7-8 | 660.00 | 50043 | 7-6 | 501.00 | 50092 | 7-14 | 1,812.50 |
| 49945 | 7-7 | 5,592.00 | 49992 | 7-8 | 395.50 | 50044 | 7-8 | 5,096.50 | 50093 | 7-8 | 330.00 |
| 49946 | 7-8 | 335.50 | 49994 * | 7-6 | 1,650.00 | 50045 | 7-7 | 990.00 | 50094 | 7-7 | 338.00 |
| 49947 | 7-9 | 990.00 | 49995 | 7-3 | 330.00 | 50046 | 7-6 | 9,900.00 | 50095 | 7-6 | 3,630.00 |
| 49948 | 7-7 | 1,320.00 | 49996 | 7-6 | 1,650.00 | 50047 | 7-2 | 5,940.00 | 50096 | 7-15 | 849.00 |
| 49949 | 7-20 | 990.00 | 49997 | 7-14 | 330.00 | 50048 | 7-6 | 870.00 | 50097 | 7-9 | 166.50 |
| 49950 | 7-6 | 843.50 | 49998 | 7-3 | 6,328.00 | 50049 | 7-9 | 2,145.00 | 50098 | 7-9 | 181.00 |
| 49951 | 7-6 | 163.00 | 49999 | 7-20 | 534.50 | 50050 | 7-3 | 1,980.00 | 50099 | 7-6 | 990.00 |
| 49952 | 7-10 | 330.00 | 50000 | 7-10 | 2,196.00 | 50051 | 7-16 | 1,650.00 | 50100 | 7-3 | 330.00 |
| 49953 | 7-2 | 5,280.00 | 50001 | 7-6 | 330.00 | 50052 | 7-6 | 2,520.00 | 50101 | 7-8 | 188.50 |
| 49954 | 7-7 | 5,955.00 | 50002 | 7-21 | 2,093.00 | 50053 | 7-9 | 3,471.50 | 50102 | 7-7 | 3,300.00 |
| 49955 | 7-17 | 680.50 | 50004 * | 7-8 | 330.00 | 50054 | 7-2 | 660.00 | 50103 | 7-3 | 2,551.00 |
| 49956 | 7-9 | 1,650.00 | 50005 | 7-6 | 2,310.00 | 50055 | 7-6 | 3,465.00 | 50104 | 7-6 | 1,980.00 |
| 49957 | 7-7 | 5,133.00 | 50006 | 7-2 | 2,640.00 | 50056 | 7-9 | 876.50 | 50105 | 7-7 | 660.00 |
| 49958 | 7-3 | 1,587.00 | 50007 | 7-10 | 4,957.00 | 50057 | 7-9 | 660.00 | 50106 | 7-3 | 6,985.00 |

EXHIBIT 9

EXHIBIT A



CITY NATIONAL BANK
The way up.

NATIONWIDE AUTOMATED SYSTEMS, INC.     Page 3
July 31, 2009                          Account #: 22414399

## CHECKS PAID (Continued)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 50107 | 7-14 | 2,970.00 | 50154 | 7-8 | 721.00 | 50201 | 7-17 | 1,323.00 | 50251 | 7-6 | 866.00 |
| 50108 | 7-2 | 7,280.00 | 50155 | 7-14 | 660.00 | 50202 | 7-6 | 330.00 | 50252 | 7-2 | 990.00 |
| 50109 | 7-2 | 1,980.00 | 50156 | 7-3 | 6,259.00 | 50203 | 7-3 | 660.00 | 50253 | 7-3 | 1,973.00 |
| 50110 | 7-6 | 502.50 | 50157 | 7-8 | 1,637.00 | 50204 | 7-3 | 330.00 | 50254 | 7-6 | 330.00 |
| 50111 | 7-15 | 2,797.00 | 50158 | 7-14 | 378.50 | 50205 | 7-15 | 1,016.50 | 50255 | 7-8 | 330.00 |
| 50112 | 7-3 | 361.00 | 50159 | 7-8 | 869.00 | 50206 | 7-2 | 505.50 | 50256 | 7-10 | 660.00 |
| 50113 | 7-7 | 2,402.00 | 50160 | 7-7 | 2,024.50 | 50207 | 7-8 | 671.50 | 50257 | 7-13 | 660.00 |
| 50114 | 7-7 | 330.00 | 50161 | 7-3 | 1,980.00 | 50208 | 7-6 | 3,300.00 | 50258 | 7-8 | 3,358.50 |
| 50115 | 7-8 | 348.50 | 50162 | 7-3 | 16,153.50 | 50209 | 7-6 | 660.00 | 50260 * | 7-9 | 506.00 |
| 50117 * | 7-3 | 5,598.00 | 50163 | 7-8 | 4,068.50 | 50210 | 7-21 | 2,907.00 | 50261 | 7-28 | 3,859.00 |
| 50118 | 7-10 | 660.00 | 50164 | 7-7 | 4,290.00 | 50211 | 7-21 | 330.00 | 50262 | 7-15 | 342.50 |
| 50119 | 7-6 | 4,620.00 | 50165 | 7-20 | 498.00 | 50212 | 7-3 | 20,834.50 | 50263 | 7-6 | 3,461.00 |
| 50120 | 7-7 | 175.00 | 50166 | 7-3 | 990.00 | 50213 | 7-8 | 1,350.50 | 50264 | 7-7 | 330.00 |
| 50121 | 7-7 | 330.00 | 50167 | 7-6 | 6,780.00 | 50214 | 7-6 | 330.00 | 50265 | 7-13 | 170.50 |
| 50122 | 7-7 | 330.00 | 50168 | 7-8 | 990.00 | 50216 * | 7-3 | 8,714.00 | 50266 | 7-6 | 167.50 |
| 50123 | 7-8 | 19,463.00 | 50169 | 7-8 | 564.25 | 50217 | 7-13 | 339.75 | 50267 | 7-10 | 660.00 |
| 50124 | 7-2 | 1,165.00 | 50170 | 7-8 | 9,447.00 | 50218 | 7-9 | 330.00 | 50268 | 7-8 | 648.00 |
| 50125 | 7-7 | 4,757.50 | 50171 | 7-8 | 2,185.50 | 50219 | 7-10 | 5,135.50 | 50270 * | 7-6 | 646.50 |
| 50126 | 7-9 | 660.00 | 50172 | 7-6 | 322.50 | 50220 | 7-6 | 2,538.50 | 50271 | 7-3 | 859.00 |
| 50127 | 7-3 | 990.00 | 50173 | 7-9 | 1,320.00 | 50221 | 7-8 | 856.50 | 50272 | 7-3 | 2,070.50 |
| 50128 | 7-2 | 1,084.50 | 50174 | 7-9 | 749.00 | 50222 | 7-3 | 3,246.50 | 50273 | 7-3 | 2,672.00 |
| 50129 | 7-3 | 1,650.00 | 50175 | 7-6 | 724.50 | 50223 | 7-14 | 861.50 | 50274 | 7-6 | 336.50 |
| 50130 | 7-8 | 1,528.50 | 50176 | 7-3 | 13,860.00 | 50224 | 7-2 | 349.50 | 50275 | 7-8 | 330.00 |
| 50131 | 7-3 | 880.00 | 50177 | 7-7 | 330.00 | 50225 | 7-3 | 356.00 | 50276 | 7-7 | 990.00 |
| 50132 | 7-6 | 4,798.50 | 50178 | 7-3 | 6,036.50 | 50226 | 7-8 | 155.50 | 50278 * | 7-8 | 163.50 |
| 50133 | 7-3 | 1,068.50 | 50179 | 7-6 | 337.50 | 50227 | 7-16 | 179.00 | 50279 | 7-3 | 1,832.00 |
| 50134 | 7-8 | 673.50 | 50180 | 7-6 | 175.00 | 50228 | 7-7 | 161.50 | 50280 | 7-10 | 3,960.00 |
| 50135 | 7-7 | 177.50 | 50182 * | 7-6 | 187.00 | 50229 | 7-20 | 330.00 | 50281 | 7-17 | 1,650.00 |
| 50136 | 7-6 | 2,310.00 | 50183 | 7-3 | 657.00 | 50230 | 7-3 | 826.00 | 50282 | 7-9 | 3,960.00 |
| 50137 | 7-8 | 332.00 | 50184 | 7-6 | 681.50 | 50232 * | 7-7 | 176.00 | 50283 | 7-6 | 3,960.00 |
| 50138 | 7-6 | 6,600.00 | 50185 | 7-6 | 990.00 | 50233 | 7-3 | 1,685.50 | 50284 | 7-7 | 1,650.00 |
| 50139 | 7-6 | 2,743.00 | 50186 | 7-6 | 990.00 | 50234 | 7-2 | 3,630.00 | 50285 | 7-9 | 895.00 |
| 50140 | 7-8 | 7,734.00 | 50187 | 7-8 | 330.00 | 50235 | 7-6 | 1,719.00 | 50286 | 7-21 | 990.00 |
| 50141 | 7-15 | 1,737.00 | 50188 | 7-8 | 34,143.50 | 50236 | 7-7 | 3,300.00 | 50287 | 7-6 | 330.00 |
| 50142 | 7-3 | 3,550.00 | 50189 | 7-2 | 13,700.00 | 50237 | 7-8 | 84.25 | 50289 * | 7-6 | 167.50 |
| 50143 | 7-6 | 6,836.50 | 50190 | 7-7 | 2,041.50 | 50238 | 7-13 | 3,577.00 | 50290 | 7-7 | 203.00 |
| 50144 | 7-10 | 489.00 | 50191 | 7-2 | 4,188.00 | 50240 * | 7-3 | 491.50 | 50291 | 7-7 | 5,280.00 |
| 50145 | 7-6 | 1,650.00 | 50192 | 7-7 | 3,247.50 | 50241 | 7-4 | 2,135.00 | 50292 | 7-21 | 4,197.00 |
| 50146 | 7-7 | 4,939.50 | 50193 | 7-3 | 2,422.50 | 50242 | 7-3 | 5,723.00 | 50293 | 7-6 | 11,584.00 |
| 50147 | 7-9 | 341.50 | 50194 | 7-7 | 1,198.00 | 50244 * | 7-3 | 1,690.50 | 50294 | 7-6 | 990.00 |
| 50148 | 7-9 | 514.00 | 50195 | 7-9 | 3,300.00 | 50245 | 7-6 | 990.00 | 50297 * | 7-16 | 3,093.50 |
| 50149 | 7-6 | 660.00 | 50196 | 7-16 | 1,704.00 | 50246 | 7-8 | 330.00 | 50298 | 7-7 | 353.00 |
| 50150 | 7-13 | 696.00 | 50197 | 7-22 | 660.00 | 50247 | 7-3 | 12,870.00 | 50299 | 7-17 | 6,424.50 |
| 50151 | 7-6 | 543.50 | 50198 | 7-7 | 660.00 | 50248 | 7-10 | 943.50 | 50300 | 7-3 | 870.50 |
| 50152 | 7-3 | 330.00 | 50199 | 7-2 | 3,906.50 | 50249 | 7-3 | 1,511.50 | 50301 | 7-2 | 2,751.50 |
| 50153 | 7-10 | 990.00 | 50200 | 7-8 | 1,037.50 | 50250 | 7-14 | 330.00 | 50303 * | 7-10 | 660.00 |

EXHIBIT 9

EXHIBIT A



**CITY NATIONAL BANK**
The way up.

NATIONWIDE AUTOMATED SYSTEMS, INC.          Page 4
July 31, 2009                                Account #: 22414399

## CHECKS PAID (Continued)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|--------|------|--------|
| 50304 | 7-3 | 357.50 | 50350 | 7-8 | 1,320.00 | 50398 | 7-23 | 1,636.50 | 50451 | 7-3 | 660.00 |
| 50305 | 7-9 | 330.00 | 50351 | 7-7 | 5,610.00 | 50400 * | 7-2 | 838.50 | 50452 | 7-13 | 947.00 |
| 50306 | 7-9 | 1,650.00 | 50352 | 7-8 | 990.00 | 50401 | 7-10 | 12,064.50 | 50453 | 7-13 | 1,133.00 |
| 50307 | 7-9 | 318.00 | 50353 | 7-29 | 514.00 | 50402 | 7-13 | 1,747.00 | 50454 | 7-3 | 8,168.50 |
| 50308 | 7-3 | 330.00 | 50354 | 7-8 | 3,327.50 | 50403 | 7-30 | 357.50 | 50455 | 7-7 | 330.00 |
| 50309 | 7-7 | 334.50 | 50355 | 7-10 | 1,017.50 | 50404 | 7-8 | 1,189.00 | 50456 | 7-6 | 1,320.00 |
| 50310 | 7-23 | 660.00 | 50356 | 7-8 | 330.00 | 50406 * | 7-2 | 660.00 | 50457 | 7-3 | 328.00 |
| 50311 | 7-9 | 330.00 | 50357 | 7-3 | 330.00 | 50407 | 7-3 | 3,310.50 | 50458 | 7-6 | 990.00 |
| 50312 | 7-9 | 4,248.50 | 50358 | 7-7 | 677.50 | 50408 | 7-13 | 2,310.00 | 50459 | 7-7 | 330.00 |
| 50313 | 7-8 | 660.00 | 50359 | 7-8 | 330.00 | 50409 | 7-13 | 1,020.00 | 50460 | 7-3 | 2,621.00 |
| 50314 | 7-6 | 1,235.50 | 50360 | 7-3 | 3,940.50 | 50410 | 7-2 | 684.00 | 50461 | 7-9 | 952.00 |
| 50315 | 7-7 | 1,648.50 | 50361 | 7-6 | 330.00 | 50412 * | 7-8 | 846.00 | 50462 | 7-8 | 388.50 |
| 50316 | 7-8 | 5,400.50 | 50362 | 7-3 | 2,472.00 | 50413 | 7-3 | 5,280.00 | 50463 | 7-23 | 2,310.00 |
| 50317 | 7-6 | 5,940.00 | 50363 | 7-7 | 1,650.00 | 50414 | 7-7 | 818.00 | 50464 | 7-8 | 660.00 |
| 50318 | 7-13 | 597.00 | 50364 | 7-6 | 660.00 | 50415 | 7-3 | 3,092.00 | 50465 | 7-7 | 660.00 |
| 50319 | 7-3 | 1,638.00 | 50365 | 7-6 | 1,104.00 | 50416 | 7-3 | 7,648.50 | 50466 | 7-6 | 2,640.00 |
| 50320 | 7-20 | 990.00 | 50366 | 7-15 | 165.00 | 50417 | 7-3 | 1,784.00 | 50467 | 7-13 | 5,127.50 |
| 50321 | 7-8 | 162.00 | 50367 | 7-2 | 496.50 | 50418 | 7-3 | 2,358.00 | 50468 | 7-8 | 330.00 |
| 50322 | 7-6 | 9,900.00 | 50368 | 7-27 | 3,705.25 | 50419 | 7-3 | 344.50 | 50469 | 7-8 | 1,187.00 |
| 50323 | 7-7 | 5,360.00 | 50369 | 7-8 | 171.00 | 50420 | 7-3 | 3,280.00 | 50470 | 7-2 | 4,797.50 |
| 50324 | 7-9 | 1,650.00 | 50370 | 7-8 | 1,320.50 | 50421 | 7-3 | 1,668.00 | 50471 | 7-8 | 843.00 |
| 50325 | 7-2 | 5,092.00 | 50371 | 7-27 | 7,224.25 | 50422 | 7-2 | 1,205.00 | 50472 | 7-2 | 6,600.00 |
| 50326 | 7-9 | 9,431.50 | 50372 | 7-6 | 1,455.00 | 50423 | 7-7 | 2,310.00 | 50473 | 7-6 | 9,018.50 |
| 50327 | 7-29 | 6,369.00 | 50373 | 7-9 | 3,478.50 | 50425 * | 7-3 | 1,819.00 | 50474 | 7-23 | 660.00 |
| 50328 | 7-15 | 3,403.00 | 50374 | 7-8 | 3,529.00 | 50426 | 7-8 | 5,216.00 | 50475 | 7-6 | 660.00 |
| 50329 | 7-3 | 1,490.00 | 50376 * | 7-22 | 333.00 | 50427 | 7-8 | 6,600.00 | 50476 | 7-9 | 8,876.00 |
| 50330 | 7-3 | 3,707.00 | 50377 | 7-9 | 333.00 | 50428 | 7-7 | 1,688.50 | 50477 | 7-6 | 883.00 |
| 50331 | 7-6 | 990.00 | 50379 * | 7-6 | 330.00 | 50429 | 7-7 | 660.00 | 50478 | 7-6 | 990.00 |
| 50332 | 7-6 | 3,427.00 | 50380 | 7-3 | 1,777.00 | 50430 | 7-13 | 1,980.00 | 50479 | 7-2 | 5,334.00 |
| 50333 | 7-9 | 330.00 | 50381 | 7-9 | 4,176.50 | 50431 | 7-15 | 170.00 | 50480 | 7-15 | 6,715.00 |
| 50334 | 7-3 | 4,178.00 | 50382 | 7-6 | 4,669.00 | 50432 | 7-2 | 4,950.00 | 50481 | 7-6 | 845.00 |
| 50335 | 7-2 | 12,387.00 | 50383 | 7-3 | 19,554.50 | 50433 | 7-6 | 1,063.00 | 50482 | 7-8 | 1,870.50 |
| 50336 | 7-3 | 330.00 | 50384 | 7-2 | 1,320.00 | 50434 | 7-7 | 2,970.00 | 50483 | 7-8 | 330.00 |
| 50337 | 7-8 | 168.00 | 50385 | 7-6 | 516.50 | 50435 | 7-6 | 325.00 | 50484 | 7-9 | 4,950.00 |
| 50338 | 7-10 | 660.00 | 50386 | 7-6 | 3,071.50 | 50437 * | 7-10 | 4,551.00 | 50485 | 7-14 | 330.00 |
| 50339 | 7-13 | 1,650.00 | 50387 | 7-13 | 866.50 | 50438 | 7-2 | 1,150.00 | 50486 | 7-6 | 666.25 |
| 50340 | 7-6 | 330.00 | 50388 | 7-6 | 1,650.00 | 50440 * | 7-13 | 160.50 | 50487 | 7-8 | 1,028.50 |
| 50341 | 7-3 | 1,031.00 | 50389 | 7-6 | 1,980.00 | 50441 | 7-7 | 839.50 | 50488 | 7-6 | 846.00 |
| 50342 | 7-6 | 990.00 | 50390 | 7-6 | 329.50 | 50442 | 7-7 | 184.00 | 50489 | 7-8 | 357.00 |
| 50343 | 7-13 | 1,130.00 | 50391 | 7-23 | 177.00 | 50443 | 7-15 | 660.00 | 50490 | 7-6 | 660.00 |
| 50344 | 7-8 | 317.50 | 50392 | 7-8 | 2,630.50 | 50444 | 7-8 | 336.00 | 50491 | 7-16 | 660.00 |
| 50345 | 7-9 | 433.00 | 50393 | 7-7 | 990.00 | 50445 | 7-6 | 508.00 | 50492 | 7-6 | 1,183.50 |
| 50346 | 7-2 | 330.00 | 50394 | 7-3 | 1,650.00 | 50446 | 7-15 | 660.00 | 50493 | 7-7 | 227.50 |
| 50347 | 7-9 | 660.00 | 50395 | 7-6 | 330.00 | 50448 * | 7-13 | 660.00 | 50494 | 7-14 | 365.00 |
| 50348 | 7-1 | 3,464.50 | 50396 | 7-13 | 487.00 | 50449 | 7-8 | 1,320.00 | 50495 | 7-8 | 1,039.50 |
| 50349 | 7-6 | 539.00 | 50397 | 7-6 | 1,686.00 | 50450 | 7-3 | 990.00 | 50496 | 7-6 | 5,528.00 |

**EXHIBIT 9**

**EXHIBIT A**



**CITY NATIONAL BANK**
The way up.®

NATIONWIDE AUTOMATED SYSTEMS, INC.
July 31, 2009

Page 5
Account #: 22414399

## CHECKS PAID (Continued)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 50497 | 7-3 | 512.50 | 50546 | 7-20 | 657.50 | 50596 | 7-15 | 889.50 | 50646 | 7-27 | 1,650.00 |
| 50498 | 7-6 | 3,391.50 | 50547 | 7-20 | 678.00 | 50597 | 7-23 | 415.50 | 50647 | 7-9 | 3,416.50 |
| 50499 | 7-6 | 4,290.00 | 50548 | 7-9 | 1,980.00 | 50598 | 7-3 | 862.00 | 50648 | 7-3 | 1,376.00 |
| 50500 | 7-6 | 164.00 | 50549 | 7-10 | 174.50 | 50599 | 7-16 | 825.00 | 50649 | 7-6 | 330.00 |
| 50501 | 7-6 | 806.00 | 50550 | 7-7 | 3,776.50 | 50600 | 7-9 | 491.50 | 50650 | 7-6 | 990.00 |
| 50502 | 7-2 | 2,970.00 | 50551 | 7-3 | 515.00 | 50601 | 7-8 | 1,537.50 | 50651 | 7-6 | 183.00 |
| 50503 | 7-10 | 990.00 | 50552 | 7-6 | 1,980.00 | 50602 | 7-3 | 1,839.00 | 50652 | 7-6 | 1,980.00 |
| 50505 * | 7-3 | 2,452.50 | 50553 | 7-6 | 330.00 | 50603 | 7-9 | 19,718.00 | 50653 | 7-7 | 1,320.00 |
| 50506 | 7-2 | 2,970.00 | 50554 | 7-8 | 330.00 | 50604 | 7-8 | 1,650.00 | 50654 | 7-21 | 1,337.50 |
| 50507 | 7-6 | 3,777.50 | 50555 | 7-8 | 330.00 | 50605 | 7-3 | 3,798.50 | 50655 | 7-8 | 347.50 |
| 50508 | 7-6 | 2,970.00 | 50556 | 7-10 | 660.00 | 50607 * | 7-9 | 816.50 | 50656 | 7-13 | 1,005.00 |
| 50509 | 7-7 | 660.00 | 50557 | 7-3 | 7,260.50 | 50609 * | 7-7 | 3,311.00 | 50657 | 7-3 | 2,970.00 |
| 50510 | 7-31 | 660.00 | 50558 | 7-8 | 690.00 | 50611 * | 7-6 | 1,320.00 | 50659 * | 7-17 | 4,950.00 |
| 50512 * | 7-3 | 324.50 | 50559 | 7-22 | 855.50 | 50612 | 7-7 | 1,320.00 | 50660 | 7-8 | 662.00 |
| 50513 | 7-7 | 333.00 | 50560 | 7-8 | 3,042.50 | 50613 | 7-3 | 1,023.00 | 50661 | 7-7 | 1,650.00 |
| 50514 | 7-3 | 990.00 | 50561 | 7-6 | 1,668.50 | 50614 | 7-14 | 990.00 | 50662 | 7-27 | 163.00 |
| 50515 | 7-3 | 1,650.00 | 50562 | 7-3 | 847.50 | 50615 | 7-10 | 1,320.00 | 50663 | 7-6 | 8,276.50 |
| 50516 | 7-3 | 1,059.00 | 50563 | 7-2 | 755.25 | 50616 | 7-10 | 160.50 | 50664 | 7-8 | 170.50 |
| 50518 * | 7-21 | 4,541.00 | 50564 | 7-6 | 1,035.50 | 50617 | 7-6 | 990.00 | 50666 * | 7-3 | 6,013.00 |
| 50519 | 7-6 | 1,320.00 | 50565 | 7-6 | 660.00 | 50618 | 7-13 | 660.00 | 50667 | 7-20 | 330.00 |
| 50520 | 7-3 | 8,184.00 | 50566 | 7-6 | 1,691.50 | 50619 | 7-9 | 404.00 | 50668 | 7-6 | 1,662.00 |
| 50521 | 7-10 | 330.00 | 50567 | 7-3 | 4,449.50 | 50620 | 7-3 | 5,080.50 | 50669 | 7-6 | 838.00 |
| 50522 | 7-3 | 1,633.50 | 50568 | 7-6 | 1,443.50 | 50621 | 7-8 | 1,931.00 | 50670 | 7-6 | 697.50 |
| 50523 | 7-8 | 522.50 | 50569 | 7-3 | 3,230.50 | 50622 | 7-7 | 330.00 | 50671 | 7-7 | 1,107.00 |
| 50524 | 7-10 | 493.50 | 50570 | 7-7 | 4,290.00 | 50623 | 7-10 | 8,773.00 | 50673 * | 7-8 | 356.00 |
| 50525 | 7-16 | 2,008.00 | 50571 | 7-24 | 483.75 | 50624 | 7-28 | 330.00 | 50674 | 7-21 | 161.50 |
| 50526 | 7-15 | 990.00 | 50572 | 7-13 | 162.00 | 50625 | 7-3 | 4,025.00 | 50675 | 7-20 | 1,506.00 |
| 50527 | 7-9 | 1,033.50 | 50573 | 7-7 | 5,429.50 | 50626 | 7-2 | 1,650.00 | 50676 | 7-13 | 2,087.50 |
| 50528 | 7-7 | 330.00 | 50574 | 7-3 | 5,280.00 | 50627 | 7-10 | 1,320.00 | 50677 | 7-2 | 2,758.50 |
| 50529 | 7-10 | 2,845.50 | 50576 * | 7-8 | 1,054.50 | 50628 | 7-6 | 3,960.00 | 50678 | 7-10 | 687.50 |
| 50530 | 7-7 | 1,320.00 | 50577 | 7-9 | 7,918.50 | 50629 | 7-17 | 330.00 | 50679 | 7-14 | 996.00 |
| 50531 | 7-10 | 1,320.00 | 50578 | 7-7 | 224.50 | 50630 | 7-8 | 520.00 | 50680 | 7-2 | 9,900.00 |
| 50532 | 7-7 | 3,608.50 | 50579 | 7-8 | 1,650.00 | 50631 | 7-30 | 200.00 | 50681 | 7-15 | 510.50 |
| 50533 | 7-2 | 10,494.00 | 50580 | 7-8 | 3,300.00 | 50632 | 7-10 | 676.00 | 50682 | 7-13 | 330.00 |
| 50534 | 7-9 | 679.00 | 50582 * | 7-3 | 59,845.00 | 50633 | 7-9 | 1,066.00 | 50683 | 7-3 | 179.00 |
| 50535 | 7-17 | 3,960.00 | 50583 | 7-3 | 7,654.00 | 50634 | 7-6 | 1,650.00 | 50684 | 7-9 | 2,548.00 |
| 50536 | 7-8 | 330.00 | 50584 | 7-3 | 358.50 | 50635 | 7-3 | 1,320.00 | 50685 | 7-16 | 833.50 |
| 50537 | 7-7 | 175.00 | 50585 | 7-6 | 4,943.50 | 50636 | 7-13 | 1,214.50 | 50687 * | 7-15 | 660.00 |
| 50538 | 7-9 | 330.00 | 50587 * | 7-10 | 160.00 | 50637 | 7-13 | 2,640.00 | 50688 | 7-13 | 240.00 |
| 50539 | 7-6 | 330.00 | 50588 | 7-8 | 5,973.00 | 50638 | 7-3 | 3,630.00 | 50689 | 7-1 | 887.50 |
| 50540 | 7-7 | 1,779.50 | 50589 | 7-2 | 1,632.00 | 50639 | 7-3 | 660.00 | 50690 | 7-22 | 814.00 |
| 50541 | 7-3 | 2,967.50 | 50590 | 7-3 | 2,540.50 | 50640 | 7-3 | 3,726.50 | 50691 | 7-7 | 263.00 |
| 50542 | 7-3 | 1,760.50 | 50591 | 7-8 | 6,879.00 | 50642 * | 7-6 | 4,004.50 | 50692 | 7-9 | 113.00 |
| 50543 | 7-20 | 4,252.50 | 50593 * | 7-8 | 502.00 | 50643 | 7-3 | 330.00 | 50693 | 7-7 | 242.50 |
| 50544 | 7-20 | 850.50 | 50594 | 7-8 | 849.00 | 50644 | 7-13 | 1,650.00 | 50694 | 7-7 | 1,061.50 |
| 50545 | 7-20 | 663.50 | 50595 | 7-3 | 511.00 | 50645 | 7-13 | 660.00 | 50695 | 7-7 | 1,862.00 |

**EXHIBIT 9**

**EXHIBIT A**


**CITY NATIONAL BANK**
The way up.®

NATIONWIDE AUTOMATED SYSTEMS, INC.          Page 6
July 31, 2009                                Account #: 22414399

## CHECKS PAID (Continued)

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|--------|------|--------|
| 50696 | 7-8 | 1,429.50 | 50702 | 7-15 | 923.00 | 50707 | 7-17 | 332.00 | 51521 | 7-30 | 6,565.50 |
| 50698 * | 7-13 | 393.00 | 50703 | 7-14 | 795.00 | 50708 | 7-28 | 5,103.50 | 51522 | 7-24 | 808.50 |
| 50699 | 7-20 | 567.50 | 50704 | 7-14 | 3,381.00 | 50709 | 7-22 | 6,699.00 | 51525 * | 7-29 | 82.00 |
| 50700 | 7-16 | 152.50 | 50705 | 7-17 | 843.00 | 51517 * | 7-24 | 330.00 | * Skip in check sequence | | |
| 50701 | 7-17 | 674.50 | 50706 | 7-13 | 8,358.50 | 51520 * | 7-24 | 387.00 | | | |

## DAILY BALANCES

| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|------|--------|
| 6-30 | 326,681.15 | 7-8 | 414,312.90 | 7-16 | 93,771.15 | 7-24 | 19,426.40 |
| 7-1 | 1,721,289.65 | 7-9 | 286,247.90 | 7-17 | 70,330.65 | 7-27 | 6,368.40 |
| 7-2 | 1,563,756.40 | 7-10 | 222,254.90 | 7-20 | 54,722.15 | 7-28 | -2,924.10 |
| 7-3 | 1,117,473.40 | 7-13 | 171,758.15 | 7-21 | 37,139.65 | 7-29 | 490,110.90 |
| 7-6 | 795,073.90 | 7-14 | 143,871.15 | 7-22 | 27,448.15 | 7-30 | 482,818.90 |
| 7-7 | 599,513.90 | 7-15 | 119,229.65 | 7-23 | 21,589.15 | 7-31 | 481,813.40 |

Thank you for banking with Woodland Hills Office

**EXHIBIT 9**

**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 117 of 245   Page ID #:564

Case 5:16-cv-00502-SJO-FFM   Document 14-10   Filed 04/15/16   Page 1 of 14   Page ID #:252

Case 1:12-bk-14290-VK   Doc 26-2   Filed 07/10/12   Entered 07/10/12 18:31:50   Desc Cooper Decl. & exs.   Page 1 of 14

1 | **ROSEN & ASSOCIATES, P.C.**
**Robert C. Rosen (SBN 79684)**
2 | **David Paul Bleistein (SBN 191810)**
444 S. Flower Street, Suite 602
3 | Los Angeles, California 90071
Tel.: (213) 362-1000; Fax: (213) 362-1001
4 | e-mail: mail@rosen-law.com

5 | Attorneys for Creditor
RICK COOPER

6 |

7 |

8 | **UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
9 | **SAN FERNANDO VALLEY DIVISION**

10 | In re | **CASE NO.: 2:12-bk-14290-VK**

11 | DEBRA MICHELE SALEH

12 | | **CHAPTER 7**

13 | Debtor, | **DECLARATION OF RICK COOPER**
**IN REPLY TO MOTION FOR ORDER:**
**(1) DISMISSING BANKRUPTCY**
14 | | **CASE; OR (2) ABSTAINING FROM**
**AND REFUSING TO ACCEPT**
15 | | **JURISDICTION**

16 | | **Hearing Information:**
**DATE: July 17, 2012**
17 | | **TIME: 2:00 p.m.**
**PLACE: Courtroom 301**
18 | | **21041 Burbank Blvd.**
**Woodland Hills, CA**

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |
ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower St.
Suite 602
Los Angeles, CA 90071
(213) 362-1000

1
DECLARATION OF RICK COOPER           Cooper D & E
page 19

**EXHIBIT 10**

**EXHIBIT A**

**DECLARATION OF RICK COOPER**

1.   I make this declaration in response to the perjurious declaration submitted by Debtor, Debbie Michelle Saleh, in Opposition to Motion for Order: (1) Dismissing Bankruptcy cases; or (2) Abstaining from and Refusing to Accept Jurisdiction.

2.   I was the Claimant in the FINRA Arbitration against Wedbush Morgan Securities, Inc., Edward Wedbush and Debbie Saleh.

3.   Wachovia Securities LLC (now Wells Fargo Advisors, LLC) was also a respondent, but prior to the hearing they settled agreeing to pay over $500,000. Debtor Debbie Saleh was the broker for my elderly mother, Laurette Kupperman, and me while at Wachovia. As our broker, Saleh handled our account. I later learned that she purchased securities that were not authorized and unsuitable for me and for years, from 2001 to 2004, sent me monthly statements which: (a) falsely stated transactions which did not occur; (b) dividends and interest which in fact were not deposited in the account; and (c) inflated the value of the account.

4.   In January, 2004, my mother died at age 97 and Saleh convinced me to transfer my account to her at her new broker-dealer, Wedbush Securities, which I did.

5.   From 2004 to 2008, Saleh sent to me, on Wedbush letterhead monthly statements which, in the fall of 2008, I discovered were false statements. Similar to the false statements Saleh sent to my mother and me while she was at Wachovia, these Wedbush bogus monthly statements: (a) falsely stated transactions which did not occur; (b) dividends and interest credited which in fact were not deposited in the account; and (c) that my account had as much as three times the value then it actually did. Ex. 1 hereto is a true and correct copy of a Saleh bogus monthly statement for December of 2007.

6.   During the course of the discovery process in the FINRA Arbitration, we obtained documents that showed that Saleh had forged my name on dozens of

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower St.
Suite 602
Los Angeles, CA 90071
(213) 362-1060

2
DECLARATION OF RICK COOPER

Cooper D & E
page 20

**EXHIBIT 10**

**EXHIBIT A**

07/10/2012   09:16   1-661-298-2532          CANYON MAIL N MORE                  PAGE   02/02

1  documents, mostly relating to unauthorized and unsuitable variable annuity
2  transactions that earned her the highest commission possible of any securities
3  sold by Wedbush.  Ex. 2 hereto is a copy of several such documents in which
4  Saleh forged my signature.

5       7.    Upon learning of the fraud perpetuated on me by Saleh, I retained the
6  law firm of Rosen & Associates and closed my account at Wedbush.

7       8.    Also, I could not believe that Saleh, who had been my mother's and
8  my broker for so many years, could engage in the fraud she did.  I was devastated
9  to learn that I only had about one-third the funds to live on the rest of my life that
10 Saleh represented I had.  Saleh represented to me orally and in writing that I was
11 living off of the dividends and interest she was earning for me in my account and
12 that the principal remained intact at approximately $1.8 million.  This was not true.
13 In fact, I was living off the principal which was being depleted every month, along
14 with losses in the account due to Saleh's unauthorized switching from one variable
15 annuity to another variable annuity.  As a result, I was forced to move into a small
16 11' x 11' room of a friend of mine and also felt a tremendous amount of stress, as I
17 was disabled due to a prior accident and could not work.  I became suicidal and
18 sought the help of professionals.

19      I declare under penalty of perjury that the foregoing is true and correct.
20 Executed on July 10, 2012.

21
22
23
24                                    Rick Cooper
25
   N:\WORK\COOPER, RICK - 1384-02\DEBBIE SALEH BANKRUPTCY\COURT\DEC OF RICK COOPER RE REPLY TO MOTION FOR DISMISSAL
26 070912.wpd
27
28
ROSEN & ASSOCIATES, P.C.
Law Offices
445 S. Figueroa St.
Suite 400
Los Angeles, CA 90071
(213) 995-1000

                                      3
                       DECLARATION OF RICK COOPER

Cooper D & E
page 21

JUL-10-2012   11:08          1 661 298 2532            ·98%


**EXHIBIT 10**


**EXHIBIT A**

Case 1:12-bk-14290-VK    Doc 26-2    Filed 07/10/12    Entered 07/10/12 18:31:50    Desc
Cooper Decl. & exs.    Page 4 of 14

Cooper D & E
page 22

EXHIBIT 1

EXHIBIT 10

EXHIBIT A

Case 1:12-bk-14290-VK   Doc 26-2   Filed 07/10/12   Entered 07/10/12 18:31:50   Desc
Cooper Decl. & exs.   Page 5 of 14

5855 TOPANGA CANYON BLVD | SUITE 510 | WOODLAND HILLS | CALIFORNIA 91367
610 NEWPORT CTR DR | STE 1300 | NEWPORT BEACH | CALIFORNIA 92660 | (949) 719-3200
MEMBER NEW YORK STOCK EXCHANGE
www.wedbush.com



**WEDBUSH MORGAN SECURITIES**
*Serving Investors Since 1925*

(818) 226-6740
FAX (818) 226-6750

December 2007

Mr. Rick Cooper
14040 Tahiti Way #526
Marina Del Rey, CA  90292

Re: Rick Cooper
    Account#: 6164-2368

Dear Rick,
The following is a list of the dividends you received....

| | |
|---|---|
| Federated Communications | $271.30 |
| Alliance Income | $284.34 |
| PW Strategy | $205.95 |
| MFS | $471.96 |
| American Total Return | $248.54 |
| Fund of America | $220.76 |
| Federated Large Cap | $141.20 |
| Federated High Income | $317.86 |
| PaineWebber High Income | $237.77 |
| Federated American Leaders | $138.27 |
| Regatta Gold | $625.00 |
| Growth Plus | $479.40 |
| Alliance North American | $512.60 |
| Treasury | $681.22 |
| | |
| Total | $4,836.17 |

Sincerely,

Debbie M. Saleh
Senior Vice President-Investments

This is a personal service of your broker and some of the data may be incorrect. This statement should not be relied upon for tax, trading income, net worth or other purposes. Please rely on your regular monthly Wedbush Morgan statements in case of discrepancies. Please report any discrepancies to me as soon as possible.

*"People Serving People"*

Cooper D & E
page 23

**EXHIBIT 10**

**EXHIBIT A**

## Portfolio
### 12/31/07

| Security | Current Value |
|---|---|
| Rick Cooper | $1,572,558.49 |
| | $305,955.00 |
| TOTAL | $1,878,513.49 |

This is a personal service of your broker and some of the the data may be incorrect. This statement should not be relied upon for tax, trading income, net worth or other purposes. Please rely on your regular monthly Wedbush Morgan statements in case of discrepancies. Please report any discrepancies to your financial advisor.

Debbie M. Saleh
Senior Vice President
866-837-2533

Cooper
14040 Tahiti Way #526
Marina Del Rey, CA  90292

Totals

Cooper D & E
page 24

**EXHIBIT 10**
**EXHIBIT A**

## Portfolio
### 12/31/07

| Security | Current Value | Purchased | Purchased Amount |
|---|---|---|---|
| American Online | $3,213.21 | 1/7/2000 | 10,374.00 |
| Alliance Income | $101,758.33 | 9/27/1999 | $64,500 |
| Alliance North American | $48,621.47 | 1/22/1999 | $33,333 |
| American Janus | $47,954.98 | 9/27/1999 | $64,500 |
| American Total Return | $57,872.16 | | |
| Fund of America | $114,435.23 | 9/27/1999 | $84,500 |
| Money Market Treasury | $146,499.76 | | |
| Federated American Leaders | $21,004.99 | various | $49,716 |
| Federated Large | $125,853.12 | various | $85,000 |
| Federated High Income | $56,895.43 | various | $47,000 |
| MFS | $112,826.47 | 9/27/1999 | $64,500 |
| PW High Income B | $63,690.02 | 2/19/1998 | $34,500 |
| Federated Communications | $29,554.36 | 1/14/2000 | $25,000 |
| Federated Equity Income | $99,972.94 | 10/18/1996 | $50,000 |
| Fortis | $30,238.98 | 2/7/1995 | $17,513 |
| Alliance | $84,138.66 | 10/18/1996 | $44,410 |
| Regatta Gold | $76,909.44 | 2/27/1997 | $50,000 |
| Growth Plus | $145,033.11 | 6/2/1997 | $112,000 |
| PW Strategy | $68,580.25 | 2/11/2000 | $50,000 |
| Golden American | $67,993.42 | 10/20/1999 | $53,979.40 |
| Sun Life Regatta | $69,512.16 | 1/29/1997 | $33,333 |
| TOTAL | $1,572,558.49 | | |

This is a personal service of your broker and some of the data may be incorrect. This statement should not be relied upon for tax, trading income, net worth or other purposes. Please rely on your regular record by Wedbush Morgan statement base of discrepancies. Please report any discrepancies to your financial advisor, Debbie Saleh.

Debbie M. Saleh
Senior Vice President
Toll Free:866-837-2533

Rick Cooper

**Cooper**
14040 Tahiti Way #526
MDR, CA 90292

Cooper D & E
page 25

**EXHIBIT 10**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 26-2   Filed 07/10/12   Entered 07/10/12 18:31:50   Desc
Cooper Decl. & exs.   Page 8 of 14

## Checks Paid
### 12/31/2007

| Check Number | Date Cleared | Payee | Amount |
|---|---|---|---|
| | 12/10/2007 | American Express | 1716.45 |
| | 12/10/2007 | American Express | 888.18 |
| | 12/5/2007 | E&S Ring Management | 1805 |
| | 12/11/2007 | Oceanaire HOA | 1424.25 |
| 227 | 12/12/2007 | Citibank | 112.61 |
| | | Total | 5,946.49 |

This is a personal service of your broker and some of the data may be incorrect. This statement should not be relied upon for tax, trading income, net worth or other purposes. Please rely on your regular monthly Wedbush Morgan statements in case of discrepancies. Please report any discrepancies to your financial advisor

Debbie M. Saleh
Senior Vice President
866-837-2533

Checks Paid

Cooper
535 Ocean Avenue
Santa Monica, CA.
90402

Cooper D & E
page 26

**EXHIBIT 10**
**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 125 of 245   Page ID
#:572
Case 5:16-cv-00502-SJO-FFM   Document 14-10   Filed 04/15/16   Page 9 of 14   Page ID
#:260

Case 1:12-bk-14290-VK    Doc 26-2    Filed 07/10/12    Entered 07/10/12 18:31:50    Desc
Cooper Decl. & exs.    Page 9 of 14

EXHIBIT  2

Cooper D & E
page 27

EXHIBIT 10
EXHIBIT A

Case 1:12-bk-14290-VK    Doc 26-2    Filed 07/10/12    Entered 07/10/12 18:31:50    Desc
Cooper Decl. & exs.    Page 10 of 14

OCT. 28. 2005 11:16AM    WEDBUSH MORGAN                                    NO. 558    P. 7

## WEDBUSH MORGAN SECURITIES
*Investment Bankers for Entrepreneurs*

MCCUE
...RANCE DEPT. MGR

My reasons for purchasing a Variable Annuity are:

*(Please initial all that apply)*

| | |
|---|---|
| Client | Protection of my initial investment and capital appreciation for my beneficiaries. |
| Rep | |

| | |
|---|---|
| Client | Tax deferred gains. |
| Rep | |

| | |
|---|---|
| Client | To avoid paying taxes on my Social Security income. |
| Rep | |

| | |
|---|---|
| Client | Probate avoidance. |
| Rep | |

Rick Cooper

_Rick Cooper_                    10-28-05
Client Name                    Client Signature                    Date

_____          _____          _____
Client Name                    Client Signature                    Date

**This section is to be completed by the Investment Executive.**
Please describe all material facts upon which you based your recommendation i.e. fund performance, reallocation,
change in Investment Objectives. Your description should include an evaluation of all charges and fees vs. all material
insurance benefits to your client.
guarantee of principal

_____

_____

_____

Debbie Saleh

_Debbie Saleh_                    10-28-05
Investment Executive Name          Investment Executive Signature          Date

_Ronald Vogel_          Ronald Vogel                    10-28-05
Sales Office Manager Name          Sales Office Manager Signature          Date

Variable Annuity Disclosure-Review.doc                    Page 2                    Rev. 10/24/2005 11:00 AM

Cooper D & E
page 28

**EXHIBIT 10**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 26-2   Filed 07/10/12   Entered 07/10/12 18:31:50   Desc
Cooper Decl. & exs.   Page 11 of 14

OCT. 28. 2005  11:17AM   WEDBUSH MORGAN                    NO. 558    P. 8

JOSEPH H MCCUE
INSURANCE DEPT. MGR

## WEDBUSH MORGAN SECURITIES
*Investment Bankers for Entrepreneurs*

### PROSPECTUS RECEIPT

| 6164-2368 | | ALTV |
|---|---|---|
| WMS Account Number | Social Security or Tax ID | Rep Code |

Rick Cooper
Account Title

I intend to purchase:  Nationwide                                        10/28/05
                      Name of Insurance Company and Variable Annuity Product        Purchase Date

My investment Objective is: *(Check one)*

☐ Income                    ☐ Conservation of Capital          ☐ Speculation & Growth
☐ Income & Growth           ☐ Income & Conservation of Capital ☐ Speculation Income & Growth
☐ Income & Speculation      ☐ Speculation                      ☒ Growth

I understand that it is my responsibility to read the prospectus or all other offering materials prepared by the investment sponsor thoroughly and understand them prior to investing. When reading the prospectus or offering materials, I will pay particular attention to the contents of the following sections as they apply to my investment objectives: *(Check one)*

☐ Risk Factors                    ☐ Surrender Charges & Penalties for Early Withdrawal
☐ Suitability Requirements        ☐ Administrative Fees/Mortality Expenses
☐ Commissions/Sales Charges       ☐ Tax Aspects
☐ Liquidity Restrictions

To the extent I am purchasing a variable annuity in a tax qualified account, I realize that the variable annuity does not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax qualified retirement plan itself.

To the extent applicable, the use of financial derivatives in the investment portfolio and the potential risks involved have been fully disclosed and explained to me. The concepts of total return, yield, and distribution rates have been fully disclosed and explained to me.

A complete and balanced disclosure has been made to me regarding the distinctions between classes of a multi-class investment. A multi-class investment is one that has more than one class of investment, based on commission, charge, or fee structure. I have not received, read, or relied upon any other material concerning the investment(s) and no representations have been made to me that are different from those contained in the prospectus or offering materials.

Rick Cooper                          *Rick Cooper*                    10-28-05
      Client Name                        Client Signature                 Date

      Client Name                        Client Signature                 Date

Debbie Saleh                         *Debbie Sal*                     10-28-05
   Investment Executive Name           Investment Executive Signature      Date

Ronald Vogel                         *Ronald Vogel*                   10-28-05
   Sales Office Manager Name           Sales Office Manager Signature      Date

Prospectus Ronald-Revised.doc              Page 1                     Rev. 10/24/2005 11:00 AM

Ronald Vogel

Cooper D & E
page 29

**EXHIBIT 10**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 26-2   Filed 07/10/12   Entered 07/10/12 18:31:50   Desc
Cooper Decl. & exs.   Page 12 of 14

MAY. 31. 2006  8:23AM      WEDBUSH MORGAN                      NO. 612    P. 4



# WEDBUSH MORGAN SECURITIES
*Investment Bankers for Entrepreneurs*

## SUPPLEMENTAL VARIABLE ANNUITY DISCLOSURE STATEMENT

| Instructions: | Investment Executive and Client must complete this form *prior to* the subsequent sale of any Variable Annuity sold by prospectus. |
|---|---|

| 6164-2368 | ████████ | altv |
|---|---|---|
| WMS Account Number | Social Security or Tax ID | Rep Code |

Rick Cooper
Account Title

I intend to purchase: NATIONWIDE BEST OF AMERICA          05/26/06
Name of Insurance Company and Variable Annuity Product          Purchase Date

Investment Executive Name: DEBBIE SALEH

I understand that:
(Please initial all that apply)



Client / Rep — I fully understand that I am purchasing a Variable Annuity, which will be subject to surrender charge for a period of no less than _7_ years.

Client / Rep — My Investment Executive has fully disclosed all fees and expenses associated with this investment. I understand that I will be charged on an annual basis _1.5_ % of my account balance for Mortality Expenses and Administration Fees. I also understand that I will be charged on an annual basis an additional _.93_ % of my account balance for underlying Sub-Account Portfolio Expenses.



Client / Rep — My Investment Executive has made it clear to me that the expenses associated with Variable Annuities are substantially higher than stocks, bonds, and mutual funds. I clearly understand by paying these additional fees I am in fact buying additional insurance coverage for the benefit of my beneficiaries.



Client / Rep — Being mindful that Variable Annuities are a long-term investment, my Investment Executive has carefully disclosed to me the portion of my account balance annually available to me without incurring surrender charges. After careful consideration, I have decided that my penalty-free withdrawal provisions will more than cover my need for income/liquidity.

Variable Annuity Disclosure-Revised.doc                Page 1                Rev. 10/24/2005 11:00 AM

Cooper D & E
page 30

**EXHIBIT 10**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 26-2   Filed 07/10/12   Entered 07/10/12 18:31:50   Desc
Cooper Decl. & exs.   Page 13 of 14

MAY. 31. 2006  8:28AM   WEDBUSH MORGAN                                    NO. 612   P. 5



## WEDBUSH MORGAN SECURITIES
*Investment Bankers for Entrepreneurs*

My reasons for purchasing a Variable Annuity are:

*(Please initial all that apply)*

Client/Rep — Protection of my initial investment and capital appreciation for my beneficiaries.

Client/Rep — Tax deferred gains.

Client/Rep — To avoid paying taxes on my Social Security income.

Client/Rep — Probate avoidance.

Rick Cooper

_____    _Rick Cooper_____    _5/26/06_
Client Name              Client Signature        Date

_____    _____       _____
Client Name              Client Signature        Date

This section is to be completed by the Investment Executive.
Please describe all material facts upon which you based your recommendation i.e. fund performance, reallocation, change in Investment Objectives.  Your description should include an evaluation of all charges and fees vs. all material insurance benefits to your client.

client wants guaranteed of principal, we discussed other options and we agreed that this annuity makes
the most sense for the client

_____

_____

_____

Debbie Saleh ALTV              _Debbie Saleh_____    _5/26/06_
Investment Executive Name      Investment Executive Signature   Date

_____           _____       _____
Sales Office Manager Name      Sales Office Manager Signature   Date

Variable Annuity-Disclosure-Revised.doc          Page 2          Rev. 10/24/2005 11:00 AM

Cooper D & E
page 31

**EXHIBIT 10**
**EXHIBIT A**

Case 1:12-bk-14290-VK    Doc 26-2    Filed 07/10/12    Entered 07/10/12 18:31:50    Desc
Cooper Decl. & exs.    Page 14 of 14

SEP. 27. 2005 12:35PM    WEDBUSH MORGAN    NO. 181   P. 3

JOSEPH H. MCCUE
INSURANCE DEPT. MGR

**WEDBUSH MORGAN SECURITIES**
*Investment Bankers for Entrepreneurs*

VARIABLE ANNUITY SUITABILITY QUESTIONNAIRE AND PROSPECTUS RECEIPT

Account Title: *Rick Cooper*    SSN: 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

Account Number: *01104-3368*    Rep. Code: *ALTV*

I hereby acknowledge receipt of the prospectus of:    Dated: *7-26-05*

*AXA Equitable*
Name of Company

*Accumulator*
Name of Product

My investment Objective is: (circle one)

Income · Income and Conservation of capital · Income and Speculation · Income, Speculation, and Growth · Income and Growth

I understand that it is my responsibility to read the prospectus or other offering materials prepared by the investment sponsor thoroughly and understand them prior to investing. When reading the prospectus or offering materials, I will pay particular attention to the contents of the following sections as they apply to my investment objectives:

· Risk Factors    · Suitability Requirements    · Tax Aspects.    · Commissions/Sales Charges    · Liquidity Restrictions
· Surrender Charges & Penalties for Early Withdrawal    · Administrative Fees/Mortality Expenses

To the extent I am purchasing a variable annuity in a tax qualified account, I realize that the variable annuity does not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax qualified retirement plan itself.

To the extent applicable, the use of financial derivatives in the investment portfolio and the potential risks involved have been fully disclosed and explained to me. The concepts of total return, yield, and distribution rates have been fully disclosed and explained to me.

A complete and balanced disclosure has been made to me regarding the distinctions between classes of a multi-class investment. A multi-class investment is one that has more than one class of investment, based on commission, charge, or fee structure. I have not received, read or relied upon any other material concerning the investment(s) and no representations have been made to me that are different from those contained in the prospectus or the offering materials.

☑ I acknowledge that I have received, read, and understand all the information regarding this investment.

*Rick Coo*          *Rick Cooper*          *9/24/05*
Client Signature          Client Name          Date

*[signature]*          *Debbie Saleh*          *9/24/05*
Joint Client Signature          Joint Client Name          Date

*[signature]*          Representative Name          Date
Representative Signature

*[signature]*          Ronald Vogel          *9-20-05*
Sales Office Manager Signature          Sales Office Manager Name          Date

Rev. 09/01/2004

Cooper D & E
page 32

**EXHIBIT 10**
**EXHIBIT A**

**This page is part of your document - DO NOT DISCARD**



## 20090014269



Pages:
0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**01/06/09 AT 09:14AM**

| | |
|---|---|
| FEES: | 16.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 16.00 |

**TITLE(S) : DEED**



LEADSHEET



200901060620003

001162989

**SEQ:**
05

DAR - Counter (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**

EXHIBIT 11
**EXHIBIT A**

2

RECORDING REQUESTED BY:
-SAME-

AND WHEN RECORDED MAIL TO:

GENSAR AND CLAIRE SALEH
P O BOX 611
WOODLAND HILLS, CA 91365

01/06/09



20090014269

THIS SPACE FOR RECORDER'S USE ONLY

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
**DOCUMENTARY TRANSFER TAX is $NONE**
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale
[ ] Unincorporated area   [X] City of Calabasas AND
"This is a bonafide gift and the grantor received nothing in return, R & T 11911 "

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**DEBRA M. SALEH, TRUSTEE OF THE DEBRA M. SALEH SEPARATE PROPERTY TRUST, DATED JANUARY 17, 2006**

hereby GRANT(s) to

**GENSAR SALEH AND CLAIRE SALEH TRUSTEES OF THE GENSAR SALEH AND CLAIRE SALEH REVOCABLE LIVING TRUST, DATED December 30, 2008**
the real property in the City of Calabasas, County of Los Angeles  State of California, described as
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
Also Known as  24535 Via Esquina, Calabasas, CA  91302-3068
AP# 2069-042-034

DATED November 13, 2008
STATE OF CALIFORNIA
COUNTY OF ___LOS ANGELES___

On__ DECEMBER 30, 2008
before me, DAINA D SUPSTIES
A Notary Public in and for said State personally appeared
__ DEBRA M SALEH __

who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies) and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument

I certify under PENALTY OF PERJURY under the laws of the State
of California that the foregoing paragraph is true and correct
WITNESS my hand and official seal

Signature _____                              (Seal)

_DEBRA M SALEH_

DAINA D. SUPSTIES
Commission # 1778836
Notary Public - California
Los Angeles County
My Comm. Expires Nov 8, 2011

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW, IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE

## EXHIBIT 11

## EXHIBIT A

EXHIBIT "A"

The real property in the City of Calabasas, County of Los Angeles, State of California, described as:
Lot 5 in Tract No 36314, in the City of Calabasas, as per Map recorded in Book 1102, Pages 94 to 97 inclusive of Maps, in the Office of the County Recorder of Los Angeles County, California.

Parcel 1.

Lot 6, of Tract No. 36314, in the County of Los Angeles, State of California, as per map recorded in Book 1102, Pages 84 through 97, inclusive of Maps, in the Office of the County Recorder of said County.

Except therefrom all oil, gas, minerals and other hydrocarbons, below a depth of 500 feet, without the right of surface entry, as reserved in Deeds of Record.

Parcel 2

The easements and rights set forth in Article 6, Section 6.01(c), entitled "Rights in Common Area, Owners' Easement" in Article 6, Section 6.02 entitled "Vehicular Access, Use and Parking Rights" in Article 6, Section 6.06 entitled "Common Fences" in Article 8, Section 8 07 entitled "Encroachments" in Article 6, Section 6.08 entitled "Utility Easements and other Utility Matters" and in Article 18, Section 18.08 entitled "Reciprocal Cross Easements between Phases", of the Declaration.

APN. 2089-042-034
AKA: 24535 Via Esquina, Calabasas, CA 91302

06  0254590

**EXHIBIT 11**

**EXHIBIT A**



▲                                                                    ▲

**This page is part of your document - DO NOT DISCARD**



## 20090364598

|‖|‖‖|‖‖||‖|‖‖|‖|‖‖|‖‖|

**Pages:
0002**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**03/13/09 AT 10:57AM**

| FEES | 13.00 |
|---|---|
| TAXES: | 0 00 |
| OTHER: | 0 00 |
| PAID | 13.00 |

▲                                                                    ▲



**L E A D S H E E T**

|‖|‖‖|‖‖||‖|‖‖|‖|‖‖|‖‖|

200903130060029

**00000184244**

|‖|‖‖|‖‖||‖|‖‖|

002008501

**SEQ:
01**

**DAR - Mail (Hard Copy)**

|‖|‖‖|‖‖||‖|‖‖|‖|‖‖|‖‖|

**THIS FORM IS NOT TO BE DUPLICATED**

▲                                                                    ▲

**EXHIBIT 12**

**EXHIBIT A**

RECORDING REQUESTED BY

JEFFREY S HELFER

When Recorded Mail Document
and Tax Statement To.

JEFFREY S HELFER
21800 Oxnard Street, Suite 850
Woodland Hills, CA 91367

03/13/2009

*20090364598*

SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN. 2054-024-067     **QUITCLAIM DEED**     GIFT R&T 11911  This is a bona fide gift
and the Grantor received nothing in return

The undersigned grantor(s) declare(s)
Documentary transfer tax is $_____-0-_____     City tax $_____-0-_____
[     ] computed on full value of property conveyed, or
[     ] computed on full value less value of liens or encumbrances remaining at time of sale,
[     ] Unincorporated Area  City of _____

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
PATRICK B. FITZWILLIAM and BETTY L  SALEH-FITZWILLIAM, TRUSTEES OF THE PATRICK B  FITZWILLIAM AND
BETTY L  SALEH FAMILY TRUST DATED FEBRUARY 12, 1999

hereby remises, releases and quitclaims to
GENSAR SALEH as Trustee of THE FAIRGRANGE AGREEMENT OF TRUST

the following described real property in the City of  AGOURA HILLS
County of Los Angeles, State of California:

COMMONLY REFERRED TO AS 5444 FAIRGRANGE DRIVE, AGOURA HILLS, CALIFORNIA 91301, AND MORE
PARTICULARLY DESCRIBED AS LOT 73 IN TRACT NO. 33254 AS PER MAP RECORDED IN BOOK 886, PAGES 22
TO 26 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

DATED  3/11/09 _____     _____
                                                                 PATRICK B  FITZWILLIAM

DATED  3/11/09 _____     _____
                                                                 BETTY L. SALEH-FITZWILLIAM

State of California
County of Los Angeles

On March 11, 2009 before me, Kellie A  Mumford, Notary Public personally appeared
PATRICK B  FITZWILLIAM and BETTY L  SALEH-FITZWILLIAM who proved to me
on the basis of satisfactory evidence to be the persons whose names are subscribed
to the within instrument and acknowledged to me that they executed the same in their
authorized capacities, and that by their signatures on the instrument the persons, or
the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct

Witness my hand and official seal

Signature _Kellie A. Mumford_

KELLIE A. MUMFORD
Commission # 1713490
Notary Public - California
Los Angeles County
My Comm. Expires Jan 28, 2011

MAIL TAX STATEMENT AS DIRECTED ABOVE

QUITCLAIM DEED

**EXHIBIT 12**

**EXHIBIT A**



**This page is part of your document - DO NOT DISCARD**

# 20160191409





Pages:
0008

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**02/23/16 AT 08:04AM**

| | |
|---|---|
| FEES: | 43.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 43.00 |



**L E A D S H E E T**

201602230220026

00011738021

007392599

**SEQ:**
**01**

ERDS - Daily

**THIS FORM IS NOT TO BE DUPLICATED**

E534011

2016010804834-FTEWILLIAM

**EXHIBIT 13**

**EXHIBIT A**

Recording Requested By and
After Recording Return To:
**American Title, Inc.**
**PO Box 641010**
**Omaha, NE 68164-1010**

This Instrument Prepared by:
Wells Fargo Bank, N.A.
RICHARD FOSTER
DOCUMENT PREPARATION
11601 N. Black Canyon Hwy
Phoenix, AZ 85029
866-537-8489

---

[Space Above This Line For Recording Data]

### SHORT FORM OPEN-END DEED OF TRUST

REFERENCE #:  20153466000029                     ACCOUNT #:  **XXX-XXX-XXX3244-1998**

DEFINITIONS

Words used in multiple sections of this document are defined below.  The Fictitious Deed of Trust includes other defined words and rules regarding the usage of words used in this document.

**(A)  "Security Instrument"** means this document, which is dated February 06, 2016, together with all Riders to this document.
**(B)  "Borrower"** is GENSAR SALEH AS TRUSTEE OF THE FAIRGRANGE AGREEMENT OF TRUST, whose address is 5444 FAIRGRANGE DR   AGOURA HILLS, CA 91301. Borrower is the trustor under this Security Instrument.
**(C)  "Lender"** is Wells Fargo Bank, N.A.. Lender is a National Bank organized and existing under the laws of the United States of America.  Lender's address is 101 North Phillips Avenue, Sioux Falls, SD  57104.
**(D)  "Trustee"** is American Securities Company P.O. Box 31557, Billings, MT 59107.
**(E)  "Debt Instrument"** means the loan agreement or other credit instrument signed by Borrower and dated February 06, 2016.  The Debt Instrument states that Borrower owes Lender, or may owe Lender, an amount that may vary from time to time up to a maximum principal sum outstanding at any one time of, FOUR HUNDRED FIFTY THOUSAND  AND 00/100THS Dollars (U.S. $450,000.00) plus interest.

**EXHIBIT 13**

**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 14-13   Filed 04/15/16   Page 3 of 8   Page ID #:273

Borrower has promised to pay this debt in Periodic Payments and to pay the debt in full not later than seven (7) calendar days after <u>March 06, 2046</u>.

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means all amounts owed now or hereafter under the Debt Instrument, including without limitation principal, interest, any prepayment charges, late charges and other fees and charges due under the Debt Instrument, and also all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [mark as applicable]:

<u>   N/A</u>  Leasehold Rider
<u>   X  </u>  Third Party Rider
<u> N/A</u>  Other(s) [specify]  _____<u>   N/A   </u>_____

**(I)** "**Fictitious Deed of Trust**" means the Fictitious Open-End Deed of Trust dated <u>June 14, 2007</u>, and recorded on <u>December 31, 2007</u>, as Instrument Number <u>20072857725</u> in Book <u>n/a</u> at Page <u>n/a</u> of the Official Records in the Office of the Recorder of <u>Los Angeles</u> County, State of California.

TRANSFER OF RIGHTS IN THE PROPERTY

    This Security Instrument secures to Lender: (i) the repayment of the Loan, and all future advances, renewals, extensions and modifications of the Debt Instrument, including any future advances made at a time when no indebtedness is currently secured by this Security Instrument; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Debt Instrument. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

_____<u>County</u>_____ of _____<u>Los Angeles</u>_____ :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

THE FOLLOWING DESCRIBED REAL PROPERTY IN THE CITY OF AGOURA HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA: LOT 73 IN TRACT NO. 33254 AS PER MAP RECORDED IN BOOK 886, PAGES 22 TO 26 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Assessor's Identification Number: 2054-024-067

**EXHIBIT 13**

**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 14-13   Filed 04/15/16   Page 4 of 8   Page ID #:274

which currently has the address of

5444 FAIRGRANGE DR
[Street]

AGOURA HILLS _____ , California   91301 _____ ("Property Address"):
[City]                                                 [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." The Property shall also include any additional property described in Section 20 of the Fictitious Deed of Trust.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the execution date of this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

FICTITIOUS DEED OF TRUST

By the execution and delivery of this Security Instrument, Borrower agrees that all of the provisions of the Fictitious Deed of Trust are hereby incorporated in their entirety into this Security Instrument. Borrower agrees to be bound by and to perform all of the covenants and agreements in the Fictitious Deed of Trust. A copy of the Fictitious Deed of Trust has been provided to Borrower.

**EXHIBIT 13**

**EXHIBIT A**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it. Borrower also acknowledges receipt of a copy of this document and a copy of the Fictitious Deed of Trust.

In accordance with California Civil Code Section 2924b, the undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address of the Borrower set forth above. NOTICE: A copy of any Notice of Default and any Notice of Sale will be sent to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

_____   TRUSTEE   _____
GENSAR SALEH AS TRUSTEE OF THE FAIRGRANGE AGREEMENT OF TRUST                                   -Borrower

Lender Name: Wells Fargo Bank, N.A.   NMLSR ID: 399801

Loan Originator's Name: Karen Marie Collins
NMLSR ID: 1347201

CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT
CA107006, HCWF#997v7 (8/15/15)   CA-107006-0515

(page 4 of 5 pages)
Documents Processed 02-05-2016 16:06:33

**EXHIBIT 13**

**EXHIBIT A**

For An Individual Acting In His/Her Own Right:

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California      )
                         ) ss.
County of _Ventura_      )

On _2-6-2016_ before me, _Dirk E White_ Notary Public, personally appeared _Gensar      Saleh_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

_Dirk E white_
Signature

[NOTARIAL SEAL]

_Dirk E White_
Print Name

DIRK E. WHITE
COMM. #1971279
Notary Public - California
Ventura County
My Comm. Expires Apr. 1, 2016

My commission expires: _4-1-2016_

CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT                                 (page 5 of 5 pages)
CA107006, HCWF#9997v7 (8/15/15)   CA-107006-0315                     Documents Processed 02-05-2016 16:06:36

**EXHIBIT 13**

**EXHIBIT A**

Reference Number:   20153466000029
Account Number:      XXX-XXX-XXX3244-1998

Wells Fargo Bank, N. A.

## THIRD PARTY RIDER

THIS THIRD PARTY RIDER is made on February 06, 2016 is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date  given by the undersigned Trustee(s) to secure the Debt Instrument from PATRICK B. FITZWILLIAM, BETTY SALEH-FITZWILLIAM, (individually and collectively referred to as the "Debtor") to Wells Fargo Bank, N. A. (the "Lender") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

5444 FAIRGRANGE DR , AGOURA HILLS, CA 91301
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, the undersigned Trustee(s) and Lender further covenant and agree as follows:

With respect to the FAIRGRANGE AGREEMENT OF TRUST (the "Trust"), the Security Instrument constitutes a third party mortgage/deed of trust and grant of security interest by the undersigned as Trustee(s) of said Trust in the Property to secure the Debt Instrument of the Debtor to the Lender.
Consequently, references in the Security Instrument to "Borrower" refer to the undersigned Trustee(s) and the Debtor if the context in which the term is used so requires.  Without limiting the generality of the foregoing, the use of the term "Borrower" in the context of warranties, representations and obligations pertaining to the Property shall refer to the undersigned Trustee(s).  The use of the term "Borrower" in the context of the requirements under the Debt Instrument shall refer to the Debtor.

Except with respect to the obligation(s) of the undersigned as individuals, and not as Trustee(s), with respect to the Debt Instrument before the date first set forth herein above and the obligation(s) of the undersigned as individuals with respect to the Debt Instrument prior to the transfer of the Property into the Trust, the Trust and the undersigned, as Trustee(s), are not liable for the debt evidenced by the Debt Instrument and are a party hereunder only insofar as their interest in the Property is made subject to the Security Instrument.

Further, revocation of the Trust, transfer of the Property by the Trust, or death of any Debtor shall constitute an event of default under the Security Instrument.

## EXHIBIT 13

## EXHIBIT A

By signing below, the undersigned Trustee(s) accept(s) and agree(s) to the terms and provisions contained in this Third Party Rider.

GENSAR SALEH AS TRUSTEE OF THE FAIRGRANGE AGREEMENT OF TRUST

**Attach this Rider to the Security Instrument before Recording**

Loan Originator's Name: Karen Marie Collins
NMLSR ID: 1347201

3rd Party Rider, HE101137 HCWF#132.v10 (8/16/14)

HE-101137-0314

2/2
Documents Processed 02-05-2016 16:06:28

**EXHIBIT 13**

**EXHIBIT A**

Nancy Hoffmeier Zamora (SB No. 87736)
U.S. Bank Tower
633 West 5th Street, Suite 2600
Los Angeles, CA 90071
Tel.: (213) 488-9411 Fax: (213) 488-9418
e-mail: zamora3@aol.com

### UNITED STATES BANKRUPTCY COURT
CENTRAL **DISTRICT OF** CALIFORNIA
SAN FERNANDO VALLEY **DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| SALEH, DEBRA MICHELE | § | Case No. 1:12-14290 VK |
| | § | |
| Debtor(s) | § | |

**CHAPTER 7 TRUSTEE'S FINAL ACCOUNT AND DISTRIBUTION REPORT CERTIFICATION THAT THE ESTATE HAS BEEN FULLY ADMINISTERED AND APPLICATION TO BE DISCHARGED (TDR)**

Nancy Hoffmeier Zamora, Esq., chapter 7 trustee, submits this Final Account, Certification that the Estate has been Fully Administered and Application to be Discharged.

1) All funds on hand have been distributed in accordance with the Trustee's Final Report and, if applicable, any order of the Court modifying the Final Report. The case is fully administered and all assets and funds which have come under the trustee's control in this case have been properly accounted for as provided by law. The trustee hereby requests to be discharged from further duties as a trustee.

2) A summary of assets abandoned, assets exempt, total distributions to claimants, claims discharged without payment, and expenses of administration is provided below:

| | |
|---|---|
| Assets Abandoned: 0.00 *(Without deducting any secured claims)* | Assets Exempt: 274,075.89 |
| Total Distributions to Claimants: 14,761.13 | Claims Discharged Without Payment: 4,578,393.13 |
| Total Expenses of Administration: 35,238.87 | |

3) Total gross receipts of $ 50,000.00  (see **Exhibit 1**), minus funds paid to the debtor and third parties of $ 0.00  (see **Exhibit 2**), yielded net receipts of $ 50,000.00  from the liquidation of the property of the estate, which was distributed as follows:

UST Form 101-7-TDR (10/1/2010) *(Page: 1)*

**EXHIBIT 14**

**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document   Page 2 of 13

|  | CLAIMS SCHEDULED | CLAIMS ASSERTED | CLAIMS ALLOWED | CLAIMS PAID |
|---|---|---|---|---|
| SECURED CLAIMS (from **Exhibit 3**) | $ NA | $ NA | $ NA | $ NA |
| PRIORITY CLAIMS: CHAPTER 7 ADMIN. FEES AND CHARGES (from **Exhibit 4**) | NA | 35,466.37 | 35,238.87 | 35,238.87 |
| PRIOR CHAPTER ADMIN. FEES AND CHARGES (from **Exhibit 5**) | NA | NA | NA | NA |
| PRIORITY UNSECURED CLAIMS (from **Exhibit 6**) | 0.00 | 0.00 | 0.00 | 0.00 |
| GENERAL UNSECURED CLAIMS (from **Exhibit 7**) | 1,751,453.26 | 4,366,620.93 | 4,366,620.93 | 14,761.13 |
| **TOTAL DISBURSEMENTS** | $ 1,751,453.26 | $ 4,402,087.30 | $ 4,401,859.80 | $ 50,000.00 |

4)  This case was originally filed under chapter 7 on  05/08/2012 .  The case was pending for 34 months.

5)  All estate bank statements, deposit slips, and canceled checks have been submitted to the United States Trustee.

6) An individual estate property record and report showing the final accounting of the assets of the estate is attached as **Exhibit 8**.  The cash receipts and disbursements records for each estate bank account, showing the final accounting of the receipts and disbursements of estate funds is attached as **Exhibit 9**.

Pursuant to Fed R Bank P 5009, I hereby certify, under penalty of perjury, that the foregoing report is true and correct.

Dated:  02/17/2015            By:/s/Nancy Hoffmeier Zamora, Esq.
                                              Trustee

**STATEMENT**: This Uniform Form is associated with an open bankruptcy case, therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 101-7-TDR (10/1/2010) *(Page: 2)*

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document     Page 3 of 13

EXHIBITS TO
FINAL ACCOUNT

### EXHIBIT 1 – GROSS RECEIPTS

| DESCRIPTION | UNIFORM TRAN. CODE[1] | $ AMOUNT RECEIVED |
|---|---|---|
| PREF./FRAUD. TRANSFER LITIGATION | 1241-000 | 50,000.00 |
| TOTAL GROSS RECEIPTS | | $ 50,000.00 |

[1]The Uniform Transaction Code is an accounting code assigned by the trustee for statistical reporting purposes.

### EXHIBIT 2 – FUNDS PAID TO DEBTOR & THIRD PARTIES

| PAYEE | DESCRIPTION | UNIFORM TRAN. CODE | $ AMOUNT PAID |
|---|---|---|---|
| | | NA | NA |
| TOTAL FUNDS PAID TO DEBTOR & THIRD PARTIES | | | $ 0.00 |

### EXHIBIT 3 – SECURED CLAIMS

| CLAIM NO. | CLAIMANT | UNIFORM TRAN. CODE | CLAIMS SCHEDULED (from Form 6D) | CLAIMS ASSERTED | CLAIMS ALLOWED | CLAIMS PAID |
|---|---|---|---|---|---|---|
| NA | NA | NA | NA | NA | NA | NA |
| TOTAL SECURED CLAIMS | | | $ NA | $ NA | $ NA | $ NA |

### EXHIBIT 4 – CHAPTER 7 ADMINISTRATIVE FEES and CHARGES

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document      Page 4 of 13

| PAYEE | UNIFORM TRAN. CODE | CLAIMS SCHEDULED | CLAIMS ASSERTED | CLAIMS ALLOWED | CLAIMS PAID |
|---|---|---|---|---|---|
| NANCY HOFFMEIER ZAMORA, ESQ. | 2100-000 | NA | 5,750.00 | 5,750.00 | 5,750.00 |
| NANCY HOFFMEIER ZAMORA, ESQ. | 2200-000 | NA | 138.24 | 138.24 | 138.24 |
| U.S. BANKRUPTCY COURT | 2700-000 | NA | 293.00 | 293.00 | 293.00 |
| LAW OFFICES OF LARRY D. SIMONS | 3210-000 | NA | 25,440.00 | 25,440.00 | 25,440.00 |
| LAW OFFICES OF LARRY D. SIMONS | 3220-000 | NA | 158.61 | 158.61 | 158.61 |
| BIGGS & CO. | 3410-000 | NA | 3,594.00 | 3,366.50 | 3,366.50 |
| BIGGS & CO. | 3420-000 | NA | 92.52 | 92.52 | 92.52 |
| TOTAL CHAPTER 7 ADMIN. FEES AND CHARGES | | $ NA | $ 35,466.37 | $ 35,238.87 | $ 35,238.87 |

## EXHIBIT 5 – PRIOR CHAPTER ADMINISTRATIVE FEES and CHARGES

| PAYEE | UNIFORM TRAN. CODE | CLAIMS SCHEDULED | CLAIMS ASSERTED | CLAIMS ALLOWED | CLAIMS PAID |
|---|---|---|---|---|---|
| NA | NA | NA | NA | NA | NA |
| TOTAL PRIOR CHAPTER ADMIN. FEES AND CHARGES | | $ NA | $ NA | $ NA | $ NA |

## EXHIBIT 6 – PRIORITY UNSECURED CLAIMS

UST Form 101-7-TDR (10/1/2010) *(Page: 4)*

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document       Page 5 of 13

| CLAIM NO. | CLAIMANT | UNIFORM TRAN. CODE | CLAIMS SCHEDULED (from Form 6E) | CLAIMS ASSERTED (from Proofs of Claim) | CLAIMS ALLOWED | CLAIMS PAID |
|---|---|---|---|---|---|---|
| | Franchise Tax Board Special Procedures P.O. Box 2952 Sacramento, CA 95812 | | 0.00 | NA | NA | 0.00 |
| | Internal Revenue Service P.O. Box 7346 Philadelphia, PA 19101-7346 | | 0.00 | NA | NA | 0.00 |
| TOTAL PRIORITY UNSECURED CLAIMS | | | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

### EXHIBIT 7 – GENERAL UNSECURED CLAIMS

| CLAIM NO. | CLAIMANT | UNIFORM TRAN. CODE | CLAIMS SCHEDULED (from Form 6F) | CLAIMS ASSERTED (from Proofs of Claim) | CLAIMS ALLOWED | CLAIMS PAID |
|---|---|---|---|---|---|---|
| | Gensar Saleh P.O. Box 611 Woodland Hills, CA 91365 | | 62,533.33 | NA | NA | 0.00 |
| | Gensar Saleh P.O. Box 611 Woodland Hills, CA 91365 | | 164,000.00 | NA | NA | 0.00 |
| 000001 | RICK COOPER | 7100-000 | 1,500,000.00 | 1,581,590.00 | 1,581,590.00 | 5,346.48 |
| 000002 | WEDBUSH SECURITIES INC | 7100-000 | 24,919.93 | 2,785,030.93 | 2,785,030.93 | 9,414.65 |
| TOTAL GENERAL UNSECURED CLAIMS | | | $ 1,751,453.26 | $ 4,366,620.93 | $ 4,366,620.93 | $ 14,761.13 |

UST Form 101-7-TDR (10/1/2010) *(Page: 5)*

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document   Page 6 of 13

FORM 1

INDIVIDUAL ESTATE PROPERTY RECORD AND REPORT                                                    Page:    1
ASSET CASES                                                                        Exhibit 8

| Case No:  | 1:12-14290    VK    Judge: The Honorable Victoria Kaufman | Trustee Name: | Nancy Hoffmeier Zamora, Esq. |
|---|---|---|---|
| Case Name: | SALEH, DEBRA MICHELE | Date Filed (f) or Converted (c): | 05/08/12 (f) |
| | | 341(a) Meeting Date: | 06/08/12 |
| For Period Ending: 02/17/15 | | Claims Bar Date: | 09/07/12 |

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Asset Description (Scheduled and Unscheduled (u) Property) | Petition/ Unscheduled Values | Estimated Net Value (Value Determined by Trustee, Less Liens, Exemptions, and Other Costs) | Property Formally Abandoned OA=554(a) Abandon | Sale/Funds Received by the Estate | Asset Fully Administered (FA)/ Gross Value of Remaining Assets |
| 1. CASH | 20.00 | 0.00 | | 0.00 | FA |
| Exemption:  $20.00. | | | | | |
| 2. BANK ACCOUNTS | 0.63 | 0.00 | | 0.00 | FA |
| Checking account - Chase Bank. | | | | | |
| Exemption:  $0.63. | | | | | |
| 3. BANK ACCOUNTS | 0.39 | 0.00 | | 0.00 | FA |
| Savings account - Chase Bank. | | | | | |
| Exemption: $0.39. | | | | | |
| 4. BANK ACCOUNTS | 0.00 | 0.00 | | 0.00 | FA |
| Checking account - Wells Fargo (zero balance). | | | | | |
| Exemption:  None. | | | | | |
| 5. BANK ACCOUNTS | 100.00 | 0.00 | | 0.00 | FA |
| Checking account - Union Bank. | | | | | |
| Exemption:  $100.00. | | | | | |
| 6. BANK ACCOUNTS | 274.00 | 0.00 | | 0.00 | FA |
| Checking Acct in Name of non-filing Spouse w/ Chase. | | | | | |
| Exemption:  $274.00. | | | | | |
| 7. HOUSEHOLD GOODS | 970.00 | 0.00 | | 0.00 | FA |
| Stove: $ 20; Bedroom furniture: $100; Refrigerator: $50; Washer/dryer: $30; Microwave: $10; Television: $50; DVDs: $30; Cookware: $50; Utensils/Silverware: $10; Living room furniture: $50; Cell phone: $25; Dining room furniture: $150;  Tables and Chairs: $100; Dressers/nightstands: $150; Lamps and accessories: $100; Stereo: $25; Tools: $20. | | | | | |
| Exemption:  $970.00. | | | | | |
| 8. BOOKS AND ART OBJECTS | 100.00 | 0.00 | | 0.00 | FA |
| Books and CDs. | | | | | |

LFORM1

**UST Form 101-7-TDR (10/1/2010)** *(Page: 6)*

Ver: 18.04

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK    Doc 95    Filed 03/05/15    Entered 03/05/15 11:56:39    Desc
Main Document    Page 7 of 13

FORM 1

INDIVIDUAL ESTATE PROPERTY RECORD AND REPORT

ASSET CASES

Page:  2

Exhibit 8

| Case No: | 1:12-14290 | VK | Judge: The Honorable Victoria Kaufman | | Trustee Name: | Nancy Hoffmeier Zamora, Esq. |
|---|---|---|---|---|---|---|
| Case Name: | SALEH, DEBRA MICHELE | | | | Date Filed (f) or Converted (c): | 05/08/12 (f) |
| | | | | | 341(a) Meeting Date: | 06/08/12 |
| | | | | | Claims Bar Date: | 09/07/12 |

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Asset Description (Scheduled and Unscheduled (u) Property) | Petition/ Unscheduled Values | Estimated Net Value (Value Determined by Trustee, Less Liens, Exemptions, and Other Costs) | Property Formally Abandoned OA=554(a) Abandon | Sale/Funds Received by the Estate | Asset Fully Administered (FA)/ Gross Value of Remaining Assets |
| Exemption:  $100.00. | | | | | |
| 9. WEARING APPAREL | 1,000.00 | 0.00 | | 0.00 | FA |
| Traditional clothing and wearing apparel for two adults and three children. | | | | | |
| Exemption:  $1,000.00. | | | | | |
| 10. JEWELRY | 1,100.00 | 0.00 | | 0.00 | FA |
| Wedding ring. | | | | | |
| Exemption:  $1,100.00. | | | | | |
| 11. INTERESTS IN INSURANCE POLICIES | 0.00 | 0.00 | | 0.00 | FA |
| West Coast Life Insurance Term Policy. | | | | | |
| Exemption:  None. | | | | | |
| 12. PENSION PLANS AND PROFIT SHARING | 80,919.00 | 0.00 | | 0.00 | FA |
| Wells Fargo - IRA (Debtor). | | | | | |
| Exemption:  $80,919.00. | | | | | |
| 13. PENSION PLANS AND PROFIT SHARING | 42,613.00 | 0.00 | | 0.00 | FA |
| Union - IRA (Debtor). | | | | | |
| Exemption:  $42,613.00. | | | | | |
| 14. PENSION PLANS AND PROFIT SHARING | 77,363.35 | 0.00 | | 0.00 | FA |
| Union - IRA (Debtor). | | | | | |
| Exemption:  $77,363.35. | | | | | |
| 15. PENSION PLANS AND PROFIT SHARING | 56,000.00 | 0.00 | | 0.00 | FA |
| Wedbush Morgan Securities (Non-filing Spouse). | | | | | |
| Exemption:  $56,000.00. | | | | | |
| 16. PENSION PLANS AND PROFIT SHARING | 0.00 | 0.00 | | 0.00 | FA |
| Paine Webber - Pension (Debtor). | | | | | |
| Exemption:  N/A. | | | | | |
| 17. PENSION PLANS AND PROFIT SHARING | 0.00 | 0.00 | | 0.00 | FA |

LFORM3

UST Form 101-7-TDR (10/1/2010) *(Page: 7)*

Ver: 18.04

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document   Page 8 of 13

FORM 1

INDIVIDUAL ESTATE PROPERTY RECORD AND REPORT

ASSET CASES

Page:   3
Exhibit 8

| | | | | | |
|---|---|---|---|---|---|
| Case No.: | 1:12-14290    VK   Judge: The Honorable Victoria Kaufman | | Trustee Name: | Nancy Hoffmeier Zamora, Esq. | |
| Case Name: | SALEH, DEBRA MICHELE | | Date Filed (f) or Converted (c): | 05/08/12 (f) | |
| | | | 341(a) Meeting Date: | 06/08/12 | |
| | | | Claims Bar Date: | 09/07/12 | |

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Asset Description<br>(Scheduled and Unscheduled (u) Property) | Petition/<br>Unscheduled<br>Values | Estimated Net Value<br>(Value Determined by Trustee,<br>Less Liens, Exemptions,<br>and Other Costs) | Property Formally<br>Abandoned<br>OA=554(a) Abandon | Sale/Funds<br>Received by<br>the Estate | Asset Fully Administered (FA)/<br>Gross Value of Remaining Assets |
| Smith Barney - Pension (Non-filing Spouse).<br>Exemption: N/A. | | | | | |
| 18. PENSION PLANS AND PROFIT SHARING<br>Unvested 401(k) Matching Portion of Account - Held at Wedbush.<br>Exemption: $2,024.52. | 2,024.52 | 0.00 | | 0.00 | FA |
| 19. AUTOMOBILES AND OTHER VEHICLES<br>2004 Infiniti G35.<br>Exemption: $11,591.00. | 11,591.00 | 0.00 | | 0.00 | FA |
| 20. AUTOMOBILES AND OTHER VEHICLES<br>2013 Infiniti JX35 - Leased Vehicle.<br>Exemption: None. | 0.00 | 0.00 | | 0.00 | FA |
| 21. ANIMALS<br>Old German Shepherd.<br>Exemption: None. | 0.00 | 0.00 | | 0.00 | FA |
| 22. PREF./FRAUD. TRANSFER LITIGATION (u)<br>Fraudulent conveyance action against Debtors' parents.<br>Exemption: N/A. | 0.00 | 50,000.00 | | 50,000.00 | FA |

| | | | | | |
|---|---|---|---|---|---|
| TOTALS (Excluding Unknown Values) | $274,075.89 | $50,000.00 | | $50,000.00 | Gross Value of Remaining Assets<br>$0.00<br>(Total Dollar Amount in Column 6) |

Major activities affecting case closing which are not reflected above, and matters pending, date of hearing or sale, and other action:

PROP. #22:
On July 25, 2012, Trustee commenced an adversary proceeding against Debtors' parents, Gensar and Claire Saleh

LFORM1

**UST Form 101-7-TDR (10/1/2010)** *(Page: 8)*

Ver: 18.04

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document   Page 8 of 13

FORM 1
INDIVIDUAL ESTATE PROPERTY RECORD AND REPORT
ASSET CASES

Page:   4
Exhibit 8

| | | |
|---|---|---|
| Case No: | 1:12-14290   VK   Judge: The Honorable Victoria Kaufman | |
| Case Name: | SALEH, DEBRA MICHELE | |

| | |
|---|---|
| Trustee Name: | Nancy Hoffmeier Zamora, Esq. |
| Date Filed (f) or Converted (c): | 05/08/12 (f) |
| 341(a) Meeting Date: | 06/08/12 |
| Claims Bar Date: | 09/07/12 |

("Defendants"), assigned adversary proceeding no. 1:12-ap-01263-VK, to avoid and recover fraudulent transfer of that certain real property commonly known as 24535 Via Esquina, Calabasas, California (Debtor's residence). Trustee and Defendants participated in mediation. Thereafter, the parties negotiated a settlement. Trustee's Counsel (defined below) prepared a compromise motion seeking the Court's order approving the settlement between Trustee and Defendants whereby Defendants will tender a settlement payment of $50,000.00 (the "Settlement Payment") in exchange for Trustee's dismissal of the adversary proceeding. On December 23, 2013, the Court entered that certain order approving the settlement (the "Compromise Order"). In January 2014, Trustee received and deposited the Settlement Payment pursuant to the Compromise Order.

GENERAL COMMENTS:
On July 12, 2012, the Court employed that certain order approving Trustee's employment of Biggs & Co. as Estate accountant ("Biggs"). Biggs prepared and filed final Estate tax returns. On August 1, 2012, the Court entered that certain order approving Trustee's employment of Law Offices of Larry D. Simons as general bankruptcy counsel ("Trustee's Counsel"). Trustee reviewed the claims register and claims. Trustee did not object to any claims. On February 20, 2014, Trustee prepared the TFR.

Initial Projected Date of Final Report (TFR): 04/30/15          Current Projected Date of Final Report (TFR): 02/20/14

UST Form 101-7-TDR (10/1/2010) (Page: 9)          LFORM1

Ver: 18.04

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK    Doc 95    Filed 03/05/15    Entered 03/05/15 11:56:39    Desc
Main Document    Page 10 of 13

FORM 2

Page: 1
Exhibit 9

**ESTATE CASH RECEIPTS AND DISBURSEMENTS RECORD**

| | | |
|---|---|---|
| Case No: | 1:12-14290 -VK | |
| Case Name: | SALEH, DEBRA MCHELE | |
| Taxpayer ID No: | *******9623 | |
| For Period Ending: | 02/17/15 | |

| | | |
|---|---|---|
| Trustee Name: | Nancy Hoffmeier Zamora, Esq. | |
| Bank Name: | Union Bank | |
| Account Number / CD #: | *******1522 Checking Account | |
| Blanket Bond (per case limit): | $ 5,000,000.00 | |
| Separate Bond (if applicable): | | |

| 1 Transaction Date | 2 Check or Reference | 3 Paid To / Received From | 4 Description Of Transaction | Uniform Tran. Code | 5 Deposits ($) | 6 Disbursements ($) | 7 Account / CD Balance ($) |
|---|---|---|---|---|---|---|---|
| | | | BALANCE FORWARD | | | | 0.00 |
| 01/21/14 | 22 | Capitol Insurance & Financial Services | SETTLEMENT PAYMENT | 1241-000 | 50,000.00 | | 50,000.00 |
| 12/18/14 | 001001 | Nancy Hoffmeier Zamora, Esq. U.S. Bank Tower 633 West 5th Street, Suite 2600 Los Angeles, CA 90071 | Chapter 7 Compensation/Fees Paid per orders entered August 29, 2014 and December 18, 2014 | 2100-000 | | 5,750.00 | 44,250.00 |
| 12/18/14 | 001002 | Nancy Hoffmeier Zamora, Esq. U.S. Bank Tower 633 West 5th Street, Suite 2600 Los Angeles, CA 90071 | Chapter 7 Expenses Paid per orders entered August 29, 2014 and December 18, 2014 | 2200-000 | | 138.24 | 44,111.76 |
| 12/18/14 | 001003 | Clerk of the Courts Costs (includes 21041 Burbank Boulevard Woodland Hills, CA 91367 | Clerk of the Courts Costs (includes Paid per orders entered August 29, 2014 and December 18, 2014 | 2700-000 | | 293.00 | 43,818.76 |
| * 12/18/14 | 001004 | Law Offices of Larry D. Simons 15545 Devonshire Street, Suite 110 Mission Hills, CA 91101 | Attorney for Trustee Fees (Other Fi Paid per orders entered August 29, 2014 and December 18, 2014 | 3210-003 | | 25,240.00 | 18,578.76 |
| * 12/18/14 | 001004 | Law Offices of Larry D. Simons 15545 Devonshire Street, Suite 110 Mission Hills, CA 91101 | Attorney for Trustee Fees (Other Fi clerical error; correction made and replacement check issued | 3210-003 | | -25,240.00 | 43,818.76 |
| 12/18/14 | 001005 | Law Offices of Larry D. Simons 15545 Devonshire Street, Suite 110 Mission Hills, CA 91101 | Attorney for Trustee Expenses (Othe Paid per orders entered August 29, 2014 and December 18, 2014 | 3220-000 | | 158.61 | 43,660.15 |
| * 12/18/14 | 001006 | BIGGS & CO. c/o SLBiggs A Div. of SingerLewak 10960 Wilshire Blvd., Suite 700 Los Angeles, CA 90024 | Accountant for Trustee Fees (Other Paid per orders entered August 29, 2014 and December 18, 2014 | 3410-003 | | 3,594.00 | 40,066.15 |
| * 12/18/14 | 001006 | BIGGS & CO. c/o SLBiggs A Div. of SingerLewak 10960 Wilshire Blvd., Suite 700 Los Angeles, CA 90024 | Accountant for Trustee Fees (Other clerical error; correction made and replacement check issued | 3410-003 | | -3,594.00 | 43,660.15 |
| | | | Page Subtotals | | 50,000.00 | 6,339.85 | |

LFORM24
UST Form 101-7-TDR (10/1/2010) (Page: 10)

Ver: 18.04

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK    Doc 95    Filed 03/05/15    Entered 03/05/15 11:56:39    Desc
Main Document    Page 11 of 13

FORM 2

**ESTATE CASH RECEIPTS AND DISBURSEMENTS RECORD**

Page:  2

Exhibit 9

| | | |
|---|---|---|
| Case No: | 1:12-14290 -VK | |
| Case Name: | SALEH, DEBRA MICHELE | |
| Taxpayer ID No: | *******9623 | |
| For Period Ending: | 02/17/15 | |

| | |
|---|---|
| Trustee Name: | Nancy Hoffmeier Zamora, Esq. |
| Bank Name: | Union Bank |
| Account Number / CD #: | *******1522 Checking Account |
| Blanket Bond (per case limit): | $ 5,000,000.00 |
| Separate Bond (if applicable): | |

| 1 | 2 | 3 | 4 | Uniform Tran. Code | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Transaction Date | Check or Reference | Paid To / Received From | Description Of Transaction | | Deposits ($) | Disbursements ($) | Account / CD Balance ($) |
| 12/18/14 | 001007 | BIGGS & CO.<br>c/o SLBiggs A Div. of SingerLewak<br>10960 Wilshire Blvd., Suite 700<br>Los Angeles, CA 90024 | Accountant for Trustee Expenses (Ot<br>Paid per orders entered August 29, 2014 and<br>December 18, 2014 | 3420-000 | | 92.52 | 43,567.63 |
| 12/18/14 | 001008 | Rick Cooper<br>Attn: Robert Rosen, Esq.<br>444 South Flower Street, Suite 602<br>Los Angeles, CA 90071 | Claim 000001, Payment 0.33741%<br>(1-1) Fraudulent transfer of real<br>property by debtor under California UFTA to her<br>parents(1-2) State court case for fraudulent transfer of<br>real property<br>(1-1) Creditor obtained judgment for fraud, elder<br>abuse, and infliction of emotional distress, which has<br>been confirmed as a California Superior Court<br>Judgment in Case No. BS 133 853(1-2) Creditor<br>obtained Superior Court Judgment against debtor for,<br>inter alia, fraud, elder abuse, and infliction of<br>emotional distress arising out of debtor's fraudulent<br>actions while Debtor acted as Mr. Cooper's<br>investment broker<br>Paid per orders entered August 29, 2014 and<br>December 18, 2014 | 7100-003 | | 5,336.52 | 38,231.11 |
| 12/18/14 | 001008 | Rick Cooper<br>Attn: Robert Rosen, Esq.<br>444 South Flower Street, Suite 602<br>Los Angeles, CA 90071 | Claim 000001, Payment 0.33741%<br>clerical error; correction made and check reissued | 7100-003 | | -5,336.52 | 43,567.63 |
| 12/18/14 | 001009 | BIGGS & CO.<br>c/o SLBiggs A Div. of SingerLewak<br>10960 Wilshire Blvd., Suite 700<br>Los Angeles, CA 90024 | Accountant for Trustee Fees (Other<br>Paid per orders entered August 29, 2014 and<br>December 18, 2014 | 3410-000 | | 3,366.50 | 40,201.13 |
| 12/18/14 | 001010 | Rick Cooper<br>Attn: Robert Rosen, Esq. | Claim 000001, Payment 0.34262%<br>(1-1) Fraudulent transfer of real | 7100-003 | | 5,418.92 | 34,782.21 |
| | | | Page Subtotals | | 0.00 | 8,877.94 | |

LFORM24

UST Form 101-7-TDR (10/1/2010) *(Page: 11)*

Ver: 18.04

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document   Page 12 of 13

FORM 2

**ESTATE CASH RECEIPTS AND DISBURSEMENTS RECORD**

Page:   3
Exhibit 9

| | | |
|---|---|---|
| Case No: | 1:12-14290 -VK | |
| Case Name: | SALEH, DEBRA MICHELE | |
| | | |
| Taxpayer ID No: | *******9623 | |
| For Period Ending: | 02/17/15 | |

| | |
|---|---|
| Trustee Name: | Nancy Hoffmeier Zamora, Esq. |
| Bank Name: | Union Bank |
| Account Number / CD #: | *******1522 Checking Account |
| | |
| Blanket Bond (per case limit): | $ 5,000,000.00 |
| Separate Bond (if applicable): | |

| 1 | 2 | 3 | 4 | | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Transaction Date | Check or Reference | Paid To / Received From | Description Of Transaction | Uniform Tran. Code | Deposits ($) | Disbursements ($) | Account / CD Balance ($) |
| | | 444 South Flower Street, Suite 602 Los Angeles, CA 90071 | property by debtor under California UFTA to her parents(1-2) State court case for fraudulent transfer of real property (1-1) Creditor obtained judgment for fraud, elder abuse, and infliction of emotional distress, which has been confirmed as a California Superior Court Judgment in Case No. BS 133 853(1-2) Creditor obtained Superior Court Judgment against debtor for, inter alia, fraud, elder abuse, and infliction of emotional distress arising out of debtor's fraudulent actions while Debtor acted as Mr. Cooper's investment broker Paid per orders entered August 29, 2014 and December 18, 2014 | | | | |
| 12/18/14 | 001010 | Rick Cooper Attn: Robert Rosen, Esq. 444 South Flower Street, Suite 602 Los Angeles, CA 90071 | Claim 000001, Payment 0.34262% clerical error; correction made and replacement check issued | 7100-003 | | -5,418.92 | 40,201.13 |
| 12/18/14 | 001011 | Law Offices of Larry D. Simons 15545 Devonshire Street, Suite 110 Mission Hills, CA 91101 | Attorney for Trustee Fees (Other Fi Paid per orders entered August 29, 2014 and December 18, 2014 | 3210-000 | | 25,440.00 | 14,761.13 |
| 12/18/14 | 001012 | Rick Cooper Attn: Robert Rosen, Esq. 444 South Flower Street, Suite 602 Los Angeles, CA 90071 | Claim 000001, Payment 0.33804% (1-1) Fraudulent transfer of real property by debtor under California UFTA to her parents(1-2) State court case for fraudulent transfer of real property (1-1) Creditor obtained judgment for fraud, elder abuse, and infliction of emotional distress, which has been confirmed as a California Superior Court Judgment in Case No. BS 133 853(1-2) Creditor | 7100-000 | | 5,346.48 | 9,414.65 |

Page Subtotals          0.00          25,367.56

L.FORM24

**UST Form 101-7-TDR (10/1/2010)** *(Page: 12)*

Ver: 18.04

**EXHIBIT 14**
**EXHIBIT A**

Case 1:12-bk-14290-VK   Doc 95   Filed 03/05/15   Entered 03/05/15 11:56:39   Desc
Main Document   Page 13 of 13

FORM 2

Page:   4

**ESTATE CASH RECEIPTS AND DISBURSEMENTS RECORD**

Exhibit 9

| | | |
|---|---|---|
| Case No: | 1:12-14290 -VK | |
| Case Name: | SALEH, DEBRA MICHELE | |
| Taxpayer ID No: | *******9623 | |
| For Period Ending: | 02/17/15 | |

| | |
|---|---|
| Trustee Name: | Nancy Hoffmeier Zamora, Esq. |
| Bank Name: | Union Bank |
| Account Number / CD #: | *******1522 Checking Account |
| Blanket Bond (per case limit): | $ 5,000,000.00 |
| Separate Bond (if applicable): | |

| 1 | 2 | 3 | 4 | Uniform Tran. Code | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Transaction Date | Check or Reference | Paid To / Received From | Description Of Transaction | | Deposits ($) | Disbursements ($) | Account / CD Balance ($) |
| 01/20/15 | 001013 | Wedbush Securities Inc 1000 Wilshire Blvd 7th Flr Los Angeles CA 90017 | obtained Superior Court Judgment against debtor for, inter alia, fraud, elder abuse, and infliction of emotional distress arising out of debtor's fraudulent actions while Debtor acted as Mr. Cooper's investment broker Paid per orders entered August 29, 2014 and December 18, 2014 Claim 000002, Payment 0.33804% Paid per orders entered August 29, 2014 and December 18, 2014 and order entered January 5, 2015 in adversary proceeding no. 1:14-ap-01148-VK. | 7100-000 | | 9,414.65 | 0.00 |

| | Deposits | Disbursements | Balance |
|---|---|---|---|
| COLUMN TOTALS | 50,000.00 | 50,000.00 | 0.00 |
| Less:  Bank Transfers/CD's | 0.00 | 0.00 | |
| Subtotal | 50,000.00 | 50,000.00 | |
| Less:  Payments to Debtors | | 0.00 | |
| Net | 50,000.00 | 50,000.00 | |

| | | | |
|---|---|---|---|
| TOTAL - ALL ACCOUNTS | NET DEPOSITS | NET DISBURSEMENTS | ACCOUNT BALANCE |
| Checking Account - *******1522 | 50,000.00 | 50,000.00 | 0.00 |
| | 50,000.00 | 50,000.00 | 0.00 |
| | (Excludes Account Transfers) | (Excludes Payments To Debtors) | Total Funds On Hand |

| | | |
|---|---|---|
| Page Subtotals | 0.00 | 9,414.65 |

Ver: 18.04

LFORM24   **UST Form 101-7-TDR (10/1/2010)** *(Page: 13)*

**EXHIBIT 14**
**EXHIBIT A**

# TRANCHE 1

**EXHIBIT 15**

**EXHIBIT A**

*BRIAN FITZWILLIAM*

# NATIONWIDE AUTOMATED SYSTEMS, INC.

22048 SHERMAN WAY,  SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

## ATM EQUIPMENT PURCHASE AGREEMENT

11 / 27 , 20 06

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on Schedule A attached hereto and incorporated herein by reference.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM | |
|---|---|---|
| 10 | $12,000 | |
| | | $ 120,000.00 |

| | |
|---|---|
| TOTAL PURCHASE PRICE: | $ 120,000.00 |
| LESS:  BUYER'S DEPOSIT | $ 120,000.00 |
| BALANCE DUE ON SIGNING: | $ 0 |

SELLER shall deliver the ATM(s) to location written on Exhibit A within sixty (60) days of the date hereof.  If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom.  The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

**EXHIBIT 15**

R00005014

**EXHIBIT A**

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

**NATIONWIDE AUTOMATED SYSTEMS, INC.**
**A California Corporation**

By: _~Joel Miller~_

Title: _~President~_

By:_____

Title:_____

**BUYER:**

By: _~Betty Ann Wright~_

Title: _Owner / President_

**REDACTED**

_____

(Telephone Number)
Social Security Number:   **REDACTED**

-2-

**EXHIBIT 15**                                    R00005015

**EXHIBIT A**

EXHIBIT "A"

Brian Fitzwilliam

| HOTEL NAME | Marriott Hotel | Embassy Suites | Omni Hotel |
|---|---|---|---|
| ADDRESS | 1414 So. Patterson | 3332 S. 79th E. Ave. | 100 S. 12th St. |
| CITY, STATE | Dayton, Oh. | Tulsa, Ok. | Richmond, Va. |
|  |  |  |  |
| SERIAL NUMBER | TR-401721 | TR-443685 | TR-413137 |

| HOTEL NAME | Marriott Hotel | Hilton Hotel | Omni Hotel |
|---|---|---|---|
| ADDRESS | 5801 Opus Parkway | 500 W. Third Ave. | 235 W. Main St. |
| CITY, STATE | Minnetonka, Mn. | Anchorage, Ak. | Charlottesville, Va. |
|  |  |  |  |
| SERIAL NUMBER | TR-401725 | TR-401822 | TR-413154 |

| HOTEL NAME | Hyatt Hotel | Omni Hotel | |
|---|---|---|---|
| ADDRESS | 1 Grand Cypress Blvd. | 40 W. Jackson Place | |
| CITY, STATE | Orlando, Fl. | Indianapolis, In. | |
|  |  |  | |
| SERIAL NUMBER | TR-401780 | TR-413105 | |

| HOTEL NAME | Hyatt Hotel | Omni Hotel | |
|---|---|---|---|
| ADDRESS | Fairlane Town Center | 900 N. Shoreline Drive | |
| CITY, STATE | Dearborn, Mi. | Corpus Christi, Tx. | |
|  |  |  | |
| SERIAL NUMBER | TR-401793 | TR-413117 | |

| HOTEL NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |
|  | | | |
| SERIAL NUMBER | | | |

**EXHIBIT 15**

R00005034

**EXHIBIT A**



R00005019

**EXHIBIT 15**

**EXHIBIT A**

## *NATIONWIDE AUTOMATED SYSTEMS, INC.*

22048 SHERMAN WAY, SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

### ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of ___11 /27___ , 20 _06_ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and _Bribet Services_ _____("Lessor").

### RECITALS

A.    NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.    Lessor is the owner of the ATM(s) listed and described on Schedule A attached hereto.

C.    NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.    Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.    Lease of Equipment. Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A attached hereto and incorporated herein by reference.

2. Term. The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above. The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

**EXHIBIT 15**

R00005016

**EXHIBIT A**

set forth above.

**NATIONWIDE AUTOMATED SYSTEMS, INC.**
**A California Corporation**

By: *Joel Mello*

Title: *President*


LESSOR:

By: *Betty Idd PA*

Title: *Owner / President*

**EXHIBIT 15**

R00005017

**EXHIBIT A**

Nationwide Automated Systems, Inc.

ADDENDUM TO OWNER LEASE AGREEMENT

1)  If at anytime the owner's ATM machine fails to make enough transactions
To pay the owner a monthly check equivalent to a twenty (20%) percent
Annual return on the owner's investment of $12,000. Nationwide Automated
Systems, Inc. guarantees to pay owner the difference between what the
Owner has received and $2,400. This is based on a rental fee of $.50
Per transaction. This is done on an annual basis calculating from the
installation month.

2)  At anytime after the first two years of ownership, should the owner wish to
.... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _____

Owner

By _____

**EXHIBIT 15**

R00005018

**EXHIBIT A**

# TRANCHE 2

**EXHIBIT 15**

**EXHIBIT A**

# *NATIONWIDE AUTOMATED SYSTEMS, INC.*

22048 SHERMAN WAY,  SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

## ATM EQUIPMENT PURCHASE AGREEMENT

_JUNE 1_ , 20_07_

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on Schedule A attached hereto and incorporated herein by reference.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM | |
|---|---|---|
| _10_ | _$12,000_ | |
| | | _$20,000_ |

TOTAL PURCHASE PRICE:           _$120,000_

LESS:  BUYER'S DEPOSIT           _$120,000_

BALANCE DUE ON SIGNING:        _$ -0-_

SELLER shall deliver the ATM(s) to location written on Exhibit A within sixty (60) days of the date hereof.  If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom.  The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

**EXHIBIT 15**

R00005011

**EXHIBIT A**

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

**NATIONWIDE AUTOMATED SYSTEMS, INC.**
**A California Corporation**

By: _____

Title: _____

By: _____

Title: _____

BUYER:

By: _____

Title: _____

**REDACTED**

(Telephone Number)
**Social Security Number:** _ _ _ _ _ _ _ _ _

-2-

R00005012

**EXHIBIT 15**

**EXHIBIT A**

EXHIBIT "A"

Bribet Services

| HOTEL NAME | Westin Hotel | Hyatt Hotel | Sheraton Hotel |
|---|---|---|---|
| ADDRESS | 675 El Camino Real | 1800 Presidents Street | 1400 Sixth Ave. |
| CITY, STATE | Palo Alto, Ca. | Reston, Va. | Seattle, Wa. |
| | | | |
| SERIAL NUMBER | MB-815130 | TR-321118 | TR-401542 |

| HOTEL NAME | Westin Hotel | Wyndham Hotel | Marriott Hotel |
|---|---|---|---|
| ADDRESS | 310 S. High St. | 215 West South Temple | 51 S Forrest Beach Road |
| CITY, STATE | Columbus, Oh. | Salt Lake City, Ut. | Hilton Head Island, S.C. |
| | | | |
| SERIAL NUMBER | MB-815409 | TR-371809 | TR-441168 |

| HOTEL NAME | Sheraton Hotel | Wyndham Hotel | |
|---|---|---|---|
| ADDRESS | 100 E. River Drive | 4801 LBJ Parkway | |
| CITY, STATE | Hartford, Ct. | Dallas, Tx. | |
| | | | |
| SERIAL NUMBER | MB-815752 | TR-372006 | |

| HOTEL NAME | Sheraton Hotel | Marriott Hotel | |
|---|---|---|---|
| ADDRESS | 39 Dalton Street | 555 So. Alamo | |
| CITY, STATE | Boston, Ma. | San Antonio, Tx. | |
| | | | |
| SERIAL NUMBER | MB-817025 | TR-396338 | |

| HOTEL NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |
| | | | |
| SERIAL NUMBER | | | |

**EXHIBIT 15**

R00005035

**EXHIBIT A**



R00005013

**EXHIBIT 15**

**EXHIBIT A**



## *NATIONWIDE AUTOMATED SYSTEMS, INC.*

22048 SHERMAN WAY, SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

### ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of _JUNE 1_ , 20_07_ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and _Bri Bet Services_ _____("Lessor").

### RECITALS

A.      NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.      Lessor is the owner of the ATM(s) listed and described on Schedule A attached hereto.

C.      NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.      Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.      Lease of Equipment. Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A attached hereto and incorporated herein by reference.

2. Term. The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above. The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

**EXHIBIT 15**

R00005008

**EXHIBIT A**

set forth above.

**NATIONWIDE AUTOMATED SYSTEMS, INC.**
**A California Corporation**

By: _____

Title: _____

LESSOR:

By: _____

Title: _____

-6-

**EXHIBIT 15**

R00005009

**EXHIBIT A**

Nationwide Automated Systems, Inc.

ADDENDUM TO OWNER LEASE AGREEMENT

1) If at anytime the owner's ATM machine fails to make enough transactions
   To pay the owner a monthly check equivalent to a twenty (20%) percent
   Annual return on the owner's investment of $12,000. Nationwide Automated
   Systems, Inc. guarantees to pay owner the difference between what the
   Owner has received and $2,400. This is based on a rental fee of $.50
   Per transaction. This is done on an annual basis calculating from the
   installation month.

2) At anytime after the first two years of ownership, should the owner wish to
.... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
   Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _Joel Nells_ 6-1-07

By X _____
   Owner

**EXHIBIT 15**

R00005010

**EXHIBIT A**

# TRANCHE 3

**EXHIBIT 15**

**EXHIBIT A**

## *NATIONWIDE AUTOMATED SYSTEMS, INC.*

22048 SHERMAN WAY, SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

### ATM EQUIPMENT PURCHASE AGREEMENT

_JULY 1_____, 20_08_

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on Schedule A attached hereto and incorporated herein by reference.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM | |
|---|---|---|
| 10 | $12,000 | |
| | | $120,000 |

TOTAL PURCHASE PRICE:      $120,000

LESS:  BUYER'S DEPOSIT      $120,000

BALANCE DUE ON SIGNING:      $ =0=

SELLER shall deliver the ATM(s) to location written on Exhibit A within sixty (60) days of the date hereof.  If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom.  The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

**EXHIBIT 15**

R00005004

**EXHIBIT A**

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

**NATIONWIDE AUTOMATED SYSTEMS, INC.**
**A California Corporation**

By: _____

Title: _____

By: _____

Title: _____

**BUYER:**

By: _____

Title: _____

**REDACTED**

(Telephone Number)
Social Security Number: _ _ _ _ _ _ _ _ _

-2-

**EXHIBIT 15**

**EXHIBIT A**

R00005005

EXHIBIT "A"

Bribet Services

| HOTEL NAME | Hilton Hotel | Embassy Suites | Hilton Hotel |
|---|---|---|---|
| ADDRESS | 333 St. Charles Ave. | 28100 Franklin Road | 8629 JM Keynes Drive |
| CITY, STATE | New Orleans, La. | Southfield, Mi. | Charlotte, N.C. |
| | | | |
| SERIAL NUMBER | FC-777311 | FC-777393 | FC-777467 |

| HOTEL NAME | Doubletree Hotel | Hilton Garden Inn | Embassy Suites |
|---|---|---|---|
| ADDRESS | 44 Middlesex Turnpike | 411 Minnesota St. | 555 So. 10th St. |
| CITY, STATE | Bedford, Ma. | St. Paul, Mn. | Omaha, Ne. |
| | | | |
| SERIAL NUMBER | FC-777333 | FC-777418 | FC-777494 |

| HOTEL NAME | Doubletree Hotel | Hilton Hotel | |
|---|---|---|---|
| ADDRESS | 5400 Computer Drive | 8801 NW 112th St. | |
| CITY, STATE | Westborough, Ma. | Kansas City, Mo. | |
| | | | |
| SERIAL NUMBER | FC-777345 | FC-777439 | |

| HOTEL NAME | Hilton Hotel | Hilton Hotel | |
|---|---|---|---|
| ADDRESS | 1739 W. Nursery Road | 1001 E. County Line Road | |
| CITY, STATE | Linthicum Hights, Md. | Jackson, Ms. | |
| | | | |
| SERIAL NUMBER | FC-777368 | FC-777456 | |

| HOTEL NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |
| SERIAL NUMBER | | | |

R00005006

**EXHIBIT 15**

**EXHIBIT A**



**EXHIBIT 15**

**EXHIBIT A**



## NATIONWIDE AUTOMATED SYSTEMS, INC.

22048 SHERMAN WAY, SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

### ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of ___7 - 1_____, 20 _08_ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and

_BRIBOT SERVICES_____("Lessor").

### RECITALS

A.    NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.    Lessor is the owner of the ATM(s) listed and described on Schedule A attached hereto.

C.    NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.    Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.    **Lease of Equipment.** Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A attached hereto and incorporated herein by reference.

2. **Term.** The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above. The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

**EXHIBIT 15**

R00005001

**EXHIBIT A**

set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _____

Title: _____

LESSOR:

By: _____

Title: _____

-6-

R00005002

**EXHIBIT 15**

**EXHIBIT A**

Nationwide Automated Systems, Inc.

ADDENDUM TO OWNER LEASE AGREEMENT

1) If at anytime the owner's ATM machine fails to make enough transactions To pay the owner a monthly check equivalent to a twenty (20%) percent Annual return on the owner's investment of $12,000. Nationwide Automated Systems, Inc. guarantees to pay owner the difference between what the Owner has received and $2,400. This is based on a rental fee of $.50 Per transaction. This is done on an annual basis calculating from the installation month.

2) At anytime after the first two years of ownership, should the owner wish to .... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _Paul Nelles_ 6-27-08

Owner

By X _____

**EXHIBIT 15**

R00005003

**EXHIBIT A**

# TRANCHE 4

**EXHIBIT 15**

**EXHIBIT A**

# *NATIONWIDE AUTOMATED SYSTEMS, INC.*

22048 SHERMAN WAY, SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

### ATM EQUIPMENT PURCHASE AGREEMENT

JUNE 30 , 20 09

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on Schedule A attached hereto and incorporated herein by reference.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
| 10 | $12,000 |

TOTAL PURCHASE PRICE:      $120,000

LESS BUYERS DEPOSIT:       $120,000

BALANCE DUE ON SIGNING:    $ -0-

SELLER shall deliver the ATM(s) to location written on Exhibit A within sixty (60) days of the date hereof. If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom. The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

R00005031

**EXHIBIT 15**

**EXHIBIT A**

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Gilbs_____

Title: _President_____

By: _____

Title: _____

BUYER:

By: X _____

Title: _Owner_____

**REDACTED**

_____
(Telephone Number)
Social Security Number:  _ _ _ _ _ _ _ _ _

-2-

R00005032

**EXHIBIT 15**

**EXHIBIT A**

EXHIBIT "A"

Bribet Services

| LOCATION NAME | Circle K # 2167 | Sunrise Mkt. & Gas | Quik Stop |
|---|---|---|---|
| ADDRESS | 4754 S. Padre Island Drive | 1315 S. Commercial St. | 2017 N. 6th St. |
| CITY, STATE | Corpus Christy, Tx. | Arkansas Pass, Tx. | Harrisburg, Pa. |
| | | | |
| SERIAL NUMBER | FC-332842 | FC-332890 | FC-332927 |

| LOCATION NAME | Speedy Stop # 36 | Byler Quik Mart | Marcus Hook Exxon |
|---|---|---|---|
| ADDRESS | 9811 Bob Bullock Loop | 3158 Lincoln Hwy E. | 2403 Market St. |
| CITY, STATE | Laredo, Tx. | Paradise, Pa. | Marcus Hook, Pa. |
| | | | |
| SERIAL NUMBER | FC-332845 | FC-332901 | FC-332937 |

| LOCATION NAME | Speed Mart | Zeek's Exxon | |
|---|---|---|---|
| ADDRESS | 301 N. Johnson St. | 835 S. Eisenhower Rd. | |
| CITY, STATE | Alice, Tx. | Middletown, Pa. | |
| | | | |
| SERIAL NUMBER | FC-332871 | FC-332904 | |

| LOCATION NAME | Speedy Stop # 58 | A & J's Food & Gas | |
|---|---|---|---|
| ADDRESS | 5175 IH 37 | 620 S. Cameron St. | |
| CITY, STATE | Corpus Christy, Tx. | Harrisburg, Pa. | |
| | | | |
| SERIAL NUMBER | FC-332878 | FC-332910 | |

| LOCATION NAME | | | |
|---|---|---|---|
| ADDRESS | | | |

R00005033

**EXHIBIT 15**

**EXHIBIT A**



# *NATIONWIDE AUTOMATED SYSTEMS, INC.*

22048 SHERMAN WAY, SUITE 111
CANOGA PARK, CA 91303
818-716-6790
FAX: 818-673-1945

## ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of ___JUNE 30___, 20 09 by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and

___BRIDGT SERVICES___ ("Lessor").

### RECITALS

A.      NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.      Lessor is the owner of the ATM(s) listed and described on Schedule A attached hereto.

C.      NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.      Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.      Lease of Equipment.  Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A attached hereto and incorporated herein by reference.

2. Term.  The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above.  The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

R00005028

**EXHIBIT 15**

**EXHIBIT A**

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Nellis_

Title: _President_

LESSOR:

By: _X_ _____

Title: _Owner_

-6-

**EXHIBIT 15**

**EXHIBIT A**

R00005029

Nationwide Automated Systems, Inc.

ADDENDUM TO OWNER LEASE AGREEMENT

1) If at anytime the owner's ATM machine fails to make enough transactions
   To pay the owner a monthly check equivalent to a twenty (20%) percent
   Annual return on the owner's investment of $12,000. Nationwide Automated
   Systems, Inc. guarantees to pay owner the difference between what the
   Owner has received and $2,400. This is based on a rental fee of $.50
   Per transaction. This is done on an annual basis calculating from the
   installation month.

2) At anytime after the first two years of ownership, should the owner wish to
   .... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
   Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _Jerel Nulls_ 6-30-09

Owner

By_X_

R00005030

**EXHIBIT 15**

**EXHIBIT A**

S&J AGREEMENT OF TRUST
GENSAR SALEH TTE
P O Box 1170
Agoura Hills, CA 91376-1170

101

16-24/1220 4404
660S498424

6/30/09   Date

Pay to the Order of   Nationwide Automated Systems   $ 120,000.00

One hundred twenty thousand no/100   Dollars

Wells Fargo Bank, N.A.
California
wellsfargo.com

For

⑆122000247⑆ 660549842 4⑈ 00101  ⑇00⑆2000000⑈

PAY TO THE ORDER OF
CITY NATIONAL BANK
FOR DEPOSIT ONLY
NATIONWIDE AUTOMATED SYSTEMS, INC.
022414410

**EXHIBIT 16**

**EXHIBIT A**





Date:20120301 Check:10633 Account:22414410 Amount:60000.00

Date:20120301 Check:10633 Account:22414410 Amount:60000.00





Date:20140811 Check:13426 Account:22414410 Amoun:60000.00

Date:20140811 Check:13426 Account:22414410 Amount:60000.00

EXHIBIT 17
EXHIBIT A

 

February 14, 2012


RE: Nationwide Automated Systems


To Whom It May Concern:

This letter is to confirm that Nationwide Automated has been a valued client of City National Bank since December 1996. As of February 14th 2012, Nationwide Automated maintains average balances over $4,000,000 in their operating account.



Sincerely,

Brian FitzWilliam
Senior Vice President
Branch Manager
City National Bank
Woodland Hills Office
818-227-4323


**EXHIBIT 18**

**EXHIBIT A**


**CITY NATIONAL BANK**
The way up.·

Brian Fitzwilliam | Senior Vice President
Woodland Hills Branch

August 27th, 2014

Edward Wishner
20969 Ventura Blvd Suite # 20
Woodland Hills, CA 91364

RE:    Account Numbers: # 022-106260 / # 022-135252 / # 022-389270 / # 022-451154
Safe Deposit Boxes: # 611 / # 901 / # 904

After careful review City National Bank has determined that your accounts and safe boxes listed above must be closed. We ask that you close the above accounts by September 25th, 2014. If you do not close the accounts and boxes by that date we will close the accounts. This means we will refuse to accept any further deposits to the account after that date and when we are satisfied that all funds then remaining are collected, we will send these funds to you by check. If a check is presented to us for payment after September 25th, 2014, we may return it.

We suggest that you stop making deposits to or writing checks against your account with us at once. Any checks you write after this notice or which are currently outstanding may not be presented to us for payment until after the date is closed. Any check presented after an account is closed will be returned "account closed". If you must make a deposit to cover a payment of a check presented before the closing date, the deposit must be made in cash, cashier's check or wire. We may hold funds from items deposited into the account to the fullest extent of the law, and you should not expect us to pay checks against uncollected funds.

When your account is closed, automatic payments or withdrawals from your account will be rejected and will not be paid.

We regret we are unable to service your banking needs. If you have question, please contact us.

21800 Oxnard Street   Woodland Hills, CA 91367
T: 818.227.4323   F: 818.227.4330   brian.fitzwilliam@cnb.com

Member FDIC

**EXHIBIT 19**

**EXHIBIT A**

August 27th, 2014
Page 2


Sincerely,

Brian FitzWilliam

SVP / Branch Manager

Member FDIC

**EXHIBIT 19**

**EXHIBIT A**

3/26/2016        Two Charged in ATM Ponzi Scheme - WSJ

# THE WALL STREET JOURNAL.

opy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
//www.djreprints.com.

http://www.wsj.com/articles/SB125354074222827765

LAW

# Two Charged in ATM Ponzi Scheme

By **CHAD BRAY**

Updated Sept. 21, 2009 9:48 a.m. ET

NEW YORK -- Two men are facing criminal charges for an alleged $80 million Ponzi scheme that revolved around purported investments in automated teller machines, prosecutors said Monday.

Vance Moore II, 55 years old, of Raleigh, N.C., and Walter Netschi, 62, of McKinney, Texas, have been charged with conspiracy to commit wire fraud and nine counts of wire ﬁ   ﬁd. Each charge carries up to 20 years in prison.

Vance Moore II and Walter Netschi used false promises and fake returns to steal tens of millions of dollars from their victims. We will continue to use the full resources of our office to expose the perpetrators and vindicate the victims of complex financial frauds," said U.S. Attorney Preet Bharara in a statement.

Mr. Moore was arrested in Garner, N.C., on Friday and Mr. Netschi is expected to surrender to federal authorities in Manhattan on Monday. Mr. Moore is expected to appear in federal court in North Carolina Monday. Mr. Netschi is expected to appear before a U.S. magistrate judge in Manhattan on Monday.

Prosecutors from the U.S. Attorney's office in Manhattan alleged Mr. Moore and Mr. Netschi solicited more than $80 million in investments in ATMs that they represented to investors were placed in retail locations nationwide, including convenience stores, gas stations, malls and hotel. Instead of using the money to purchase ATMs, the men used the money to further their fraudulent scheme and enrich themselves, the ernment said.

Mr. Moore and Mr. Netschi entered into contracts with victims falsely representing they have purchased about 4,000 ATMs, prosecutors said. About 90% of the machines purportedly purchased either didn't exist or weren't owned by the men, the government

**EXHIBIT 20**
**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 194 of 245   Page ID #:641
Case 5:16-cv-00502-SJO-FFM   Document 14-20   Filed 04/15/16   Page 2 of 2   Page ID #:329

3/26/2016                    Two Charged in ATM Ponzi Scheme - WSJ

said.



...urther the scheme, Mr. Moore and Mr. Netschi allegedly sent phony monthly reports ...id payments to victims purportedly related to their investments, prosecutors said. The payments weren't revenues from the ATMs, but were from money the men had collected from new investors, prosecutors said.

**Write to** Chad Bray at chad.bray@dowjones.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

**EXHIBIT 20**
**EXHIBIT A**

10/26/2009 14:21 FAX 8186731045          MATGNWGE                        ☑001
    OCT.26'2009 09:04 8182274330            CITY NATIONAL BANK 022        #6994 P.001/001

October 26th, 2009

Hi Joel,

I wish to sell back 20 ATM's at the end of this month (October 2009). Please send me a check payable to Bribet Services for $240,000.

Serial # TR-401721
Serial # TR-401725
Serial # TR-401780
Serial # TR-401793
Serial # TR-401822
Serial # TR-413105
Serial # TR-413117
Serial # TR-413137
Serial # TR-413154
Serial # TR-443685

Serial # TR-321118
Serial # TR-371809
Serial # TR-372006
Serial # TR-396338
Serial # TR-401542
Serial # TR-441168
Serial # MB-815130
Serial # MB-815409
Serial # MB-815752
Serial # MB-817025

Thank you,

Brian FitzWilliam

R00005025

**EXHIBIT 21**

**EXHIBIT A**



**CITY NATIONAL BANK**
The way up.

*Account Analysis*
*Relationship Summary*
*April 2009*

WOODLAND HILLS OFFICE
21800 OXNARD STREET
WOODLAND HILLS CA 91367

| | |
|---|---|
| Account Number | 00022414410 |
| Settlement Period Ends | April 2009 |
| Statement Date | May 14, 2009 |
| | Page 1 of 3 |

NATIONWIDE AUTOMATED SYSTEMS, INC.
(GENERAL ACCOUNT)
22048 SHERMAN WAY # 111
CANOGA PARK CA 91303

For Questions Regarding Your Statement, Contact:
FITZWILLIAM, BRIAN

## Relationship Summary

| Account Number | Account Name | Investable Balance | Required Balance | Service Charge |
|---|---|---|---|---|
| (309) D 0002106260 | EDWARD WISHNER COMPANY | $4,324 | $377,364 | $248.32 |
| (309) D 00022135252 | JOEL B GILLIS | $1,278 | $72,209 | $49.82 |
| (309) D 00022414399 | NATIONWIDE AUTOMATED SYS | $239,789 | $1,693,976 | $1,127.73 |
| (309) D 00022414402 | NATIONWIDE AUTOMATED SYS | $7,828 | $1,419,299 | $939.63 |
| (309) D 00022414410 | NATIONWIDE AUTOMATED SYS | $824,808 | $738,926 | $485.87 |
| | **Total** | **$1,078,027** | **$4,301,774** | **$2,851.37** |

## Balance Summary

| | |
|---|---|
| Average Ledger Balance | $1,262,354.47 |
| Less Average Float | $67,360.37 |
| Average Collected Balance | $1,194,994.10 |
| | |
| Average Negative Collected Balance | $2,813.45 |
| Average Positive Collected Balance | $1,197,807.55 |
| | |
| Positive Collected Balance | $1,197,807.54 |
| Less Federal Reserve Requirement at 10.000000% of Positive Collected Balance | $119,780.75 |
| Investable Balance | $1,078,026.79 |
| | |
| Investable Balance | $1,078,026.79 |
| Less Balance Required for Services | $4,301,774.15 |
| Excess/(Deficit) Balance | ( $3,223,747.36 ) |

Page 1 of 3 Total Pages

For Internal Use Only: 02206 - 00022

**EXHIBIT 22**

**EXHIBIT A**



**CITY NATIONAL BANK**
The way up.®

*Account Analysis*
*Relationship Summary*
*April 2009*

WOODLAND HILLS OFFICE
21800 OXNARD STREET
WOODLAND HILLS CA 91367

| | |
|---|---|
| Account Number | 00022414410 |
| Settlement Period Ends | April 2009 |
| Statement Date | May 14, 2009 |
| | Page 2 of 3 |

NATIONWIDE AUTOMATED SYSTEMS, INC.

For Questions Regarding Your Statement, Contact:
FITZWILLIAM, BRIAN

## Results Summary

**Analyzed Results**

| | |
|---|---|
| Earnings Credit at 0.800000% of Investable Balance | $708.84 |
| Less Total Analyzed Fees | $2,828.57 |
| Total Analyzed Results | ( $2,119.73 ) |
| Total Analyzed Service Charges This Statement | $2,119.73 |

**Fee Based Results**

| | |
|---|---|
| Total Fee Based Fees | $22.80 |
| Net Fee Based Results | $22.80 |

The total analyzed charge result of $2,119.73 will be debited to account 00022414410 on 05/20/09.

## Service Detail

| Service Description | Volume | Unit Price | Total Fee | Balance Required |
|---|---|---|---|---|
| **General Account Services** | | | | |
| Account Maintenance | 5 | $18.0000 | $90.00 | $136,874.70 |
| FDIC Insurance - Per $1,000 | $1,263.00 | $0.1300 | $164.19 | $249,705.08 |
| Check Return With Statement | 1 | $3.0000 | $3.00 | $4,562.49 |
| Funds Advanced Overdrafts | $2,772.59 | 10.000000% | $22.80 | Fee Based |
| Funds Advanced Uncollected | $40.86 | 10.000000% | $0.34 | $517.08 |
| **Depository Services** | | | | |
| Deposits | 27 | $1.2500 | $33.75 | $51,328.02 |
| Checks Paid | 1,404 | $0.2000 | $280.80 | $427,049.07 |
| Overdraft Item | 73 | $24.0000 | $1,752.00 | $2,664,494.16 |
| Deposit Correction | 1 | $3.5000 | $3.50 | $5,322.91 |
| Stop Payment (Customer Request) | 2 | $22.0000 | $44.00 | $66,916.52 |
| Official Check | 2 | $8.0000 | $16.00 | $24,333.28 |
| Deposited Items - On Us | 6 | $0.1000 | $0.60 | $912.49 |
| Deposited Items - Local Clearing | 80 | $0.1000 | $8.00 | $12,166.64 |

Page 2 of 3 Total Pages

For Internal Use Only: 02206 - 00022

**EXHIBIT 22**

**EXHIBIT A**



**CITY NATIONAL BANK**
The way up.®

*Account Analysis*
Relationship Summary
April 2009

WOODLAND HILLS OFFICE
21800 OXNARD STREET
WOODLAND HILLS CA 91367

| | |
|---|---|
| Account Number | 00022414410 |
| Settlement Period Ends | April 2009 |
| Statement Date | May 14, 2009 |
| | Page 3 of 3 |

NATIONWIDE AUTOMATED SYSTEMS, INC.

For Questions Regarding Your Statement, Contact:
FITZWILLIAM, BRIAN

## Service Detail-Continued

| Service Description | Volume | Unit Price | Total Fee | Balance Required |
|---|---|---|---|---|
| Deposited Items - Other Local | 16 | $0.1000 | $1.60 | $2,433.33 |
| Deposited Items - S.F. RCPC | 1 | $0.1000 | $0.10 | $152.08 |
| Deposited Items - Transit | 11 | $0.1000 | $1.10 | $1,672.92 |
| Currency Deposited | 300 | $0.0012 | $0.36 | $547.50 |
| Returned Item | 1 | $7.0000 | $7.00 | $10,646.81 |
| R.I.Reclear Fee | 1 | $2.5000 | $2.50 | $3,802.08 |
| **ACH Services** | | | | |
| ACH Credit - Incoming | 7 | $0.5000 | $3.50 | $5,322.91 |
| ACH Debit - Incoming | 8 | $0.2000 | $1.60 | $2,433.33 |
| **Information Reporting Services** | | | | |
| Online CM Acct Maint | 3 | $20.0000 | $60.00 | $91,249.80 |
| Online CM Acct Maint | 2 | $85.0000 | $170.00 | $258,541.10 |
| Online CM Detail Trans | 642 | $0.2000 | $128.40 | $195,274.58 |
| **Other Cash Management Services** | | | | |
| Harland #09117120050 | 1 | $56.2300 | $56.23 | $85,516.27 |
| | | | | |
| Total Analyzed Fees | | | $2,828.57 | $4,301,774.15 |
| Total Fee Based Fees | | | $22.80 | |

$1,520.83 in investable Balances Offset $1.00 of Total Fees for all Analysis Based Services.

Page 3 of 3 Total Pages

For Internal Use Only: 02206 - 00022

**EXHIBIT 22**

**EXHIBIT A**

**rlbrace@rusty.lawyer**

| From: | Cheryl Johnson <cjohnson@hbsb.com> |
|---|---|
| Sent: | Tuesday, April 5, 2016 6:49 PM |
| To: | Robert L. Brace (rlbrace@rusty.lawyer); Michael Denver |
| Subject: | Fuel Doctor $5.7MM loan? |

```
                    NATIONWIDE AUTOMATED SYSTEMS, INC
                             Balance Sheet
                                 0413

                         (Prepared without Audit)


                            A S S E T S

             Current Assets:
                CASH - CITY NATL                    $12,769,517
                CASH - CITY NATL LOCATION               (77,208)
                CASH - CITY NATL INVESTORS          (6,761,522)
                LOAN - MAUI PRODUCTIONS                   8,947
                LOAN RECEIVABLE - FUEL DOCTOR         5,734,711
                LOAN RECEIVABLE - OASIS               1,477,192
                LOAN - ROBERT KELLER                     13,000
                LOAN RECEIVABLE - E. WISHNER             37,500
                LOAN - JEFFREY RAMSEY                     7,000
                LOAN - STOCK                             50,000
                INVESTMENT                            1,254,307
                INVESTMENT - FUEL STATIONS                3,089
                RECEIVABLE LOAN - M SOFFA               100,000
                                                    ----------
                    Total Current Assets            14,596,533
                                                    ----------
             Property and Equipment (at cost):
                EQUIPMENT                                93,993
                ACCUM DEPREC                           (90,228)
                FURNITURE FIXTURES                       49,555
                ACC DEPREC - F & F                     (49,555)
                                                    ----------
                                                         3,765
                                                    ----------
             Other Non-Current Assets:
             TOTAL ASSETS                           $14,600,298
                                                    ==========


                        L I A B I L I T I E S

             Current Liabilities
                NATIONWIDE AUTOMATED                        $1
                FEDERAL INCOME TAX DEP                   13,432
                DEPOSITS PAYABLE                      5,938,636
                FICA PAYABLE                             2,327
                SWT PAYABLE                              5,000
                                                    ----------
                    Total Current Liabilities        5,959,396

                                                    ----------
                    Total Liabilities               5,959,396
                                                    ----------
```

Exhibit 43A

N

1

**EXHIBIT 22**


**EXHIBIT A**

# Privately Owned Automated Teller Machines — Overview

**Objective.** *Assess the adequacy of the bank's systems to manage the risks associated with privately owned automated teller machines (ATM) and Independent Sales Organization (ISO) relationships, and management's ability to implement effective due diligence, monitoring, and reporting systems.*

Privately owned ATMs are particularly susceptible to money laundering and fraud. Operators of these ATMs are often included within the definition of an ISO.[204]

Privately owned ATMs are typically found in convenience stores, bars, restaurants, grocery stores, or check cashing establishments. Some ISOs are large-scale operators, but many privately owned ATMs are owned by the proprietors of the establishments in which they are located. Most dispense currency, but some dispense only a paper receipt (scrip) that the customer exchanges for currency or goods. Fees and surcharges for withdrawals, coupled with additional business generated by customer access to an ATM, make the operation of a privately owned ATM profitable.

ISOs link their ATMs to an ATM transaction network. The ATM network routes transaction data to the customer's bank to debit the customer's account and ultimately credit the ISO's account, which could be located at a bank anywhere in the world. Payments to the ISO's account are typically made through the automated clearing house (ACH) system. Additional information on types of retail payment systems is available in the FFIEC *Information Technology Examination Handbook*.[205]

## Sponsoring Bank

Some electronic funds transfers (EFT) or point-of-sale (POS) networks require an ISO to be sponsored by a member of the network (sponsoring bank). The sponsoring bank and the ISO are subject to all network rules. The sponsoring bank is also charged with ensuring the ISO abides by all network rules. Therefore, the sponsoring bank should conduct proper due diligence on the ISO and maintain adequate documentation to ensure that the sponsored ISO complies with all network rules.

---

[204] An ISO typically acts as an agent for merchants, including ATM owners, to process electronic transactions. In some cases, an ATM owner may act as its own ISO processor. Banks may engage the services of an ISO to solicit merchants and privately owned ATMs; however, in many situations, ISOs contract with merchants and ATM owners without the review and approval of the clearing bank.

[205] The FFIEC *Information Technology Examination Handbook* is available at www.ffiec.gov/ffiecinfobase/html_pages/it_01.html.

---

**EXHIBIT 23**
**EXHIBIT A**

_Privately Owned Automated Teller Machines — Overview_

## Risk Factors

Most states do not currently register, limit ownership, monitor, or examine privately owned ATMs or their ISOs.[206] While the provider of the ATM transaction network and the sponsoring bank should be conducting adequate due diligence on the ISO, actual practices may vary.  Furthermore, the provider may not be aware of ATM or ISO ownership changes after an ATM contract has already been established.  As a result, many privately owned ATMs have been involved in, or are susceptible to, money laundering schemes, identity theft, outright theft of the ATM currency, and fraud. Consequently, privately owned ATMs and their ISOs pose increased risk and should be treated accordingly by banks doing business with them.

Due diligence becomes more of a challenge when ISOs sell ATMs to, or subcontract with, third- and fourth-level companies ("sub-ISOs") whose existence may be unknown to the sponsoring bank.  When an ISO contracts with or sells ATMs to sub-ISOs, the sponsoring bank may not know who actually owns the ATM. Accordingly, sub-ISOs may own and operate ATMs that remain virtually invisible to the sponsoring bank.

Some privately owned ATMs are managed by a vault currency servicer that provides armored car currency delivery, replenishes the ATM with currency, and arranges for insurance against theft and damage.  Many ISOs, however, manage and maintain their own machines, including the replenishment of currency.  Banks may also provide currency to ISOs under a lending agreement, which exposes those banks to various risks, including reputation and credit risk.

Money laundering can occur through privately owned ATMs when an ATM is replenished with illicit currency that is subsequently withdrawn by legitimate customers. This process results in ACH deposits to the ISO's account that appear as legitimate business transactions.  Consequently, all three phases of money laundering (placement, layering, and integration) can occur simultaneously.  Money launderers may also collude with merchants and previously legitimate ISOs to provide illicit currency to the ATMs at a discount.

## Risk Mitigation

Banks should implement appropriate policies, procedures, and processes, including appropriate due diligence and suspicious activity monitoring, to address risks with ISO customers.  At a minimum, these policies, procedures, and processes should include:

---

[206] FinCEN has issued interpretive guidance, _Application of the Definition of Money Services Business to Certain Owner-Operators of Automated Teller Machines Offering Limited Services,_ FIN-2007-G006, December 3, 2007, clarifying the circumstances under which a nonbank owner and operator of an ATM would be a money services business for the purposes of the Bank Secrecy Act and its implementing regulations.

**EXHIBIT 23**
**EXHIBIT A**

_Privately Owned Automated Teller Machines — Overview_

- Appropriate risk-based due diligence on the ISO, through a review of corporate documentation, licenses, permits, contracts, or references.

- Review of public databases to identify potential problems or concerns with the ISO or principal owners.

- Understanding the ISO's controls for currency servicing arrangements for privately owned ATMs, including source of replenishment currency.

- Documentation of the locations of privately owned ATMs and determination of the ISO's target geographic market.

- Expected account activity, including currency withdrawals.

Because of these risks, ISO due diligence beyond the minimum CIP requirements is important. Banks should also perform due diligence on ATM owners and sub-ISOs, as appropriate. This due diligence may include:

- Reviewing corporate documentation, licenses, permits, contracts, or references, including the ATM transaction provider contract.

- Reviewing public databases for information on the ATM owners.

- Obtaining the addresses of all ATM locations, ascertain the types of businesses in which the ATMs are located, and identify targeted demographics.

- Determining expected ATM activity levels, including currency withdrawals.

- Ascertaining the sources of currency for the ATMs by reviewing copies of armored car contracts, lending arrangements, or any other documentation, as appropriate.

- Obtaining information from the ISO regarding due diligence on its sub-ISO arrangements, such as the number and location of the ATMs, transaction volume, dollar volume, and source of replenishment currency.

**EXHIBIT 23**
**EXHIBIT A**

# Appendix F: Money Laundering and Terrorist Financing "Red Flags"

The following are examples of potentially suspicious activities, or "red flags" for both money laundering and terrorist financing. Although these lists are not all-inclusive, they may help banks and examiners recognize possible money laundering and terrorist financing schemes. Management's primary focus should be on reporting suspicious activities, rather than on determining whether the transactions are in fact linked to money laundering, terrorist financing, or a particular crime.

The following examples are red flags that, when encountered, may warrant additional scrutiny. The mere presence of a red flag is not by itself evidence of criminal activity. Closer scrutiny should help to determine whether the activity is suspicious or one for which there does not appear to be a reasonable business or legal purpose.

## Potentially Suspicious Activity That May Indicate Money Laundering

### Customers Who Provide Insufficient or Suspicious Information

- A customer uses unusual or suspicious identification documents that cannot be readily verified.

- A customer provides an individual tax identification number after having previously used a Social Security number.

- A customer uses different tax identification numbers with variations of his or her name.

- A business is reluctant, when establishing a new account, to provide complete information about the nature and purpose of its business, anticipated account activity, prior banking relationships, the names of its officers and directors, or information on its business location.

- A customer's home or business telephone is disconnected.

- The customer's background differs from that which would be expected on the basis of his or her business activities.

- A customer makes frequent or large transactions and has no record of past or present employment experience.

- A customer is a trust, shell company, or Private Investment Company that is reluctant to provide information on controlling parties and underlying beneficiaries. Beneficial owners may hire nominee incorporation services to establish shell companies and open bank accounts for those shell companies while shielding the owner's identity.

**EXHIBIT 23**
**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

## Efforts to Avoid Reporting or Recordkeeping Requirement

- A customer or group tries to persuade a bank employee not to file required reports or maintain required records.

- A customer is reluctant to provide information needed to file a mandatory report, to have the report filed, or to proceed with a transaction after being informed that the report must be filed.

- A customer is reluctant to furnish identification when purchasing negotiable instruments in recordable amounts.

- A business or customer asks to be exempted from reporting or recordkeeping requirements.

- A person customarily uses the automated teller machine to make several bank deposits below a specified threshold.

- A customer deposits funds into several accounts, usually in amounts of less than $3,000, which are subsequently consolidated into a master account and transferred outside of the country, particularly to or through a location of specific concern (e.g., countries designated by national authorities and Financial Action Task Force on Money Laundering (FATF) as noncooperative countries and territories).

- A customer accesses a safe deposit box after completing a transaction involving a large withdrawal of currency, or accesses a safe deposit box before making currency deposits structured at or just under $10,000, to evade CTR filing requirements.

## Funds Transfers

- Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts.

- Funds transfer activity occurs to or from a financial secrecy haven, or to or from a higher-risk geographic location without an apparent business reason or when the activity is inconsistent with the customer's business or history.

- Many small, incoming transfers of funds are received, or deposits are made using checks and money orders. Almost immediately, all or most of the transfers or deposits are wired to another city or country in a manner inconsistent with the customer's business or history.

- Large, incoming funds transfers are received on behalf of a foreign client, with little or no explicit reason.

- Funds transfer activity is unexplained, repetitive, or shows unusual patterns.

- Payments or receipts with no apparent links to legitimate contracts, goods, or services are received.

---



**EXHIBIT 23**

**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

- Funds transfers are sent or received from the same person to or from different accounts.

- Funds transfers contain limited content and lack related party information.

## Automated Clearing House Transactions

- Large-value, automated clearing house (ACH) transactions are frequently initiated through third-party service providers (TPSP) by originators that are not bank customers and for which the bank has no or insufficient due diligence.

- TPSPs have a history of violating ACH network rules or generating illegal transactions, or processing manipulated or fraudulent transactions on behalf of their customers.

- Multiple layers of TPSPs that appear to be unnecessarily involved in transactions.

- Unusually high level of transactions initiated over the Internet or by telephone.

- NACHA — The Electronic Payments Association (NACHA) information requests indicate potential concerns with the bank's usage of the ACH system.

## Activity Inconsistent with the Customer's Business

- The currency transaction patterns of a business show a sudden change inconsistent with normal activities.

- A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity.

- A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location.

- Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.

- The owner of both a retail business and a check-cashing service does not ask for currency when depositing checks, possibly indicating the availability of another source of currency.

- Goods or services purchased by the business do not match the customer's stated line of business.

- Payments for goods or services are made by checks, money orders, or bank drafts not drawn from the account of the entity that made the purchase.

**EXHIBIT 23**
**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

## Lending Activity

- Loans secured by pledged assets held by third parties unrelated to the borrower.

- Loan secured by deposits or other readily marketable assets, such as securities, particularly when owned by apparently unrelated third parties.

- Borrower defaults on a cash-secured loan or any loan that is secured by assets which are readily convertible into currency.

- Loans are made for, or are paid on behalf of, a third party with no reasonable explanation.

- To secure a loan, the customer purchases a certificate of deposit using an unknown source of funds, particularly when funds are provided via currency or multiple monetary instruments.

- Loans that lack a legitimate business purpose, provide the bank with significant fees for assuming little or no risk, or tend to obscure the movement of funds (e.g., loans made to a borrower and immediately sold to an entity related to the borrower).

## Changes in Bank-to-Bank Transactions

- The size and frequency of currency deposits increases rapidly with no corresponding increase in noncurrency deposits.

- A bank is unable to track the true accountholder of correspondent or concentration account transactions.

- The turnover in large-denomination bills is significant and appears uncharacteristic, given the bank's location.

- Changes in currency-shipment patterns between correspondent banks are significant.

## Cross-Border Financial Institution Transactions[268]

- U.S. bank increases sales or exchanges of large denomination U.S. bank notes to Mexican financial institution(s).

- Large volumes of small denomination U.S. banknotes being sent from Mexican casas de cambio to their U.S. accounts via armored transport or sold directly to U.S. banks. These sales or exchanges may involve jurisdictions outside of Mexico.

- Casas de cambio direct the remittance of funds via multiple funds transfers to jurisdictions outside of Mexico that bear no apparent business relationship with the

---

[268] FinCEN Advisory FIN-2006-A003, *Guidance to Financial Institutions on the Repatriation of Currency Smuggled into Mexico from the United States*, April 28, 2006.

**EXHIBIT 23**
**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

casas de cambio.  Funds transfer recipients may include individuals, businesses, and other entities in free trade zones.

- Casas de cambio deposit numerous third-party items, including sequentially numbered monetary instruments, to their accounts at U.S. banks.

- Casas de cambio direct the remittance of funds transfers from their accounts at Mexican financial institutions to accounts at U.S. banks.  These funds transfers follow the deposit of currency and third-party items by the casas de cambio into their Mexican financial institution.

## Bulk Currency Shipments

- An increase in the sale of large denomination U.S. bank notes to foreign financial institutions by U.S. banks.

- Large volumes of small denomination U.S. bank notes being sent from foreign nonbank financial institutions to their accounts in the United States via armored transport, or sold directly to U.S. banks.

- Multiple wire transfers initiated by foreign nonbank financial institutions that direct U.S. banks to remit funds to other jurisdictions that bear no apparent business relationship with that foreign nonbank financial institution.  Recipients may include individuals, businesses, and other entities in free trade zones and other locations.

- The exchange of small denomination U.S. bank notes for large denomination U.S. bank notes that may be sent to foreign countries.

- Deposits by foreign nonbank financial institutions to their accounts at U.S. banks that include third-party items, including sequentially numbered monetary instruments.

- Deposits of currency and third-party items by foreign nonbank financial institutions to their accounts at foreign financial institutions and thereafter direct wire transfers to the foreign nonbank financial institution's accounts at U.S. banks.

## Trade Finance

- Items shipped that are inconsistent with the nature of the customer's business (e.g., a steel company that starts dealing in paper products, or an information technology company that starts dealing in bulk pharmaceuticals).

- Customers conducting business in higher-risk jurisdictions.

- Customers shipping items through higher-risk jurisdictions, including transit through noncooperative countries.

- Customers involved in potentially higher-risk activities, including activities that may be subject to export/import restrictions (e.g., equipment for military or police organizations of foreign governments, weapons, ammunition, chemical mixtures,

**EXHIBIT 23**
**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

classified defense articles, sensitive technical data, nuclear materials, precious gems, or certain natural resources such as metals, ore, and crude oil).

- Obvious over- or under-pricing of goods and services.

- Obvious misrepresentation of quantity or type of goods imported or exported.

- Transaction structure appears unnecessarily complex and designed to obscure the true nature of the transaction.

- Customer requests payment of proceeds to an unrelated third party.

- Shipment locations or description of goods not consistent with letter of credit.

- Significantly amended letters of credit without reasonable justification or changes to the beneficiary or location of payment.  Any changes in the names of parties should prompt additional OFAC review.

## Privately Owned Automated Teller Machines

- Automated teller machine (ATM) activity levels are high in comparison with other privately owned or bank-owned ATMs in comparable geographic and demographic locations.

- Sources of currency for the ATM cannot be identified or confirmed through withdrawals from account, armored car contracts, lending arrangements, or other appropriate documentation.

## Insurance

- A customer purchases products with termination features without concern for the product's investment performance.

- A customer purchases insurance products using a single, large premium payment, particularly when payment is made through unusual methods such as currency or currency equivalents.

- A customer purchases a product that appears outside the customer's normal range of financial wealth or estate planning needs.

- A customer borrows against the cash surrender value of permanent life insurance policies, particularly when payments are made to apparently unrelated third parties.

- Policies are purchased that allow for the transfer of beneficial ownership interests without the knowledge and consent of the insurance issuer.  This would include secondhand endowment and bearer insurance policies.

- A customer is known to purchase several insurance products and uses the proceeds from an early policy surrender to purchase other financial assets.

**EXHIBIT 23**
**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

- A customer uses multiple currency equivalents (e.g., cashier's checks and money orders) from different banks and money services businesses to make insurance policy or annuity payments.

## Shell Company Activity

- A bank is unable to obtain sufficient information or information is unavailable to positively identify originators or beneficiaries of accounts or other banking activity (using Internet, commercial database searches, or direct inquiries to a respondent bank).

- Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number.

- Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity; a company references remarkably dissimilar goods and services in related funds transfers; explanation given by foreign respondent bank is inconsistent with observed funds transfer activity.

- Transacting businesses share the same address, provide only a registered agent's address, or have other address inconsistencies.

- Unusually large number and variety of beneficiaries are receiving funds transfers from one company.

- Frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers.

- A foreign correspondent bank exceeds the expected volume in its client profile for funds transfers, or an individual company exhibits a high volume and pattern of funds transfers that is inconsistent with its normal business activity.

- Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose.

- Purpose of the shell company is unknown or unclear.

## Embassy and Foreign Consulate Accounts

- Official embassy business is conducted through personal accounts.

- Account activity is not consistent with the purpose of the account, such as pouch activity or payable upon proper identification transactions.

- Accounts are funded through substantial currency transactions.

- Accounts directly fund personal expenses of foreign nationals without appropriate controls, including, but not limited to, expenses for college students.

**EXHIBIT 23**
**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 210 of 245   Page ID
#:657
Case 5:16-cv-00502-SJO-FFM   Document 14-23   Filed 04/15/16   Page 11 of 14   Page ID
#:345

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

## Employees

- Employee exhibits a lavish lifestyle that cannot be supported by his or her salary.

- Employee fails to conform to recognized policies, procedures, and processes, particularly in private banking.

- Employee is reluctant to take a vacation.

## Other Unusual or Suspicious Customer Activity

- Customer frequently exchanges small-dollar denominations for large-dollar denominations.

- Customer frequently deposits currency wrapped in currency straps or currency wrapped in rubber bands that is disorganized and does not balance when counted.

- Customer purchases a number of cashier's checks, money orders, or traveler's checks for large amounts under a specified threshold.

- Customer purchases a number of open-end prepaid cards for large amounts. Purchases of prepaid cards are not commensurate with normal business activities.

- Customer receives large and frequent deposits from online payments systems yet has no apparent online or auction business.

- Monetary instruments deposited by mail are numbered sequentially or have unusual symbols or stamps on them.

- Suspicious movements of funds occur from one bank to another, and then funds are moved back to the first bank.

- Deposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time.

- Currency is deposited or withdrawn in amounts just below identification or reporting thresholds.

- Customer visits a safe deposit box or uses a safe custody account on an unusually frequent basis.

- Safe deposit boxes or safe custody accounts opened by individuals who do not reside or work in the institution's service area, despite the availability of such services at an institution closer to them.

- Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose.

**EXHIBIT 23**
**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

- Customer exhibits unusual traffic patterns in the safe deposit box area or unusual use of safe custody accounts.  For example, several individuals arrive together, enter frequently, or carry bags or other containers that could conceal large amounts of currency, monetary instruments, or small valuable items.

- Customer rents multiple safe deposit boxes to store large amounts of currency, monetary instruments, or high-value assets awaiting conversion to currency, for placement into the banking system.  Similarly, a customer establishes multiple safe custody accounts to park large amounts of securities awaiting sale and conversion into currency, monetary instruments, outgoing funds transfers, or a combination thereof, for placement into the banking system.

- Unusual use of trust funds in business transactions or other financial activity.

- Customer uses a personal account for business purposes.

- Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank.

- Customer makes multiple and frequent currency deposits to various accounts that are purportedly unrelated.

- Customer conducts large deposits and withdrawals during a short time period after opening and then subsequently closes the account or the account becomes dormant.  Conversely, an account with little activity may suddenly experience large deposit and withdrawal activity.

- Customer makes high-value transactions not commensurate with the customer's known incomes.

## Potentially Suspicious Activity That May Indicate Terrorist Financing

The following examples of potentially suspicious activity that may indicate terrorist financing are primarily based on guidance "Guidance for Financial Institutions in Detecting Terrorist Financing" provided by the FATF.[269] FATF is an intergovernmental body whose purpose is the development and promotion of policies, both at national and international levels, to combat money laundering and terrorist financing.

---

[269] *Guidance for Financial Institutions in Detecting Terrorist Financing*, April 24, 2002, is available at www.fatf-gafi.org/.

**EXHIBIT 23**
**EXHIBIT A**

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

## Activity Inconsistent With the Customer's Business

- Funds are generated by a business owned by persons of the same origin or by a business that involves persons of the same origin from higher-risk countries (e.g., countries designated by national authorities and FATF as noncooperative countries and territories).

- The stated occupation of the customer is not commensurate with the type or level of activity.

- Persons involved in currency transactions share an address or phone number, particularly when the address is also a business location or does not seem to correspond to the stated occupation (e.g., student, unemployed, or self-employed).

- Regarding nonprofit or charitable organizations, financial transactions occur for which there appears to be no logical economic purpose or in which there appears to be no link between the stated activity of the organization and the other parties in the transaction.

- A safe deposit box opened on behalf of a commercial entity when the business activity of the customer is unknown or such activity does not appear to justify the use of a safe deposit box.

## Funds Transfers

- A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations.

- Funds transfers are ordered in small amounts in an apparent effort to avoid triggering identification or reporting requirements.

- Funds transfers do not include information on the originator, or the person on whose behalf the transaction is conducted, when the inclusion of such information would be expected.

- Multiple personal and business accounts or the accounts of nonprofit organizations or charities are used to collect and funnel funds to a small number of foreign beneficiaries.

- Foreign exchange transactions are performed on behalf of a customer by a third party, followed by funds transfers to locations having no apparent business connection with the customer or to higher-risk countries.

## Other Transactions That Appear Unusual or Suspicious

- Transactions involving foreign currency exchanges are followed within a short time by funds transfers to higher-risk locations.

**EXHIBIT 23**
**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 213 of 245   Page ID
#:660
Case 5:16-cv-00502-SJO-FFM   Document 14-23   Filed 04/15/16   Page 14 of 14   Page ID
#:348

Appendix F: Money Laundering and Terrorist Financing "Red Flags"

- Multiple accounts are used to collect and funnel funds to a small number of foreign beneficiaries, both persons and businesses, particularly in higher-risk locations.

- A customer obtains a credit instrument or engages in commercial financial transactions involving the movement of funds to or from higher-risk locations when there appear to be no logical business reasons for dealing with those locations.

- Banks from higher-risk locations open accounts.

- Funds are sent or received via international transfers from or to higher-risk locations.

- Insurance policy loans or policy surrender values that are subject to a substantial surrender charge.

FFIEC BSA/AML Examination Manual          F–11                                04/29/2010

**EXHIBIT 23**
**EXHIBIT A**

Case 2:14-cv-07249-SJO-FFM   Document 13-11   Filed 09/30/14   Page 4 of 30   Page ID #:559

**From:** Fitzwilliam, Brian
**Sent:** Wednesday, May 19, 2010 3:18 PM
**To:** Joel Gillis
**Subject:** RE: Nationwide Automated Systems-Annual Review

Thanks Joel!   If I am not mistaken, Cardtronics is one of the main processors that handles everything for you correct? I will forward your response along with Ed's financials and see if this will satisfy their file.

*Brian FitzWilliam*
*Senior Vice President*
*Branch Manager*
*City National Bank*
*Woodland Hills Office*

████████████@cnb.com

**From:** Joel Gillis [mailto:████@earthlink.net]
**Sent:** Wednesday, May 19, 2010 2:53 PM
**To:** Fitzwilliam, Brian
**Subject:** Re: Nationwide Automated Systems-Annual Review

To whom it may concern:

Nationwide Automated Systems, Inc. is in the business of installing ATM machines in various locations throughout the United States. Out locations are varied consisting of Hotels, Gas Stations, Convenience Stores, Clubs, and Shopping Malls.

We subcontract with Processing Companies who perform the following functions for our company:

1. Loading of cash. This calls for Armored Car Service. Various companies are used depending on the geographical area.
The cash is picked up at different banks and delivered to the ATMs
2. Service of the ATMs. This function is performed by factory certified service stations strategically placed throughout the United States.
3. Contracts with various networks such as Cirrus & Plus are handled by the Processing Companies.

In short, our company purchases ATMs from the manufacturers and all services are performed by our processors.

Sincerely,

Joel Gillis
President
Nationwide Automated Systems, Inc.

"Fitzwilliam, Brian" wrote:

Hi Joel,

1

Exhibit ___40___ Page ___207___

NASI 0010952

**EXHIBIT 24**
**EXHIBIT A**

It is that time of the year where I am being asked by our back office to update our records regarding some of our business clients. Due to the nature of your business they have listed some items that they would like to have for their records. Obviously I can get the company's updated financials from Ed.

Thank you,

Brian

Required Info/Documentation:
   -Documents establishing the ATM ownership, network servicing (such as with Plus, Cirrus, First Data, Lynk and FiServ) and contracts/agreements with Sponsoring Financial Institution.
   -Information pertaining to ATM servicing/maintenance and replenishment. Which vendor(s) is/are contracted to provide these services for our client's ATMs?
        ○Source of replenishment currency? If not CNB account, which bank?
        ○Average $ amount and frequency of ATM replenishments?
        ○Armored car services? If yes, who?
   -Number and locations of client's ATMs
        ○Primary business type(s) where ATMs are located—i.e. gas station, hotel, restaurant/bar, grocery store, convenience store, etc.
   -2009 Tax Return or audited Financial Statements
   -2010 projected revenue

Exhibit ___40___ Page ___208___

NASI 0010953

**EXHIBIT 24**
**EXHIBIT A**



Case 2:14-cv-07249-SJO-FFM   Document 13   Filed 09/30/14   Page 1 of 50   Page ID #:255

ORIGINAL

1  GARY Y. LEUNG, L.R. 83-2.4.1 leave to practice granted
   Email: leungg@sec.gov
2  PETER F. DEL GRECO (Cal. Bar No. 164925)
   Email: delgrecop@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Lorraine Echavarria, Associate Regional Director
   John W. Berry, Regional Trial Counsel
6  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
7  Telephone: (323) 965-3998
   Facsimile: (323) 965-3908
8

FILED
CLERK, U.S. DISTRICT COURT
SEP 30 2014
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
SEP 17 2014
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  Western Division

12                                    CV14  07249- SJO(FFMx)

13  SECURITIES AND EXCHANGE
    COMMISSION,
14                                    DECLARATION OF PETER F. DEL
         Plaintiff,                   GRECO IN SUPPORT OF
15                                    PLAINTIFF SECURITIES AND
         vs.                          EXCHANGE COMMISSION'S *EX
16                                    PARTE* APPLICATION FOR A
    NATIONWIDE AUTOMATED              TEMPORARY RESTRAINING
17  SYSTEMS, INC., JOEL GILLIS, and   ORDER AND ORDERS (1)
    EDWARD WISHNER,                   FREEZING ASSETS; (2)
18                                    PROHIBITING THE DESTRUCTION
         Defendants,                  OF DOCUMENTS; (3) GRANTING
19                                    EXPEDITED DISCOVERY; (4)
         and                          REQUIRING ACCOUNTINGS; AND
20                                    (5) APPOINTING A TEMPORARY
    OASIS STUDIO RENTALS, LLC,        RECEIVER, AND ORDER TO SHOW
21  OASIS STUDIO RENTALS #2, LLC,     CAUSE RE PRELIMINARY
    and OASIS STUDIO RENTALS #3,      INJUNCTION AND APPOINTMENT
22  LLC,                              OF A PERMANENT RECEIVER
23
         Relief Defendants.
24
25
26
27
28
                            1

EXHIBIT 25
EXHIBIT A

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 217 of 245   Page ID #:664
Case 5:16-cv-00502-SJO-FFM   Document 14-25   Filed 04/15/16   Page 2 of 27   Page ID #:352

Case 2:14-cv-07249-SJO-FFM   Document 13   Filed 09/30/14   Page 2 of 50   Page ID #:256

1    I, Peter F. Del Greco, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

2        1.    I am an attorney admitted to practice law by the State Bar of California

3    and by this Court. I am a Staff Attorney with Plaintiff Securities and Exchange

4    Commission ("Commission") in the Division of Enforcement. My office is located in

5    the Commission's Los Angeles Regional Office; my address is 5670 Wilshire

6    Boulevard, 11th Floor, Los Angeles, California 90036. I make this declaration in

7    support of the Commission's *Ex Parte* Application For A Temporary Restraining

8    Order and other relief. I have personal knowledge of each of the matters set forth

9    below and, if called as a witness, I could and would competently testify to the facts

10   stated herein.

11       2.    Since June 2014, I have been the Commission Staff Attorney with

12   primary responsibility for the investigation titled *In the Matter of Nationwide*

13   *Automated Systems, Inc.* (Commission Investigation File No. LA-4407).

14       3.    Attached hereto as Exhibit 1 are true and correct copies of documents

15   available on Westlaw which identify Nationwide Automated Systems, Inc. ("NASI")

16   as a California corporation formed in 1996, active in California but whose

17   registration in Nevada has been revoked, whose sole officers are Joel Gillis and

18   Edward Wishner.

19       4.    Attached hereto as Exhibit 2 is a true and correct copy of a subpoena I

20   issued to NASI on June 17, 2014 for various documents pertaining to their finances

21   and operations. In response thereto, NASI has produced thousands of pages of

22   documents in electronic form.

23       5.    Attached hereto as Exhibit 3 is a true and correct copy of a document

24   produced by NASI pursuant to subpoena, Bates-stamped NASI 010190-91, which

25   identifies Joel Gillis and Ed Wishner as its sole officers and directors since 1995.

26       6.    Attached hereto as Exhibit 5 is a true and correct copy of a document

27   produced by NASI pursuant to subpoena, Bates-stamped NASI 010713, identifying

28   its salespeople.

2

**EXHIBIT 25**
**EXHIBIT A**

7.     Attached hereto as Exhibit 6 is a true and correct copy of a document produced by NASI pursuant to subpoena, Bates-stamped NASI 010715, identifying the trust companies that permitted their clients to invest in NASI.

8.     Attached hereto as Exhibit 7 is a true and correct copy of a letter dated November 1, 2013 that PENSCO Trust Company, which is not identified in Exhibit 6, sent to NASI to notify it that PENSCO "will no longer allow PENSCO retirement account investors to purchase and lease ATM machines" through NASI.

9.     Attached hereto as Exhibit 8 is a true and correct copy of an Order to Cease and Desist dated November 2, 1988 in *In the Matter of Prudential Petroleum Co., Joel Gillis, Principal, Respondents*, File No. CD-88-49, available on Lexis, wherein the Missouri Securities Commission ordered Prudential Petroleum Co. and Gillis, its principal, to cease and desist their unregistered offer and sale of securities.

10.     Attached hereto as Exhibit 9 are true and correct copies of records maintained by FINRA, available on its Web-Central Registration Depository, which pertain to Joel Gillis's failure to disclose the existence of the Missouri Order to Cease and Desist when he applied for his Series 6 license.

11.     Attached hereto as Exhibit 10 is a true and correct copy of an Order Making Findings and Revoking Registration of Securities Pursuant to Section 12(j) of the Securities Exchange Act of 1934 as to ATM Holdings, Inc. issued by the Securities and Exchange Commission on March 2, 2007, whereby the Commission revoked "the registration of each class of [ATM Holdings, Inc.'s] securities" because ATM Holdings, a revoked Nevada corporation, "has not filed any periodic reports with the Commission since it filed a Form 10-SB registration statement on March 30, 1998."

12.     Attached hereto as Exhibit 11 is a true and correct copy of a document available on Westlaw which identifies Joel Gillis and Edward Wishau (sic) as the principals of ATM Holdings, Inc., the revoked Nevada corporation that is the subject of Exhibit 10.

3

**EXHIBIT 25**
**EXHIBIT A**

Case 2:14-cv-07249-SJO-FFM   Document 13   Filed 09/30/14   Page 4 of 50   Page ID #:258

1    13.    From June 25 through September 10, 2014, I issued a total of four

2    subpoenas for records pertaining to NASI's bank accounts at City National Bank.  To

3    date, City National Bank has produced thousands of pages of documents responsive

4    to three of the subpoenas that cannot be conveniently examined in court; records

5    responsive to the fourth subpoena have yet to be produced.  I made these voluminous

6    records available to Roger Boudreau, an accountant with the Commission, and they

7    are summarized in his declaration, which is filed concurrently herewith.  The

8    Commission will produce, in accordance with Fed. R. Evid. 1006, these voluminous

9    materials to the court upon request.

10    14.    Attached hereto as Exhibits 12A, B and C are true and correct copies of

11    the Declaration As To Business Records that City National Bank provided with each

12    of its three productions of records to date.

13    15.    Attached hereto as Exhibit 13 are true and correct copies of account

14    opening documents produced by City National Bank indicating that Joel Gillis and

15    Edward Wishner are the sole signatories on NASI's accounts at City National Bank.

16    16.    On September 8, 2014 I issued a subpoena for records pertaining to

17    NASI's newly-opened bank account at Grandpoint Bank.  In response, Grandpoint

18    Bank produced responsive documents which I made available to Roger Boudreau and

19    they are summarized in his declaration, which is filed concurrently herewith.  The

20    Commission will produce, in accordance with Fed. R. Evid. 1006, these voluminous

21    materials to the court upon request.

22    17.    Attached hereto as Exhibit 14 is a true and correct copy of a Declaration

23    Concerning Financial Institution Records that Grandpoint Bank provided with its

24    production of records responsive to my subpoena.

25    18.    Attached hereto as Exhibit 15 are true and correct copies of account

26    opening documents produced by Grandpoint Bank indicating that Joel Gillis and

27    Edward Wishner are the sole signatories on NASI's account at Grandpoint Bank.

28    19.    Attached hereto as Exhibit 16 are true and correct copies of NASI's

4

**EXHIBIT 25**
**EXHIBIT A**

1  Articles of Incorporation, dated November 25, 1996, and the California Secretary of

2  State's certification thereof, dated November 26, 1996, which were included in the

3  account opening documents produced by Grandpoint Bank.

4      20.    Attached hereto as Exhibit 17 is a true and correct copy of the

5  Independent Sales Organization Agreement dated January 6, 2010 between NASI and

6  National Link, Inc. ("National Link"), which Gillis signed on behalf of NASI and

7  which NASI produced pursuant to subpoena and Bates-stamped NASI 10869-76.

8      21.    Attached hereto as Exhibit 18 is a true and correct copy of the ATM

9  Management Agreement dated May 31, 2011 between NASI and Cardtronics USA,

10  Inc. ("Cardtronics"), which Wishner signed on behalf of NASI and which NASI

11  produced pursuant to subpoena and Bates-stamped NASI 10877-10894.

12      22.    Attached hereto as Exhibit 19 is a true and correct copy of a subpoena I

13  sent to National Link on June 23, 2014 for various documents, including its

14  contractual agreements to provide services related to the processing of ATM

15  transactions with NASI and others (categories 1 and 2) and documents evidencing the

16  number and dollar value of those ATM transactions (categories 3 and 4).

17      23.    National Link produced several documents responsive to categories 1

18  and 2 of my subpoena in hard copy form, including a copy of the same Independent

19  Sales Organization Agreement that was produced by NASI.  In addition, National

20  Link produced a USB Drive that contained documents responsive to categories 3 and

21  4 of my subpoena.  The documents produced on the USB Drive consist of (a)

22  Monthly Reports for each month from January 2010 through May 2014 for every

23  ATM serviced by National Link and (b) Monthly Accounting Statements for NASI

24  only for each month from January 2010 through June 2014.  The Monthly Reports

25  and Monthly Accounting Statements are voluminous and have been summarized in

26  papers filed herein.  The Commission will produce, in accordance with Fed. R. Evid.

27  1006, these voluminous materials to the court upon request.

28      24.    Attached hereto as Exhibit 20 is a true and correct copy of the Monthly

5

**EXHIBIT 25**
**EXHIBIT A**

Case 2:14-cv-07249-SJO-FFM   Document 13   Filed 09/30/14   Page 6 of 50   Page ID #:260

1    Accounting Statement that National Link produced for the month of June 2014 only.

2    It identifies a total of 86 ATMs that National Link serviced for NASI that month.

3          25.    Attached hereto as Exhibit 21 is a true and correct copy of a letter that

4    National Link produced which explains the meaning of the various acronyms and

5    abbreviations on National Link's Monthly Accounting Statements.  It explains that

6    "Total Resid" refers to the "Total Amount earned by customer after all fees are

7    collected.  Net Amount." and that "Resid Bal" refers to "Amount to be paid by

8    Nationallink to customer, this is also the Net Amount."

9          26.    According to the Monthly Accounting Statement attached hereto as

10   Exhibit 20, National Link paid NASI $66,635.88 for the month of June 2014.  NASI

11   did not deposit the National Link check until July 2014, so it was not included in City

12   National Bank's production of underlying documentation for the period from January

13   2013 through June 2014.

14         27.    Attached hereto as Exhibit 22 is a true and correct copy of a document I

15   created in Excel which summarizes the voluminous materials contained in the

16   Monthly Accounting Statements that National Link produced in electronic form for

17   the period from January 2010 through June 2014; these materials cannot be

18   conveniently examined in court.  The Commission will produce, in accordance with

19   Fed. R. Evid. 1006, these voluminous materials to the court upon request.  Exhibit 22

20   indicates that during that time period, which spans 54 months, National Link paid to

21   NASI a total of $3,252,414.

22         28.    Attached hereto as Exhibit 23 are true and correct copies of checks

23   issued by National Link and deposited by NASI over a span of 18 consecutive

24   months from January 2013 through June 2014 which were produced by City National

25   Bank pursuant to subpoena.  This time span is the only period for which City

26   National Bank has produced underlying documentation to date.  Each check matches

27   the entry recorded in both National Link's Monthly Accounting Statements and my

28   summary thereof (Exhibit 22), other than the entry recorded for June 2014, for which

6

**EXHIBIT 25**
**EXHIBIT A**

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 222 of 245   Page ID #:669
Case 5:16-cv-00502-SJO-FFM   Document 14-25   Filed 04/15/16   Page 7 of 27   Page ID #:357

Case 2:14-cv-07249-SJO-FFM   Document 13   Filed 09/30/14   Page 7 of 50   Page ID #:261

1    no check has yet been produced.

2         29.    Attached hereto as Exhibit 24 is a true and correct copy of a subpoena I

3    sent to Cardtronics on July 28, 2014 for various documents, including its contractual

4    agreements to provide services related to the processing of ATM transactions with

5    NASI (category 1) and documents sufficient to identify all ATMs serviced by

6    Cardtronics on behalf of NASI and documents evidencing the volume of transaction

7    activity in those ATMs (categories 2 and 3).

8         30.    Cardtronics produced several documents responsive to category 1 of my

9    subpoena in hard copy form, including a copy of the same ATM Management

10   Agreement that was produced by NASI.  In addition, Cardtronics produced a disk that

11   contained documents responsive to categories 2 and 3 of my subpoena.  The

12   documents produced on the disk consist of Monthly Fee Settlement Reports for each

13   month from December 2009 through June 2014 for every ATM serviced by

14   Cardtronics on behalf of NASI.  The Monthly Fee Settlement Reports are voluminous

15   and have been summarized in papers filed herein.  The Commission will produce, in

16   accordance with Fed. R. Evid. 1006, these voluminous materials to the court upon

17   request.

18        31.    Attached hereto as Exhibit 25 is a true and correct copy of the Monthly

19   Fee Settlement Report that Cardtronics produced for the month of June 2014 only.  It

20   identifies a total of 149 ATMs that Cardtronics serviced for NASI that month.

21        32.    According to the Monthly Fee Settlement Report attached hereto as

22   Exhibit 25, Cardtronics paid NASI $48,523.96 for the month of June 2014.  NASI did

23   not deposit the Cardtronics check until July 2014, so it was not included in City

24   National Bank's production of underlying documentation for the period from January

25   2013 through June 2014.

26        33.    Attached hereto as Exhibit 26 is a true and correct copy of a document I

27   created in Excel which summarizes the voluminous materials contained in the

28   Monthly Fee Settlement Reports that Cardtronics produced in electronic form for the

7

**EXHIBIT 25**
**EXHIBIT A**

1  period from December 2009 through June 2014; these materials cannot be

2  conveniently examined in court.  The Commission will produce, in accordance with

3  Fed. R. Evid. 1006, these voluminous materials to the court upon request.  Exhibit 26

4  indicates that during that time period, which spans 55 months, Cardtronics paid to

5  NASI a total of $3,563,845.65.

6      34.  Attached hereto as Exhibit 27 are true and correct copies of checks

7  issued by Cardtronics and deposited by NASI over a span of 18 consecutive months

8  from January 2013 through June 2014 which were produced by City National Bank

9  pursuant to subpoena.  This time span is the only period for which City National

10  Bank has produced underlying documentation to date.  Each check matches the entry

11  recorded in both Cardtronics' Monthly Fee Settlement Reports and my summary

12  thereof (Exhibit 26), other than the entry for June 2014, for which no check has yet

13  been produced.

14      35.  Attached hereto as Exhibit 28 is a true and correct copy of an attestation,

15  by a person authorized to execute it, stating that a diligent search of the

16  Commission's records and files "do not disclose that any registration statements have

17  been received in this Commission under the name of Nationwide Automated

18  Systems, Inc., pursuant to the provisions of any of the Acts administered by the

19  Commission."

20      36.  Attached hereto as Exhibit 29 is a true and correct copy of a January 17,

21  2014 posting to an online forum devoted to NASI at www.quatloos.com by a poster

22  known as "MarvinGardens."  MarvinGardens claims to have a client who has been a

23  NASI investor for 17 years who recently received a letter from NASI which

24  MarvinGardens has posted on the forum.  The letter states "One can also hold ATMs

25  in an IRA account", mentions the tax depreciation advantages of ATM ownership,

26  and directs the recipient to contact Gillis for additional information.

27      37.  Attached hereto as Exhibit 30 is a true and correct copy of a press

28  release dated January 30, 2013 that was publicly disseminated by Marketwire, titled

**EXHIBIT 25**
**EXHIBIT A**

1   "Nationwide Automated Systems Rated #1 Provider of ATM Systems", which states

2   that NASI "boasts over 80 branches and 1,000 certified technicians on standby",

3   claims that NASI services "more than $1 billion transactions in a month's time", and

4   provides Joel Gillis's contact information.

5        38.   Attached hereto as Exhibit 31 is a true and correct copy of the first two

6   pages of an Excel spreadsheet that NASI produced in electronic form, pursuant to

7   subpoena, which lists 31,417 entries for the ATMs that were the subject of NASI

8   buy-and-leaseback agreements as of June 2014.  The entire document is 669 pages;

9   these materials cannot be conveniently examined in court.  The Commission will

10  produce, in accordance with Fed. R. Evid. 1006, these voluminous materials to the

11  court upon request.

12       39.   Attached hereto as Exhibit 32 is a true and correct copy of an Excel

13  spreadsheet that the Commission created from Exhibit 31 by sorting the 31,417

14  ATMs identified in Exhibit 31 for only those located at a Casey's Convenience Mart.

15  It identifies 673 entries for ATMs located at Casey's Convenience Stores throughout

16  the Midwest that are reflected in Exhibit 31, the spreadsheet produced by NASI

17  which purports to list its ATM holdings as of June 2014.

18       40.   Attached hereto as Exhibit 33 is a true and correct copy of the first two

19  pages of an Excel spreadsheet that NASI produced in electronic form, pursuant to

20  subpoena, which identifies the number of transactions that occurred in each of the

21  31,417 ATMs that were the subject of NASI buy-and-leaseback agreements in June

22  2014.  The entire document is 669 pages; these materials cannot be conveniently

23  examined in court.  The Commission will produce, in accordance with Fed. R. Evid.

24  1006, these voluminous materials to the court upon request.

25       41.   The Excel spreadsheet whose first two pages are attached hereto as

26  Exhibit 33 identifies an aggregate total of 17,950,346 transactions in NASI's ATMs

27  during the month of June 2014.  Assuming $0.50 per transaction, this would entitle

28  NASI investors to $8,975,173 in returns on investment for the month of June alone

**EXHIBIT 25**
**EXHIBIT A**

Case 2:14-cv-07249-SJO-FFM   Document 13   Filed 09/30/14   Page 10 of 50   Page ID #:264

1   per the terms of the Purchase and Lease Agreements.  NASI's figures are not

2   consistent with Cardtronics' Monthly Fee Settlement Reports and National Link's

3   Monthly Accounting Statements.  Cardtronics lists 149 ATMs in its Report and total

4   transaction revenue due NASI in the amount of $48,523.96 for June 2014.  (*Id.*, ¶¶

5   32-33 and Exhibit 25 thereto.)  National Link lists 86 ATMs in its Statement and total

6   transaction revenue due NASI in the amount of $66,635.88 for June 2014.  (Id., ¶¶

7   25-27, Exhibit 20 thereto.)  In sum:

| | Cardtronics/National Link settlement reports | NASI internal records |
|---|---|---|
| # of ATMs | 235 | 31,417 entries |
| Transaction Revenue | $115,159.84 (June transaction revenue paid to NASI by Cardtronics/National Link) | $8,975,173.00[1] (June investor payments owed by NASI) |

14   42.   Attached hereto as Exhibit 34 is a true and correct copy of a letter dated

15   September 11, 2013 that NASI produced pursuant to subpoena and Bates-stamped

16   NASI 0010978-79, which states "we have successfully acquired 500 more

17   Convenience Store Locations . . . The investors that have already purchased these

18   types of locations are getting between 20%-30% annually . .  These high yield ATM's

19   (sic) will not last long so place your orders now as installations start immediately."

20   43.   Attached hereto as Exhibit 35 is a true and correct copy of a document

21   dated May 11, 2014 that NASI produced pursuant to subpoena and Bates-stamped

22   NASI 0010993-95, titled "Important Announcements -- 550 Locations Available!",

23   and which provides information about how to purchase an ATM with one's self-

24   directed IRA.

25   44.   Attached hereto as Exhibit 36 is a true and correct copy of a Declaration

26

27   [1] Payments owed to investors on the 17,950,346 transactions documented in NASI's records, assuming investors were owed $.50 per transaction in accordance with their

28   agreements.

10

**EXHIBIT 25**
**EXHIBIT A**

1  as to Business Records produced by City National Bank which identifies the holders

2  of six accounts at City National Bank that received intra-account transfers from the

3  NASI accounts at City National Bank, including Oasis Studio Rentals, LLC, Edward

4  Wishner Company, and an account in the name of both Gillis and Wishner.

5      45.    Attached hereto as Exhibit 37 are true and correct copies of documents

6  available on Westlaw which identify Oasis Studio Rentals, LLC, Oasis Studio

7  Rentals #2, LLC, and Oasis Studio Rentals #3, LLC as California limited liability

8  companies and identify Edward Wishner as the registered agent for each and as one

9  of the principals of Oasis Studio Rentals #3, LLC.

10      46.    NASI produced a disk containing investor files in response to my

11  subpoena's request nos. 6 (all ATM equipment purchase agreements) and 8 (all ATM

12  equipment lease agreements).  Attached hereto as Exhibits 38A, B, C and D are true

13  and correct copies of the Purchase Agreement and Exhibit A thereto, Lease

14  Agreement, Addendum to Lease Agreement, and receipt of payment of the purchase

15  amount by wire transmission, respectively, for investor 21st Century Holdings, LLC,

16  produced by NASI on this disk.  Attached hereto as Exhibits 39A, B, C and D are true

17  and correct copies of the Purchase Agreement and Exhibit A thereto, Lease

18  Agreement, Addendum to Lease Agreement, and check for payment of the purchase

19  amount, respectively, for investor Al Checco, produced by NASI on this disk.  The

20  disk contains 13,993 pages; these materials cannot be conveniently examined in

21  court.  The Commission will produce, in accordance with Fed. R. Evid. 1006, these

22  voluminous materials to the court upon request.

23      47.    Attached hereto as Exhibit 40 is a true and correct copy of an email

24  dated May 19, 2010 that NASI produced pursuant to subpoena and Bates-stamped

25  NASI 0010952-53, wherein Gillis describes NASI's business and states:  "In short,

26  our company purchases ATMs from the manufacturers and all services are performed

27  by our processors."

28      48.    Attached hereto as Exhibit 41 are true and correct copies of a series of

11

**EXHIBIT 25**
**EXHIBIT A**

1    emails dated May 12, 2014 to May 15, 2014 that NASI produced pursuant to

2    subpoena and Bates-stamped NASI 0010996-0011002, wherein Gillis asserts that

3    NASI has several hundred ATMs for sale, but warns one investor: "They will go

4    fast."

5        49.    Attached hereto as Exhibits 42A, B and C are true and correct copies of

6    NASI's federal tax returns for the years 2010, 2011 and 2012, respectively, which

7    NASI produced pursuant to subpoena and Bates-stamped NASI 010602-010642.

8    Each of them was prepared by Edward Wishner.

9        50.    Attached hereto as Exhibits 43A and B are true and correct copies of

10   NASI Balance Sheets dated April 2013 and January 2014, respectively, which NASI

11   produced pursuant to subpoena and Bates-stamped NASI 64 and 66.  The April 2013

12   Balance Sheet lists a "Loan Receivable – Oasis" in the amount of $1,477,192; that

13   receivable had been reduced to $75,000 according to the January 2014 Balance Sheet.

14       51.    Attached hereto as Exhibit 44 are true and correct copies of two checks

15   totaling $23,250 made payable to NASI which were drawn on the account of Oasis

16   Studio Rentals, LLC at City National Bank in May 2013 and October 2013.  Based

17   on my review of the bank statements produced by City National Bank in response to

18   my subpoena, these are the only checks issued by Oasis Studio Rentals that were

19   deposited to NASI's accounts at City National Bank during the April 2013-January

20   2014 time period during which the Loan Receivable referenced in Exhibits 43A and

21   43B was reduced by $1,402,192.

22       52.    Attached hereto as Exhibit 45 is a true and correct copy of a letter dated

23   September 10, 2014 that numerous NASI investors claim to have received from

24   NASI and forwarded to the Commission for comment.

25   ///

26   ///

27   ///

28   ///

12

**EXHIBIT 25**
**EXHIBIT A**

Case 2:14-cv-07249-SJO-FFM   Document 13   Filed 09/30/14   Page 13 of 50   Page ID #:267

1       53.     Attached hereto as Exhibit 46 is a true and correct copy of a letter I

2 received from attorney Sheldon M. Jaffe on September 15, 2014 wherein he informed

3 me that his clients, Gillis and Wishner, would assert their Fifth Amendment privilege

4 not to testify at their investigative testimonies scheduled for September 17 and 19,

5 respectively.

6       I declare under penalty of perjury under the laws of the United States of

7 America that the foregoing is true and correct.  Executed on September 16, 2014.

8

9

10               PETER F. DEL GRECO

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

**EXHIBIT 25**
**EXHIBIT A**

# EXHIBIT 20

# OF EXHIBIT 25

**EXHIBIT 25**
**EXHIBIT A**



EXHIBIT 25
EXHIBIT A

Exhibit __20__ Page __98__

EXHIBIT 25
EXHIBIT A

# EXHIBIT 22

# OF EXHIBIT 25

EXHIBIT 25
EXHIBIT A

Case 2:14-cv-07249-SJO-FFM   Document 13-4   Filed 09/30/14   Page 23 of 25   Page ID #:403

Exhibit ___22___ Page __101__

**EXHIBIT 25**
**EXHIBIT A**



Exhibit ___22___ Page ___101___

**EXHIBIT 25**
**EXHIBIT A**

# EXHIBIT 25

# OF EXHIBIT 25

**EXHIBIT 25**
**EXHIBIT A**

Monthly Fee Settlement Report

Nationwide Automated Report

CardSonics

June 2014

Exhibit 25 Page 128

**EXHIBIT 25**
**EXHIBIT A**

Case 2:14-cv-07249-SJO-FFM   Document 13-6   Filed 09/30/14   Page 8 of 25   Page ID #:438

Exhibit _____25_____ Page _____129_____

**EXHIBIT 25**
**EXHIBIT A**



Exhibit ___25___ Page ___130___

**EXHIBIT 25**
**EXHIBIT A**

# EXHIBIT 26
# OF EXHIBIT 25

**EXHIBIT 25**
**EXHIBIT A**

CARDTRONICS SETTLEMENT REPORTS
12/09 - 6/14

| MONTH | AMOUNT DUE NASI |
|---|---|
| January-09 | $0.00 |
| February-09 | $0.00 |
| March-09 | $0.00 |
| April-09 | $0.00 |
| May-09 | $0.00 |
| June-09 | $0.00 |
| July-09 | $0.00 |
| August-09 | $0.00 |
| September-09 | $0.00 |
| October-09 | $0.00 |
| November-09 | $0.00 |
| December-09 | $52,771.80 |
| 2009 TOTALS: | $52,771.80 |
| January-10 | $69,479.95 |
| February-10 | $71,908.50 |
| March-10 | $91,621.10 |
| April-10 | $90,237.00 |
| May-10 | $96,847.80 |
| June-10 | $97,698.70 |
| July-10 | $106,054.55 |
| August-10 | $98,577.80 |
| September-10 | $88,982.80 |
| October-10 | $100,842.25 |
| November-10 | $74,837.20 |
| December-10 | $61,430.35 |
| 2010 TOTALS: | $1,048,518.00 |
| January-11 | $67,380.80 |

Exhibit 26 Page 131

**EXHIBIT 25**
**EXHIBIT A**

CARDTRONICS SETTLEMENT REPORTS
12/09 - 6/14

| | |
|---|---|
| February-11 | $69,406.05 |
| March-11 | $82,920.75 |
| April-11 | $87,200.70 |
| May-11 | $89,079.81 |
| June-11 | $73,589.85 |
| July-11 | $84,818.58 |
| August-11 | $71,862.91 |
| September-11 | $67,988.14 |
| October-11 | $74,551.21 |
| November-11 | $59,963.88 |
| December-11 | $50,182.83 |
| **2011 TOTALS:** | **$878,945.51** |
| January-12 | $54,678.00 |
| February-12 | $59,063.02 |
| March-12 | $72,561.93 |
| April-12 | $65,853.54 |
| May-12 | $60,174.18 |
| June-12 | $71,677.86 |
| July-12 | $73,239.49 |
| August-12 | $70,436.52 |
| September-12 | $69,987.45 |
| October-12 | $60,881.03 |
| November-12 | $56,463.95 |
| December-12 | $37,435.15 |
| **2012 TOTALS:** | **$749,452.12** |
| January-13 | $33,590.36 |

Exhibit 26 Page 132

EXHIBIT 25
EXHIBIT A

Case 5:16-cv-00502-SJO-FFM   Document 33-2   Filed 07/06/16   Page 242 of 245   Page ID #:689
Case 5:16-cv-00502-SJO-FFM   Document 14-25   Filed 04/15/16   Page 27 of 27   Page ID #:377
Case 2:14-cv-07249-SJO-FFM   Document 13-6   Filed 09/30/14   Page 14 of 25   Page ID #:444

CARDTRONICS SETTLEMENT REPORTS
12/09 - 6/14

| | |
|---|---|
| February-13 | $35,124.80 |
| March-13 | $54,333.07 |
| April-13 | $51,016.92 |
| May-13 | $47,889.35 |
| June-13 | $57,061.24 |
| July-13 | $55,303.09 |
| August-13 | $55,607.57 |
| September-13 | $50,282.61 |
| October-13 | $45,610.17 |
| November-13 | $40,924.77 |
| December-13 | $37,244.08 |
| **2013 TOTALS:** | **$563,988.03** |
| January-14 | $37,428.91 |
| February-14 | $33,500.07 |
| March-14 | $52,437.27 |
| April-14 | $46,006.91 |
| May-14 | $52,273.07 |
| June-14 | $48,523.96 |
| **2014 TOTALS:** | **$270,170.19** |

Exhibit ___26___  Page ___133___

**EXHIBIT 25**
**EXHIBIT A**



**CITY NATIONAL BANK**
The way up.

This statement: July 31, 2014
Last statement: June 30, 2014

022                                              0830G
NATIONWIDE AUTOMATED SYSTEMS, INC.
(GENERAL ACCOUNT)
5000 N PARKWAY CALABASAS SUITE 303
CALABASAS CA 91302

Page 1          (97)

Account #: 22414410

Contact us:
213 673-7700

Woodland Hills Office
21800 Oxnard Street
Woodland Hills CA 91367

cnb.com

AVOIDING INFORMATION OVERLOAD JUST GOT EASIER - ELIMINATE BULKY PAPER STATEMENTS AND PAPER COPIES OF
CHECK IMAGES.  WITH CITY IMAGE ITEMS AND STATEMENTS, YOU'LL RECEIVE A SINGLE CD EACH STATEMENT CYCLE
WITH YOUR CHECKING ACCOUNT STATEMENTS AND PAID CHECK IMAGES.

## Analyzed Business Checking

| Account Summary | | Account Activity | | |
|---|---|---|---|---|
| Account number | 22414410 | Beginning balance (6/30/2014) | | $4,021,104.17 |
| Minimum balance | $0.00 | | | |
| Average balance | $1,140,290.67 | Credits  Deposits        (27) | + 9,018,860.71 | |
| Avg. collected balance | $586,970.00 | Electronic cr  (2) | + 129,000.00 | |
| | | Other credits (2) | + 12,461.50 | |
| | | Total credits | | + $9,160,322.21 |
| | | | | |
| | | Debits  Checks paid  (97) | - 1,368,850.72 | |
| | | Electronic db (6) | - 98,632.14 | |
| | | Other debits  (41) | - 8,826,488.08 | |
| | | Total debits | | - $10,293,970.94 |
| | | | | |
| | | Ending balance  (7/31/2014) | | $2,887,455.44 |

## DEPOSITS

| Date | Description | Reference | Credits |
|---|---|---|---|
| 7-1 | Deposit | | 53,500.00 |
| 7-1 | Deposit | | 1,407,600.00 |
| 7-3 | Deposit | | 2,500.00 |
| 7-3 | Deposit | | 618,200.00 |
| 7-7 | Deposit | | 67.70 |
| 7-7 | Deposit | | 1,164,000.00 |
| 7-9 | Deposit | | 236,280.19 |
| 7-9 | Deposit | | 406,318.64 |
| 7-10 | Deposit | | 40,000.00 |
| 7-10 | Deposit | | 216,000.00 |
| 7-11 | Deposit | | 2,034.34 |
| 7-11 | Deposit | | 180,000.00 |
| 7-14 | Deposit | | 66,635.88 |
| 7-14 | Deposit | | 151,800.00 |
| 7-15 | Deposit | | 75,600.00 |
| 7-16 | Deposit | | 12,000.00 |
| 7-16 | Deposit | | 75,600.00 |
| 7-16 | Deposit | | 219,800.00 |
| 7-17 | Deposit | | 96,000.00 |

*Deposits post SEC subpoena on CNB* (handwritten annotation)

**EXHIBIT 26**
**EXHIBIT A**

NATIONWIDE AUTOMATED SYSTEMS, INC.
July 31, 2014

Page 2
Account #: 22414410

## DEPOSITS (Continued)

| Date | Description | Reference | Credits |
|------|-------------|-----------|---------|
| 7-17 | Deposit | | 125,000.00 |
| 7-18 | Deposit | | 168,000.00 |
| 7-22 | Deposit | | 156,000.00 |
| 7-23 | Deposit | *Deposits post SEC subpoena on CNB* | 48,523.96 |
| 7-23 | Deposit | | 231,000.00 |
| 7-25 | Deposit | | 1,075,800.00 |
| 7-29 | Deposit | | 780,600.00 |
| 7-30 | Deposit | | 1,410,000.00 |

## ELECTRONIC CREDITS

| Date | Description | Credits |
|------|-------------|---------|
| 7-1 | Incoming Wire-Dom | 99,000.00 |
| 7-23 | Incoming Wire-Dom | 30,000.00 |

## OTHER CREDITS

| Date | Description | Reference | Credits |
|------|-------------|-----------|---------|
| 7-3 | Automatic TRANSFER FROM DEPOSIT SYSTEM ACCOUNT 00022414399 | | 3,461.50 |
| 7-22 | Deposit Adj-Credit | | 9,000.00 |

## CHECKS PAID

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 13139 | 7-10 | 563.50 | 13307 * | 7-2 | 12,500.00 | 13341 | 7-16 | 62.5. |
| 13228 * | 7-11 | 19,800.00 | 13308 | 7-3 | 35,155.00 | 13342 * | 7-15 | 70.72 |
| 13231 * | 7-2 | 240,000.00 | 13309 | 7-8 | 10,000.00 | 13343 | 7-14 | 1,353.55 |
| 13256 * | 7-1 | 25,000.00 | 13310 | 7-7 | 7,000.00 | 13344 | 7-14 | 645.01 |
| 13266 * | 7-7 | 9,688.50 | 13311 | 7-7 | 2,000.00 | 13345 | 7-14 | 500.00 |
| 13268 * | 7-1 | 1,000.00 | 13312 | 7-15 | 2,000.00 | 13346 | 7-11 | 700.00 |
| 13269 | 7-1 | 1,800.00 | 13313 | 7-7 | 54,000.00 | 13347 | 7-18 | 11,000.00 |
| 13270 | 7-1 | 60.00 | 13314 | 7-8 | 11,000.00 | 13348 | 7-16 | 224.61 |
| 13275 * | 7-3 | 39.99 | 13317 * | 7-7 | 120,000.00 | 13349 | 7-15 | 4,314.27 |
| 13278 * | 7-2 | 150.00 | 13318 | 7-9 | 12,000.00 | 13350 | 7-15 | 1,800.00 |
| 13280 * | 7-2 | 469.25 | 13319 | 7-11 | 19,800.00 | 13353 * | 7-24 | 691.50 |
| 13284 * | 7-1 | 24.95 | 13321 * | 7-8 | 24,000.00 | 13355 * | 7-21 | 118.48 |
| 13286 * | 7-2 | 179.98 | 13322 | 7-9 | 12,000.00 | 13356 | 7-25 | 700.00 |
| 13287 | 7-1 | 368.56 | 13324 * | 7-9 | 19,800.00 | 13357 | 7-21 | 1,800.00 |
| 13288 | 7-7 | 2,549.02 | 13325 | 7-11 | 700.00 | 13359 * | 7-22 | 560.00 |
| 13289 | 7-2 | 62.59 | 13326 | 7-14 | 500.00 | 13361 * | 7-21 | 1,300.00 |
| 13290 | 7-2 | 65.00 | 13327 | 7-14 | 1,500.00 | 13362 | 7-21 | 100,000.00 |
| 13291 | 7-2 | 45.84 | 13328 | 7-11 | 51.65 | 13363 | 7-28 | 783.22 |
| 13292 | 7-1 | 216.81 | 13329 | 7-14 | 19,800.00 | 13365 * | 7-25 | 1,575.00 |
| 13295 * | 7-7 | 113.33 | 13330 | 7-9 | 25,000.00 | 13371 * | 7-24 | 80,000.00 |
| 13296 | 7-14 | 1,800.00 | 13333 * | 7-15 | 4,000.00 | 13372 | 7-29 | 59.58 |
| 13297 | 7-7 | 5,000.00 | 13334 | 7-18 | 500.00 | 13373 | 7-29 | 51.49 |
| 13299 * | 7-1 | 2,820.00 | 13335 | 7-21 | 365.00 | 13374 | 7-28 | 233.45 |
| 13300 | 7-1 | 6,500.00 | 13337 * | 7-15 | 1,793.60 | 13375 | 7-28 | 38.58 |
| 13301 | 7-1 | 4,336.45 | 13338 | 7-21 | 34.83 | 13376 | 7-29 | 351.93 |
| 13302 | 7-3 | 2,612.25 | 13339 | 7-14 | 53.30 | 13377 | 7-28 | 12,500.00 |
| 13303 | 7-3 | 282.48 | 13340 | 7-14 | 1,260.80 | 13378 | 7-28 | 598.2' |

**EXHIBIT 26**
**EXHIBIT A**



**CITY NATIONAL BANK**
The way up.®

Page 1          (50)

Account #: 22414410

This statement: August 29, 2014
Last statement: July 31, 2014

Contact us:
213 673-7700

Woodland Hills Office
21800 Oxnard Street
Woodland Hills CA 91367

022                              0830L
NATIONWIDE AUTOMATED SYSTEMS, INC.
(GENERAL ACCOUNT)
5000 N PARKWAY CALABASAS SUITE 303
CALABASAS CA 91302

cnb.com

GO GREEN, GO CONVENIENT, GO PAPERLESS. YOU CAN NOW SUPPRESS YOUR PAPER STATEMENTS FOR ALL BUSINESS
CHECKING, BUSINESS SAVINGS, AND BUSINESS MONEY MARKET ACCOUNTS AND RECEIVE YOUR STATEMENTS
ELECTRONICALLY.

## Analyzed Business Checking

### Account Summary

| | |
|---|---|
| Account number | 22414410 |
| Minimum balance | $194,584.71 |
| Average balance | $1,447,870.27 |
| Avg. collected balance | $1,156,670.00 |

### Account Activity

| | | | |
|---|---|---|---|
| Beginning balance (7/31/2014) | | | $2,887,455.44 |
| **Credits** Deposits (10) | | + 3,575,576.26 | |
| Electronic cr (0) | | + 0.00 | |
| Other credits (917) | | + 2,895,345.65 | |
| **Total credits** | | | + $6,470,921.91 |
| **Debits** Checks paid (50) | | - 735,593.67 | |
| Electronic db (7) | | - 58,064.04 | |
| Other debits (26) | | - 8,370,134.93 | |
| **Total debits** | | | - $9,163,792.64 |
| Ending balance (8/29/2014) | | | $194,584.71 |

### DEPOSITS

| Date | Description | Reference | Credits |
|---|---|---|---|
| 8-1 | Deposit | | 396,000.00 |
| 8-1 | Deposit | | 626,000.00 |
| 8-4 | Deposit | | 936,000.00 |
| 8-6 | Deposit | | 36,000.00 |
| 8-8 | Deposit | | 265,400.00 |
| 8-11 | Deposit | | 39,600.00 |
| 8-11 | Deposit | | 660,000.00 |
| 8-12 | Deposit | | 349,870.64 |
| 8-13 | Deposit | | 156,195.00 |
| 8-15 | Deposit | | 110,510.62 |

*deposits post SEC Subpoena on CNB* (handwritten annotation)

### OTHER CREDITS

| Date | Description | Reference | Credits |
|---|---|---|---|
| 8-13 | Automatic TRANSFER FROM DEPOSIT SYSTEM ACCOUNT 00022414399 | | 224.00 |
| 8-13 | Automatic TRANSFER FROM DEPOSIT SYSTEM ACCOUNT 00022414399 | | 242.50 |
| 8-13 | Automatic TRANSFER FROM DEPOSIT SYSTEM ACCOUNT 00022414399 | | 249.00 |
| 8-13 | Automatic TRANSFER FROM DEPOSIT SYSTEM ACCOUNT 00022414399 | | 280.00 |
| 8-13 | Automatic TRANSFER FROM DEPOSIT SYSTEM ACCOUNT 00022414399 | | 298.50 |
| 8-13 | Automatic TRANSFER FROM DEPOSIT SYSTEM ACCOUNT 00022414399 | | 305.00 |

**EXHIBIT 26**
**EXHIBIT A**